# EXHIBIT A

EXHIBIT A

 **CT Corporation**

**Service of Process Transmittal**
06/30/2021
CT Log Number 539827247

**TO:** Maria Bustamante, Paralegal-Litigation
United Airlines, Inc.
609 MAIN STREET, 16TH FLOOR/HSCPZ
HOUSTON, TX 77002-3167

**RE:** **Process Served in California**

**FOR:** United Airlines, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | MICHAEL AYSON, ET AL., PLTFS. vs. UNITED AIRLINES, INC., ET AL., DFTS. |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # 21STCV22789 |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, GLENDALE, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/30/2021 at 11:48 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/30/2021, Expected Purge Date: 07/05/2021 |
| | Image SOP |
| | Email Notification,  Tom Campuzano  thomas.d.campuzano@united.com |
| | Email Notification,  Maria Bustamante  maria.bustamante@united.com |
| | Email Notification,  Javaria Neagle  javaria.neagle@united.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203 |
| | 866-331-2303<br>CentralTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 1 of  1 / MS



# PROCESS SERVER DELIVERY DETAILS

**Date:**                Wed, Jun 30, 2021

**Server Name:**         Arturo Ruiz

| Entity Served | UNITED AIRLINES, INC. |
|---|---|
| Case Number | 21STCV22789 |
| Jurisdiction | CA |



SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**FILED**
Superior Court of California
County of Los Angeles

**JUN 2 3 2021**

Sherri R. Carter, Executive Officer/Clerk of Court

By _____ Deputy
Cristina Grijalva

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
UNITED AIRLINES, INC., Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MICHAEL AYSON, Additional Parties Attachment form is attached.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* Los Angeles County Superior Court 312 N. Spring Street, Los Angeles, CA 90012 | CASE NUMBER: *(Número del Caso):* 21STCV22789 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Sohaila Sagheb, Esq. 21112 Ventura Blvd., Woodland Hills, CA 91364, tel: 818-424-3545, email: sslawoffice@sbcglobal.net

| DATE: *(Fecha)* JUN 2 3 2021 | Clerk, by RISTINA GRIJALVA | , Deputy |
|---|---|---|
| | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* UNITED AIRLINES, INC.
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☒ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

**RECEIVED**

JUN 2 3 2021
Filing Window

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Ayson v. United Airlines, Inc, et al | 21STCV22789 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

NOTICE TO DEFENDANT:
DEBBIE SAUREZ AKEL, SCOTT ANDO, TERESSA BELLAZAIN, JAMES BRAUN, BEN BRENSON, JENNIFER BUCKLES, DREW DIAS, STEVE CRATON, MICHELLE GIBSON, CLADIA FLETCHER, LIZ FARFAN, KEITH HARRIS, FELISSA HAY, KERRY HENNESSY, LAVERNE JONES, MIE KATSUMATA, CHRISTINA KEMPER, KAT LOPEZ, MICHAEL LOPEZ, DANA MERRITT, MICHAEL MILES, KATHLEEN CRAIG OSAKI, KIM PAFAIA, KAREN ROLLER PENN, JULIANA PETANI, SHEILA RAMIREZ, FERNADO RODRIGUEZ, COLLEEN ROTH, ED SANFORD, R. DEAN SYLVA, SCOTT SCHUTTE, TERRY SYDORENKO, CAROLINE VIOLA, NANCY VON HUBEN, and DOES 1 to 100, inclusive,

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Ayson v. United Airlines, Inc, et al | 21STCV22789 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

[ x ] Plaintiff        [ ] Defendant        [ ] Cross-Complainant        [ ] Cross-Defendant

YOU ARE BEING SUED BY PLAINTIFF:
CHRISTINA BOWEN, DEVIN CARLSON, HANNA MICHAL FADIDA, LYNN HA, BRITNI HERBERT, CHRISTOPHER JENSEN, NATHAN NGUYEN, RONAN RATTER, YONAH SEGAL, MARC THOMPSON,

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Sohaila Sagheb, SBN 144202
Law Office of Sohaila Sagheb
21112 Ventura Blvd.
Woodland Hills, California 91364
Phone: (818) 346-3724
Fax: (818) 702-9916
sslawoffice@sbcglobal.net

FILED
Superior Court of California
County of Los Angeles

JUN 15 2021

Sherri R. Carter, Executive Officer/Clerk of Court
By_____ S. DREW _____ Deputy

Attorneys for Plaintiffs Michael Ayson, Christina Bowen, Devin Carlson, Hanna Michal
Fadida, Lynn Ha, Britni Herbert, Christopher Jensen, Nathan Nguyen, Ronan Ratter, Yonah
Segal, Marc Thompson

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| MICHAEL AYSON, CHRISTINA BOWEN, DEVIN CARLSON, HANNA MICHAL FADIDA, LYNN HA, BRITNI HERBERT, CHRISTOPHER JENSEN, NATHAN NGUYEN, RONAN RATTER, YONAH SEGAL, MARC THOMPSON, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED AIRLINES, INC., DEBBIE SAUREZ AKEL, SCOTT ANDO, TERESSA BELLAZAIN, JAMES BRAUN, BEN BRENSON, JENNIFER BUCKLES, DREW DIAS, STEVE CRATON, MICHELLE GIBSON, CLADIA FLETCHER, LIZ FARFAN, KEITH HARRIS, FELISSA HAY, KERRY HENNESSY, LAVERNE JONES, MIE KATSUMATA, CHRISTINA KEMPER, KAT LOPEZ, MICHAEL LOPEZ, DANA MERRITT, MICHAEL MILES, KATHLEEN CRAIG OSAKI, KIM PAFAIA, KAREN ROLLER PENN, JULIANA PETANI, SHEILA RAMIREZ, FERNADO RODRIGUEZ, COLLEEN | CASE NO. **21 ST CV22789** <br><br> COMPLAINT FOR: <br><br> 1) WRONGFUL TERMINATION IN BREACH OF CONTRACT; <br><br> 2) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; <br><br> 3) CIVIL HARASSMENT; <br><br> 4) INTENTIONAL MISREPREPRESENTATION; <br><br> 5) NEGLIGENT MISREPRESENTATION; <br><br> 6) INVASION OF PRIVACY; <br><br> 7) DEFAMATION; <br><br> 8) LIBEL PER SE; <br><br> 9) SLANDER PER SE; <br><br> 10) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; <br><br> 11) VIOLATION OF CALIFORNIA LABOR CODE §226 AND §1198.5 – FAILURE TO PROVIDE WAGE STATEMENTS AND PERSONNEL RECORDS; |

-1-
COMPLAINT

ROTH, ED SANFORD, R. DEAN SYLVA, SCOTT SCHUTTE, TERRY SYDORENKO, CAROLINE VIOLA, NANCY VON HUBEN, and DOES 1 to 100, inclusive,

Defendants.

| ) |
| - |

12) VIOLATION OF CALIFORNIA LABOR CODE §2802 – FAILURE TO REIMURSE BUSINESS EXPENSES

13) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – HARASSMENT

14) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – DISCRIMINATION

15) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT - RETALIATION;

16) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT - FAILURE INVESTIGATE / CORRECT

17) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – DISCRIMINATION;

18) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – HARASSMENT;

19) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – RETALIATION;

20) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – FAILURE OF INTERACTIVE PROCESS

21) VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – FAILURE TO PROVIDE REASONABLE ACCOMMODATION

22) WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

23) MANDATORY INJUNCTION;

24) VIOLATION OF BUSINESS & PROFESSIONAL CODE §17200

[UNLIMITED JURISDICTION]

COME NOW Plaintiffs Michael Ayson, Christina Bowen, Devin Carlson, Hanna Michal Fadida, Lynn Ha, Britni Herbert, Christopher Jensen, Nathan Nguyen, Ronan Ratter, Yonah Segal, Marc Thompson, and say as follows:

### GENERAL ALLEGATIONS

1. Plaintiff Michael Ayson ("Ayson") is, and at all times mentioned in the Complaint was, an individual residing in the County of Bexar, State of Texas. Ayson is a former Flight Attendant ("FA") employed by Defendant United Airlines, Inc. ("UA") based out of UA's San Francisco base of operations ("SFO").

2. Plaintiff Christina Bowen ("Bowen") is, and at all times mentioned in the Complaint was, an individual residing in the County of San Mateo, State of California. Bowen is a former FA employed by Defendant UA based out of UA's SFO.

3. Plaintiff Devin Carlson ("Carlson") is, and at all times mentioned in the Complaint was, an individual residing in the County of San Diego, State of California. Carlson is a former FA employed by Defendant UA based out of UA's SFO.

4. Plaintiff Hanna Michal Fadida ("Fadida") is, and at all times mentioned in the Complaint was, an individual residing in the County of Denver, State of Colorado. Fadida is a former FA employed by Defendant UA based out of UA's SFO.

5. Plaintiff Lynn Ha ("Ha") is, and at all times mentioned in the Complaint was, an individual residing in the County of Los Angeles, State of California. Ha is a former FA employed by Defendant UA based out of UA's SFO.

6. Plaintiff Britni Herbert ("Herbert") is, and at all times mentioned in the Complaint was, an individual residing in the County of Miami-Dade, State of Florida. Herbert is a former FA employed by Defendant UA based out of UA's SFO.

7. Plaintiff Christopher Jensen ("Jensen") is, and at all times mentioned in the Complaint was, an individual residing in the County of Salt Lake, State of Utah. Jensen is a former FA employed by Defendant UA based out of UA's SFO.

8. Plaintiff Nathan Nguyen ("Nguyen") is, and at all times mentioned in the Complaint was, an individual residing in the County of Riverside, State of California. Nguyen is a former FA employed by Defendant UA based out of UA's SFO.

9. Plaintiff Yonah Segal ("Segal") is, and at all times mentioned in the Complaint was, an individual residing in the County of Orange, State of California. Segal is a former FA employed by Defendant UA based out of UA's SFO.

10. Plaintiff Ronan Ratter ("Ratter") is, and at all times mentioned in the Complaint was, an individual residing in the County of San Mateo, State of California. Ratter is a former FA employed by Defendant UA based out of UA's SFO.

11. Plaintiff Marc Thompson ("Thompson") is, and at all times mentioned in the Complaint was, an individual residing in the County of Denver, State of Colorado. Thompson is a former FA employed by Defendant UA based out of UA's SFO.

12. Defendant United Airlines, Inc. ("UA") is a Delaware corporation which is registered to do business in and does business in the County of Los Angeles, State of California. At all relevant times UA had the duty and authority to make personnel decisions concerning Plaintiffs' work schedule, assignments, discipline and other work related issues, including authority to discipline and cause investigation. At all relevant times UA had the duty to ensure the safety and protection of Plaintiffs from discrimination, harassment, retaliation, workplace violations and the threat of violence.

13. Defendants Debbie Saurez Akel, Scott Ando, James Braun, Jennifer Buckles, Drew Dias, Steve Craton, Michelle Gibson, Cladia Fletcher, Liz Farfan, Keith Harris, Felissa Hay, Kerry Hennessy, Laverne Jones, Mie Katsumata, Christina Kemper, Kat Lopez, Michael Lopez, Dana Merritt, Michael Miles, Kathleen Craig Osaki, Kim Pafaia, Karen Roller Penn, Sheila Ramirez, Fernando Rodriguez, Ed Sanford, R. Dean Sylva, Scott Schutte, Terry Sydorenko, Caroline Viola, Nancy Von Huben, are individuals who during all times relevant to and alleged by this Complaint were employees of UA. Throughout this Complaint these Defendants are collectively referred to as the "Individual Defendants". At all times alleged by

-4-
COMPLAINT

this Complaint said Defendants engaged in wrongful conduct, including, but not limited to harassment, slander, defamation, invasion of privacy and the like of the Plaintiffs. Plaintiffs are currently unaware of the residence of any of these Defendants but allege that all said Defendants are employed and work for UA. Plaintiffs will seek leave to amend when this information is ascertained in the course of discovery. Whenever their names are individually or collectively mentioned in this Complaint, be it known that each said Defendant is sued individually and as an agent of Defendant UA who acted within the course and scope of their employment and/or in their individual capacity.

14.    Defendant Colleen Roth ("Roth") is an individual employed by UA and working from UA's SFO as the Human Resources Manager for UA. Plaintiffs are currently unaware of Roth's County of residence but will seek leave to amend when ascertained in the course of discovery. Whenever Roth's name is mentioned in this Complaint, be it known that said Defendant is sued individually and as an agent of Defendant UA who acted within the course and scope of her employment and/or in her individual capacity.

15.    Defendant Juliana Petani ("Petani") is an individual employed by UA and working from UA's SFO as a Supervisor for In Flight Services. Plaintiffs are currently unaware of Petani's County of residence but will seek leave to amend when ascertained in the course of discovery. Whenever Petani's name is mentioned in this Complaint, be it known that said Defendant is sued individually and as an agent of Defendant UA who acted within the course and scope of her employment and/or in her individual capacity.

16.    Defendant Teressa Bellazain ("Bellazain") is an individual employed by UA and working from UA's SFO as a Supervisor for In Flight Services. Plaintiffs are currently unaware of Bellazain's County of residence but will seek leave to amend when ascertained in the course of discovery. Whenever Bellazain's name is mentioned in this Complaint, be it known that said Defendant is sued individually and as an agent of Defendant UA who acted within the course and scope of her employment and/or in her individual capacity.

-5-

COMPLAINT

17.     Defendant Ben Brenson ("Brenson") is an individual employed by UA and working from UA's SFO as a Security Investigator. Plaintiffs are currently unaware of Brenson's County of residence but will seek leave to amend when ascertained in the course of discovery. Whenever Brenson's name is mentioned in this Complaint, be it known that said Defendant is sued individually and as an agent of Defendant UA who acted within the course and scope of his employment and/or in her individual capacity.

18.     Plaintiffs are ignorant of the true names and capacities of Defendants sued in this Complaint as Does 1 through 100, inclusive, and therefore sue these Defendants by these fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe and allege on this information and belief that each of the fictitiously named Defendants are negligently or otherwise responsible in some manner for the occurrences alleged in this Complaint, and that Plaintiffs' injuries and damages as alleged in this Complaint were proximately caused by that conduct.

19.     Plaintiffs are informed and believe and on this information and belief allege that at all times mentioned in this Complaint each of the Defendants was the agent or employee of each of the remaining Defendants, and in doing the things alleged in this Complaint, were acting within the course and scope of this agency and employment.

20.     Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned there existed and continues to exist a unity of interest and ownership among the Defendants such that any individuality and separateness has ceased to exist.

21.     Plaintiffs sue each corporate or entity Defendant in that capacity and such corporate entities are responsible for all acts of their employees, agents, representatives and principals as all alleged actions were done within the course and scope of their employment or agency. Plaintiffs sue individual Defendants in that capacity and allege that they took actions as agents of a corporate entity or for the benefit of themselves.

-6-
COMPLAINT

**ADMINISTRATIVE PREREQUISITES – PLAINTIFF DEVIN CARLSON**

22.     On or about December 20, 2019, Plaintiff Carlson filed timely charges of employment discrimination, harassment and retaliation with the Department of Fair Employment and Housing (DFEH) naming UA as the Respondent. On or about May 26, 2021 Plaintiff Carlson filed a timely amendment to his charges of employment discrimination, harassment and retaliation with the DFEH naming Defendants UA, the Individual Defendants, Roth and Petani as Respondents.

23.     The DFEH issued Notice of Case Closure and Right to Sue dated December 15, 2020 which is equally effective as to the amended FEHA Complaint.

24.     A true and correct copy of Plaintiff Carlson's Amended FEHA Complaint is attached hereto as **Exhibit "A"** and incorporated herein by reference.  The Notice of Case Closure and Right to Sue Letter are attached hereto as **Exhibit "B"** and incorporated herein by reference.

**ADMINISTRATIVE PREREQUISITES – PLAINTIFF MARC THOMPSON**

25.     On or about 6-8-2021, Plaintiff Thompson filed timely charges of employment discrimination, harassment and retaliation with the DFEH.

26.     The DFEH issued Notice of Case Closure and Right to Sue dated 6-8-2021.

27.     A true and correct copy of Plaintiff Thompson's FEHA Complaint is attached hereto as **Exhibit "C"** and incorporated herein by reference.  The Notice of Case Closure and Right to Sue Letter are attached hereto as **Exhibit "D"** and incorporated herein by reference.

**JURISDICTION AND VENUE**

28.     UA does business in and maintains a hub in the County of Los Angeles including at Los Angeles international Airport, Burbank (Bob Hope) international Airport.

29.     UA has been rated the third largest airline in the world by fleet size and travel routes. UA's domestic destinations include every major city in the United States.   UA's

COMPLAINT

international destinations includes cities on all continents, Africa, Asia, Europe, North America, Oceania and South America. Destinations include, but are not limited to South Africa, China, India, Iran, Israel, Japan, Malaysia, Pakistan, South Korea, Taiwan, Thailand, Belgium, France, Germany, Greece, Ireland, Italy, Netherlands, Poland, Portugal, etc.

30.     In this action Plaintiffs allege wrongful termination in breach of written agreements, violation of the statutory duty to bargain collectively and multiple statutory and common law torts all of which occurred in the State of California, in multiple locations including in the County of Los Angeles. In part, this Complaint alleges that UA wrongfully terminated the Plaintiffs to quash an internal labor dispute amongst FAs. UA breached its agreement as set forth in its Working Together Guidelines (WTG) and agreed to side with senior FAs to change and limit the terms of employment of its junior / other FAs, primarily the FAs UA absorbed in the merger with Continental Airlines ("Continental"). UA agreed with its senior pre-merger employees to change the terms of the junior or acquired Continental FAs without bargaining over the change in the terms and conditions of employment for the junior or acquired Continental FAs.[1] UA made scapegoats out of the Plaintiffs in response to growing employee unrest and dissatisfaction after United's FA merger with Continental. Employee disgruntlement stemmed nationwide and resulted in termination of FAs in at least San Francisco, Newark and Huston. In its efforts to douse the flame of internal combustion amongst senior UA employees and junior or acquired Continental FAs who were engaged in a social media war over the acquisition of international high end trip pairings UA terminated Plaintiffs as a peace offering. Instead of fixing the real problem – the adoption of Continental's liberal policy and software permitting for unlimited trip trading in place of the more restrictive former UA trip trading software – UA trampled the civil and employment rights of Plaintiffs. The social media war took place in the ether, including in or over the County of Los Angeles, State of California. UA and the Union's attempts to intervene occurred with memorandums issued electronically to thousands of

_____

[1] *Air Line Pilots Ass'n, Int'l v. UAL Corp., Int'l Ass'n of Machinists & Aerospace Workers* (7th Cir. 1989) 874 F.2d 439, 444.

COMPLAINT

employees in the air and on the ground including over Los Angeles, California.

## FACTS COMMON TO ALL CLAIMS

A.     **The Merger, CCS and Trip Trading.**

31.     Beginning October 1, 2010, UA and Continental went through a merger process that extended over a period of years. On March 31, 2013, United merged with and into Continental, with Continental continuing as the surviving corporation of the merger. Upon the closing of the merger on March 31, 2013, Continental's name was changed to United Airlines, Inc.

32.     However, FAs from the two airlines did not integrate or merge until 2018. This meant that, until 2018, scheduling of FAs was done as if they were still two separate companies.

33.     In or about mid-2018 UA merged the FA crews of the existing UA employees with new UA or former Continental employees.

34.     All Plaintiffs other than Ha and Nguyen were Continental employees. Ha and Nguyen were existing UA employee in 2018.

35.     Pre-merger, UA's Trip Trading Policy[2] among FAs was restrictive. It allowed a FA to trade trips on their schedule with another FA and once the trade was complete each FA was then obligated to work the flight they had traded. These trades were made by seniority and allotment which was $\pm2\%$ of the population of the base/domicile and by the approval of UA schedulers – at 10 am and midnight.

36.     Pre-merger, Continental's Trip Trading Policy was liberal permitting FAs to make as many trades as they wanted and which would suit their schedules. For example, Plaintiffs Fadida and Thompson both reside in Denver but worked out of UA's SFO. Their incentive in trading was often aimed at decreasing the number of times they flew to and from SFO to Denver. Continental's Trip Trading Policy allowed as many trades as the FA needed to create the monthly

---

2 Throughout this Complaint, "Trip Trading Policy" shall mean UA's provision scheduling flexibility to the FAs which allowed the FAs to change their monthly assigned schedule of flights by dropping, picking up or trading trips with another FA or through the portals established by UAs. See JCBA 7.J.1.

COMPLAINT

schedule they preferred.

37.    The new UA adopted Continental's Trip Trading Policy and permitted FAs to select their own flights and schedule. To do so, FAs access an online portal. This portal permits FAs to view and select upcoming flights (also known as "picking up" trips) from what is known as the "open market." FAs could also drop trips they did not want to work in the open market for other FAs to pick up.

38.    The ability of FAs to view and select trips is initially based on seniority. In 2010, seniority integration among FAs from United and Continental was finalized, and seniority is now supposed to be based on the original date of hire. The average years of seniority of pre-merger UA FAs is 35 years, while the average length of seniority for pre-merger Continental FAs is 14 years. Once a schedule based on seniority is given, FAs are allowed to change their schedules by trading their trips with each other. In fact, as stated by the Vice President of Labor Relations in March 2019, UA's Crew Communications Systems ("CCS") "is designed to provide you [FAs] the flexibility to trade or give it [trips pairings] to another Flight Attendant."  UA's 2018-2019 CCS is the implementation of UA's new policy and practice of liberally allowing FAs to trade flight assignments ("pairings" or "trips") by providing several way for FAs to trade trips. These include:

(1) Open pairing in the Market Que (CCS)

(2) A Direct trade between FAs

(3) Advertised pick up trade – where the FA advertises a pairing to be picked up

(4) Advertised mutually traded - where the FA advertises a pairing to be traded for another pairing

39.    The employment of all Plaintiffs with UA was subject to the Working Together Guidelines ("WTG"). As relevant herein, the WTG provide for Dignity and Respect, Honesty, Professionalism and Responsibility. As will be seen, UA terminated the Plaintiffs reciting these WTGs as the basis for the termination. UA specifically stated the basis for the termination as "fraudulent and unethical [conduct] to withhold United Airline property [trips], specifically

COMPLAINT

pairings, for your personal gain."

40.   The employment of all Plaintiffs with UA was also subject to the 2016 – 2021 Flight Attendant Agreement pursuant to a joint collective bargaining agreement ("JCBA"). The JCBA provides UA's FA are provided with unlimited trading of the trips on their schedule as follows: JCBA 7.J.1 "Flight Attendants will have unlimited trip trades with, and pick ups from, open time in their Base, and unlimited trip trades with other Flight Attendants in their Base subject to the provisions of Paragraph I. above." This Policy is referred to herein as the "Trip Trading Policy" or "Trading Policy".

41.   The practice of trading trips could and frequently did lead to changes to FAs schedules on an hourly, daily, weekly basis. As a FA's schedule or priorities changed FAs were permitted to change their flying schedules / trips accordingly. The only prohibition to the unlimited trading provided to FA was stated in the JCBA as follows: "The placement of trips on other Flight Attendant's lines to facilitate trading ("parking") is not permitted." In practice, this vague reference was ignored by all FAs. As will be seen, the individual Defendants and other FAs routinely held flights, traded only with friends, and otherwise moved trips and "placed trips on other FA's lines" to benefit themselves and their group. This was common practice not only at UA but in the airline industry generally. UA knew and condoned this practice suggesting that UA did not believe that holding trips or trading only with friends was impermissible or a violation of the "parking" provision or a violation of the WTG.

42.   There was no express or implied rule that prohibited FAs from picking up and trading flight assignments for the purpose of obtaining more preferable, profitable or favored flight assignments. Plaintiffs admit to engaging in the practice of selecting and trading flight assignments to obtain increasingly more desirable flight assignments that suited their schedules. Plaintiffs allege that all FAs, including the individual Defendants herein, engaged in this activity. Preferences included positions worked on the flight (FA01, FA02, etc.), the destinations, the accommodations at the destination, the pay rate and hours counted as working hours, and other factors personal to each FA. For example, some FAs have families and need to be home for

-11-
COMPLAINT

blocks of time, others can travel without going home for weeks at a time. Many factors went into trading trips and the key to successful trading was being on line frequently and being fast – much the same as college kids vying for seats in classrooms.

43.    Senior UA employees were less apt in the art of electronic trading than the former Continental employees (now UA employees) who had, for years, engaged with the software to achieve the trip trades they wanted or needed. This created a chasm between the senior and existing UA employees and the new UA employees / former Continental employees. As stated in one social media post by Richard Soares "I hate United for allowing the Junior flight attendants to get international flights while the 20 year veterans have to fly domestic flights! This is not fair and I will have to say to the juniors that are picking up the trips before the flight attendants that are senior to them. YOU WILL GET YOUR DAY!!!! I PROMISE!!!!!!!!" This was both threatening and harassing, an obvious infraction of the respectfulness and professionalism rules of UA's WTG. Mr. Soares was not terminated. Instead, UA made good on Mr. Soares' threats by terminating the Plaintiffs for being faster than Mr. Soares in picking up international trips from open time.

44.    As early as December 2018, social media posts reflect the growing division between senior UA FAs and their more junior counterparts from Continental. While there were many such posts, some of which were bullying and harassing, this particular exchange is important because the language of these few posts were later adopted by UA as the basis for its investigation of persons on the "Tricky Trader List". The Tricky Trader List was created and circulated by the Individual Defendants and other senior flight crew.  These posts read as follows:

45.    On December 18, 2018 Defendant Fletcher's social media post asks "plz ask them [the senior UA FAs] to not drop them in CCS [UA's Crew Communications Systems] or that cesspool of parking/reporting/trip brokering "SFO trip trades" … Instead, if they cannot find friends to pick up their trips, please ask them to put them in the 'original sfosw trip trades/drops page' Also, Kerry Hennessey is running a trip trade page. You might know her from all the work she did to stop the 'tricky trading' on our side about 10 years ago." Plaintiffs are informed and

believe that Defendants Hennessey and Hay are the creators / participants of exclusive and secretive FA trading groups such as Slack.

46.     Julie Humphreys Magowan posted her Amsterdam trip on CCS. Linda King Murphy asked "Julie have you joined friends trading with friends group". After Linda said she did not know the group existed Julie directed her "Yes it is called SFO FRIENDS TRADING WITH FRIENDS". None of the members of the SFO FRIENDS TRADING WITH FRIENDS were terminated.

47.     The paradox in these posts should be obvious. The people who were complaining that the juniors were withholding trips from CCS and therefore from them were advocating withholding trips from the juniors. What may not be as obvious is that these posts were stirring trouble and disgruntlement for the day to day working life of the Plaintiffs and others who were being singled out, ostracized or worse, harassed, accused, snicked about, rumored about being "tricky traders". Some of the Plaintiffs were harassed as they boarded flights, on flights or at various destinations. Plaintiffs were baffled. They were trading trips as they always had. The only thing that was different was that they now worked along-side the more senior UA crew.

48.     Also, social media was only venue in which the division of the workforce was evident. On nearly a daily basis, a group of senior FA's would storm UA's management's office, including HR, to repeatedly complain about Junior flight attendants taking "all" the international pairings and demanding change. The senior FAs were demanding that UA "take action". UA knew trouble was brewing within its FA crew and that they needed to do something.

49.     Instead of addressing the source of the problem, which was the adoption of Continental's rules and software for unlimited trip trading, UA undertook an "investigation" to determine some FAs were using "BOTS" to manipulate the CCS and garner more trips than could be obtained by a person engaging the software. When UA found no evidence of BOTS UA turned its attention to the alleged acts of "buying, selling or brokering trips" for money. At least as to Plaintiffs they found no such evidence. UA then creatively reinterpreted the "parking" provision of the JCBA to include "trading with friends".

50.  UA took the position with Plaintiffs that they had engaged in wrongful conduct by trading with friends, to wit, that such trades were a misuse of the information systems provided by UA. But as will become evident UA did nothing to address posts by senior UA employees limiting trades to exclusive groups. UA elected to support its senior FAs against the Continental FAs and thereby entered into a new agreement or understanding with the senior pre-existing UA FAs to the disadvantage of Continental FAs whereby pre-existing FAs could freely trade per the JCBA but the former Continental FAs were subject to new restrictions for trading velocity and who they could trade with. With the exception of Ha and Nguyen the employees UA terminated were former Continental FAs and those with whom the former Continental FAs were trading. UA left untouched the senior FAs who was doing exactly the same thing but complaining that the junior FAs could do it faster.

51.  On December 23, 2018 Doreen Regan Lundberg wrote: "I'm still wanting to know how all the jrs [juniors] keep getting Ppt (Tahiti) and the 5 and 6 day ones too."

Debbie Surez Akel responded: "right"

Luis Zavala responded: "I've heard that there is an **investigation** going on"

Oscar Colocho responded: "From your mouth to God's ears, Luis Zavala – that would be only **just and fair**!

Ann Marie Blalock responded: "Grabbing & **Parking**?

52.  Tahiti is obviously a destination location and a well paid trip for FAs. A Tahiti with a 4 or 5 day layover means that the crew who flew from SFO to Tahiti would have 4 – 5 days of recreation time, accommodations paid by the employer. The way a junior FA would get a Tahiti trip would be if a senior FA did not want to work it and traded or it was in UA's CCS and the junior FA picked it up.

-14-
COMPLAINT

B.    **UA Terminated Plaintiffs Without Cause.**

53.    Pursuant to the JCBA no FA was subject to termination without just cause and discipline of FAs was progressive.

54.    As will be seen from the details of each FA's termination the term "parking" was reinvented, redefined and reinterpreted to create a basis to terminate each Plaintiff on the grounds that they had violated the WTG for honesty, professionalism, responsibility, lack of ethics and fraud. UA took the position and interrogated Plaintiffs in reference to trading with friends. UA took the position that all trips that Plaintiffs did not want to work needed to be placed in CCS, in direct contraventions of policy and practice. The Plaintiffs were grilled at length about trading with friends and roommates as if they had violated policy in these trades. They had not. Trading with other FAs, even ones who were your friends, was not prohibited by any rule. The senior FAs who were in friend groups were not fired for trading exclusively with friends or for advocating that other senior FAs not drop trips into CCS and only trade within groups or with friends. Ha and Nguyen were targeted and fired because by trading with junior flight attendants they were traitors.

55.    On December 18, 2018 FA Keawe Kai was looking for an international trip and Debbie Miyasato asked "Do you want PVG [Shanghai] on 1/19?" Kai responded "if someone picks up my 1 day on 20th I would jump". Miyasato responded "ok I can hold for awhile for you". Kai, who could have placed her trip on the 20th into CCS and taken the Shanghai on 1/19 instead said that she would "work harder to get that trip outta there!" Neither Kai nor Miyasato were terminated for "parking" even though they were holding and trading trips for the purpose of facilitating obtaining other trips, the very definition of parking.

56.    Parking was not the basis for the terminations but parking was the subject of all of the "investigations". Sometimes parking was used by UA to mean trading with friends, other times it was moving a trip back to the FA from whom a second FA originally received the trip. It was common practice and common courtesy that if a FA took a "High End Trip" (usually the international trips) from another FA and decided not to work that trip the trip would be offered

back to the FA from whom it came. If the FA who had originally dropped the trip wanted it back it would be returned. if the original FA did not want the trip back the receiving FA would then trade it for another trip.

57.    On a date unknown to Plaintiffs a group of UA employees, including but not limited to the Individual Defendants created and circulated a "Tricky Traders List" identifying approximately 56 employees, the majority of whom were FAs absorbed from Continental by the merger. The List identified and targeted certain FAs as engaging in buying, brokering, selling High End Trips such as to Tahiti, Amsterdam, Beijing and other desirable locations. The Tricky Trader list was a source of gossip and rumor and those on the list, including the Plaintiffs were the targets of significant harassment from other FAs. The situation escalated to the point that Plaintiffs Segal and Herbert were fearful for their safety which they reported not only to UA's HR and Roth but also to airport police.

58.    On March 22nd 2019 Douglas McKeen, Senior Vice President of Labor Relations, distributed an Inflight update to all FAs stating that over the past few months, many FAs had voiced concerns about "illicit trip brokering". UA claimed it had **investigated** these concerns and was ready to take a stand against "brokering" trips, conduct UA tagged as "unethical". McKeen's letter stated that that the concern was for "selecting, trading or parking a pairing **to broker, buy or sell** it to another Flight Attendant." None of the Plaintiffs herein ever brokered, bought or sold trip pairings. UA never presented Plaintiffs with any evidence that they had brokered, bought or sold trips. McKeen's letter went on to say that UA would "fully **investigate** and take appropriate action, up to and including discharge. This is about **fairness,** …if you believe that individuals are not following rules, **please let the management team knows** so that we can address this unfairness." By this letter UA tried to quiet the roar of disgruntlement from its senior FAs who were not only making their dispute known to management but getting themselves heard through social media. Their cry: "Junior" or former Continental FAs should not continue to enjoy the unlimited trading benefits guaranteed to them by the JCBA.

59.   This communication aided and abetted the tortious speech and conduct of senior FAs at UA. It was a misleading and misinformative statement of policy and the JCBA which aided and abetted the on-going defamation and harassment of Plaintiffs by Defendants. Plaintiffs herein are ten (11) of the fifty six (56) employees identified by the Individual Defendants on the Tricky Trader List as "Tricky Traders". The Tricky Traders List was being circulated to the <5,000 FAs working at UA as well as to administrators and management such as McKeen, Roth and Petani. By McKeen's 3-22-2019 letter UA deemed Plaintiffs "Tricky Traders" giving credibility, authority and support to the Individual Defendants.

60.   Also, UA wrongfully disclosed private employment information by ensuring that during the process of its investigation FAs knew that UA was investigating, meeting with and disciplining the junior former Continental FAs on the Tricky Trader List. This is evident from Christian Wiede's social media post stating "Hi guys … I might be out of the loop on this one, but I was coming in from zrh (Zürich) and heard that letters were being sent out to all the 'tricky traders', telling them they had to attend a 'meeting' and to bring a union rep if they chose to do so …" This very specific post shows that UA disclosed to its FAs and made sure that its FAs knew, on a large scale, that the "Tricky Traders" as identified by the FAs' Tricky Trader List were being subjected to investigation - a different set of rules applicable to the senior FA traders who were trading among friends and holding trips for each other rather than putting those trips into CCS.

61.   Senior UA employees were allowed to continue with unlimited trades and not required to use CCS to drop trips they did not want to work. For example, Stacy Larson Goss, after accusing the junior UA FAs of "using bots" to get the best trips, states "Personally I'll NEVER again post a drop to CCS. It'll be friends first, then FP [Facebook] pages. If we stop posting on CCS, they won't have much to grab."  Liz Farfan stated "I agree". Luis Zavala responded "same here I always offer to my friends first". Weren't these FAs being dishonest in holding back trips from the remaining FAs? Weren't they facilitating the movement of High End Trips to their friends? If so, why weren't they terminated like the Plaintiffs? Because the

terminations were never about "parking". Plaintiffs were terminated to ease UA's fomenting labor issues after the merger. Plaintiffs were scapegoats.

62.    Furthermore, Union leadership was only half-heartedly provided to the FAs accused of being "Tricky Traders". In one post Chris Black, the Vice President of the Union, responding to another post calling Plaintiffs "Milli Mafia (Millennium)" and stating "Time to play hardball!!" called the purported "tricky traders" an "exclusive group" stating that he "cannot support" them – even though it is the Union's job to support all employees paying dues to the Union! In another post, Paul Hay, who is married to Defendant Hay, an executive of the Union stated "Devin [Carlson] there are lots of rumors of you being connected/leading a trade group with questionable ethics …", none of which was true.

63.    Also, Plaintiffs are informed and believe based on Union postings dating back to 2008 that it was the Union that coined the phrase "Tricky Traders". In a post dated December 5, 2008 the Union published: "Unlimited trades with other Flight Attendant is a contractual right we had to fight hard to achieve and it is a tool for schedule flexibility we often use." The Union's post goes on to describe situations in which a FA will trade a flight with another FA without the other FA's permission – none of the Plaintiffs were accused of any such conduct. The Union's 2008 post refers the reader to an article the Union posted called "Tricky Trading" from which, Plaintiffs are informed and believe, the term "Tricky Traders" in 2018-2019 originated. In other words, many of the Union reps were in line with Senior FAs and sympathetic to their cause. It is not a coincidence that the term used to describe the trading activity of the junior FAs is a term coined by the Union.

64.    UA took the side of its former employees in this dispute between senior and junior FAs and thereby modified the JCBA benefit of unlimited trading activity for the Junior FAs to the benefit of senior FA. UA further aided and abetted the continued isolation, harassment, retaliation and bullying against and discrimination of the junior UA employees.

-18-
COMPLAINT

**FACTS – PLAINTIFF MICHAEL AYSON**

65.    Plaintiff Ayson commenced his employment with Continental on 3-19-2007. Ayson was an excellent employee with many accolades. Ayson's reviews indicated that he met or exceeded standards in every category of performance. Ayson enjoyed his job with UA and was good at it. Ayson would not have and did not violate any rules and did not park trips. Ayons was honest, professional and responsible in this employment obligations. At the time of termination Ayson had no performance or attendance infractions.

66.    Like other FAs at UA Ayson received his monthly schedule from UA from which he was free to trade an unlimited number of times. Ayson spent a considerable amount time on CCS looking for international trips or, generally, trips that paid more than the trips that he had been assigned. Ayson was well aware of his ability drop whatever trip he had been assigned on his line at any time. In fact, Ayson could drop his entire line into CCS without question. Ayson would routinely drop a trip to obtain a better destination, a better paying trip, or for a myriad of other reasons, trade trips, particularly in open time. Ayson regularly traded with FA Miguel Cuenca. Ayson and Cuenca helped each other trade trips to maximize working hours in any given bid month. Cuenca was neither investigated nor terminated for his trading activity.

67.    Ayson is informed and believes that his name was on one or more versions of the Tricky Trader list created and circulated by the Individual Defendants.

68.    On 7-30-2019, UA issued a Letter of Investigation ("LOI") mandating that Ayson attend a meeting at the SFO Flight Operations Conference Room, on the same day, for the purpose of investigating "your trade trip trade activity from April 2019 to present." Ayson was provided no other notice of the meeting. The LOI is signed by Defendant Petani.

69.    Half an hour before the meeting, Ayson was given a document reflecting thousands of trip trades. The document meant nothing to Ayson who had never seen a similar documents and had no idea of its import. UA gave Ayson no notice as to the relevance of the document or any portion thereof to the investigatory meeting.

70.    During the meeting, it was clarified that the document was intended to reflect Ayson's trading transactions from April 2019 through June 30. During the meeting more isolated incidents of trip trading transactions were discussed.  But in real time these trades are being conducted very quickly because of fierce competition for them. Often times the details of the trip is not viewed by the FA picking it up as a valuable trip until later.

71.    During the meeting UA cited as an example of inappropriate trip trading F9AJP position FA 01 for  flights 880 and 889 between San Francisco and Beijing (PEK) departing May 16 returning May 18.  The documents reflected that Ayson picked up the flight in open time on 5-14-2019. 44 seconds later Ayson dropped the trip to Cuenca. 2.5 minutes later Cuenca dropped the trip in Open Time. This only indicates that Ayson picked up the trip and then determined that he either didn't want it, couldn't work it or had found something better. Ayson dropped the trip to his friend Cuenca because it was a High End Trip but Cuenca's scheduled couldn't accommodate it or Cuenca found a trip worth more money or to a more desirable location and dropped the trip. After Cuenca dropped the trip into open time Ayson picked up F9AJP again 8 seconds later – likely because by that time he had cleared another trip. 3 minutes later Michael Joshua Valdez picked up the trip from Ayson's line. The trip changed hands two more times before it was ultimately worked by another FA. Cuenca, Valdez and the other three FAs who touched this trip were not terminated.

72.    Ayson, who was identified as  a "Tricky Trader" by the Individual Defendants was terminated.

73.    Intentionally concealed during the investigatory meeting and later in the 8-19-2019 letter terminating Ayson's employment are the trades intermittent to the drops and picks ups of F9AJP position FA 01. As admitted by Ayson, he was trading for trips with increased value. So if he picked up F9AJP position FA 01 and immediately realized there was a more valuable trip that conflicted with it he would have dropped it to obtain the next trip which Ayson identified as more valuable to him and which fit his schedule. Furthermore, by presenting only part of the picture of the transactions surrounding F9AJP UA tried to make it appear that Ayson

COMPLAINT

has committed a "parking" infraction. But for a parking infraction to occur Ayson would have had to move F9AJP to Cuenca's line with the expectation that it would be returned to Ayson – i.e. that he was "parking" it there until he could take it back. But Cuenca moved the trip to Open time where Ayson picked it up again. This is not the definition of "parking" as recited in Ayson's termination and as reflected by the JCBA. The JCBA provides "The placement of trips on other Flight Attendant's lines to facilitate trading ("parking") is not permitted." Nowhere did UA identify a trip that was "parked" by Ayson to permit him to conduct other trading and then seek to return the parked trip to be worked by Ayson. All that UA showed was that Ayson exercised his right to unlimited trade trips. Ayson admits he used his right to unlimited trade of trips to obtain trips of increasing value than that assigned to him or in his line by UA. Ayson was well within his rights in doing so.

## FACTS – PLAINTIFF CHRISTINA BOWEN

74.     Bowen commenced her employment with Continental on 2-16-2009. Bowen was a stellar employee with many accolades. She loved her job and would not have done anything to place that job in jeopardy.

75.     Like the other Plaintiffs, Bowen was issued a LOI on 7-31-2019 and an investigatory meeting was held on the same day. Thirty (30) minutes before the meeting Bowen and her Union Rep were handed 164 page, single space, tiny print document listing thousands of trade trips and called "UA – Corporate Security Analytics", one page of velocity pairing and nine pages of International Pairing History. Contrary to the provisions of Section 23 A 2 of the JCBA Bowen was not "notified in writing of the precise charge or chares being investigated".

76.     UA provided no explanation regarding what each document was supposed to represent or show, how to read it, or what part of the many entries were pertinent to the meeting. Hence, Bowen and her Union Rep went into the meeting blind, without any real information.

77.     During the meeting, five trip pairings that occurred over a three month time period were discussed. Several misrepresentations as to each trip pairing was made by UA during the

-21-
COMPLAINT

meeting and in the subsequent letter of termination. For example, as to F6199, flight 901/900, SFO to LHR (London) leaving June 11 and returning June 13: Thompson dropped this pairing F6199 to Bowen on June 10; 1 hour 12 minutes later Bowen dropped it to FA Kelly Ciarmatori. The letter of termination misrepresents that the trade was completed 37 seconds after Bowen received it, not the actual time 1 hour and 12 minutes. There was a trade of F6199 that took 37 seconds but it was between two other FAs, neither of whom were subjected to investigation or terminated.

78. When questioned about F6199 Bowen stated that London was among her least favorite international trips and she was seeking to trade it for a more desirable location, nothing more.

79. Another example is pairing F5013, Flight 875/876, SFO-LHR which Bowen picked up through Market-Ad Pick up on June 11. When Bowen realized the trip was to London she dropped it to Carlson, who at the time was her roommate. Bowen admitted that before dropping trips back to CCS she asked her roommates or friends if they want the trip. If not, Bowen would list the trip in Ads. This is accepted practice for all FA at UA.

80. UA's letter terminating Bowen misrepresents Bowen's statement regarding this trip stating that Bowen said she "accidentally" picked it up. Bowen did not say this at all. Bowen stated that she had every intention of flying an international pairing if it worked with her personal parameters. London did not. As previously mentioned, the trades are taking place quickly and the details are often not viewed by the FAs until later.

81. FAs, including Bowen, intend to fly the trips they pick up unless they find trips that are more desirable or profitable to them. Generally, the goal is to trade up, with the intent of eventually flying a pairing with the highest hours, or a favorite destination, or flying with your friends. In real time, however, everyone is trying to get an international pairing and there is not enough time when picking up a pairing from Ads to look up the pairing destination. The goal is to grab an international trip first and then see if it fits within your particular personal preferences. Hence, there is a lot of picking up and dropping pairings back into Ads, and/or offering it to one's

-22-

COMPLAINT

flying partners.

82.    There are additional misrepresentations in the letter of termination, all of which are material to the determination of terminating Plaintiff's employment. For example as to Pairing F6904, UA states that Bowen dropped this pairing to David Kazmiersk three days after she picked it up. In fact, the data shows that the drop occurred five hours after Bowen picked up the pairing on May 20.  The Letter of Termination attributes to Bowen the statement that "you indicated that you picked up HND flight because you intended to work it, but the morning of the trip you decided not to work the trip." In reality, there was no conversation in which Bowen made the statement "decided not to work the trip the morning of". The data entry regarding that particular direct trade shows a timestamp not on the morning of May 21, but a direct trade executed on May 20, the evening before at 1800.

83.    The meeting, led by Brenson, Roth and Petani, was designed to be and was coercive and instilled fear. During the meeting Brenson demeaned Bowen stating "You have a pattern of liking to go to Sydney, but, not going to Sydney" implying that Bowen parks trips to Sydney, which were not the trips selected for discussion during the meeting. Bowen explained that her parameters change regularly and that she has favorite places, hotels and people she prefers to fly with. However it appeared clear during the meeting that UA had made up its mind to terminate Bowen and was uninterested in any explanation by Bowen. To wit, UA was uninterested in whether there was cause to terminate this long time and exceptional employee.

84.    The Termination Letter's entry regarding F5017 states that UA took the position that Bowen had "parked the trip to facilitate a trade between two other Flight Attendants". There was no discussion at all during the meeting regarding a facilitated trade of a TPE trip (pairing number was not provided). It appears that UA, realizing it had no basis to terminate Bowen, added this as an afterthought. The same letter states Defendant Petani gave Bowen a verbal directive not to change her schedule.  This is untrue. Petani did not give Bowen any such directive.

-23-

COMPLAINT

85.    Bowen, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

86.    On more than one occasion Bowen or the Union requested that UA's Corporate Security provide the same raw data they used to create UA's "analytics" from which UA's accusations of Bowen's alleged wrongful conduct stemmed. The word "analytics" means the systematic computation analysis of data or statistics or information resulting from systematic analysis of data or statistics. Plaintiff Bowen was not given raw data. To this day Plaintiff Bowen has not been provided a straight forward list of her trip trades.

87.    By letter on 8-20-2019 Plaintiff Bowen was terminated based on opinion, conjecture and without cause.

88.    By email on 9-9-2019 Bowen requested copies of (i) All of my trip trades for the year of 2019 (ii) All of my master schedules for 2019 and (iii) an itemized receipt with deduction for my final paycheck. In violation of California law UA refused to provide any of this information or documents to Bowen.

89.    The malice towards Bowen is evident not only in the termination without cause and the misrepresentations but in UA's post-termination invasion of Plaintiff's right to privacy by disclosure of her employment information. UA, without any reason to do so, publicly posted on CCS that five employees, including Bowen, Fadida and Nguyen were taken off the organization's chart *because they had been terminated*, not merely because they had separated from UA.

### FACTS – PLAINTIFF DEVIN CARLSON

90.    Plaintiff Carlson was hired by Continental on 04/27/2015.

91.    Plaintiff Carlson was a premier FA who tended to the needs of every passenger. Customer surveys regarding Carlson's efforts as exemplary were ample and stated such things as "he was discreetly attentive to me in my special circumstances … His eye contact and quiet communication smile transformed a potentially unhappy experience into a very pleasant one. I

-24-
COMPLAINT

am grateful." Plaintiff Carlson received accolades from In-Flight supervisors who recognized his team effort in dealing with emergencies on flight 728 on 11/15/2015 and in service on flight 8893 on 10/27/2016.

92.    Plaintiff Carlson had no performance issues and no write ups.

93.    UA's WTG provides that "United Airlines is committed to providing a work environment that is free from acts and/or *threats of violence*. We recognize that our employees face some significant challenges every day when they report to work, but dealing with threatened physical violence should not be one of them. United Airlines *will not tolerate* any form of violence and/or *threat of violence in our workplaces* or to employees as they performed their work duties. We believe that all employees have a *basic right to be safe and secure in the workplace*. The Company will not tolerate any behavior which endangers the safety of its employees or customers." As described herein, UA failed to implement this policy as it pertained to Plaintiff Carlson.

A.    <u>**Threatening Letters and Unsafe Workplace.**</u>

94.    On 2-19-2019 Plaintiff Carlson found the first of four handwritten anonymous letters in his company mailbox. In part, this first letter stated "DEVIN - THE GAMES YOU PLAY WITH A TRIP TRADING ARE ABSOLUTELY DISGUSTING AND IN VIOLATION OF SENIORITY … *YOUR DAYS ARE NUMBERED* … YOU AND YOUR FRIENDS ARE ON THE MOST HATED LIST – THE COMPANY KNOWS … WE'LL SEE WHO GETS THE LAST LAUGH! YOU ARE A SCAM ARTIST … YOU DISGUST ALL OF US …YOU ARE A VERY HATED JUNIOR MAN – *WATCH YOUR BACK*". (All capital letters in the original).

95.    On 3-25-2019, three days after McKeen issued the company wide memo stating that UA had investigated "brokering, buying and selling" international pairings, Carlson met with Defendant Roth to discuss the first anonymous letter. Roth assured Carlson that an investigation would be started to determine the identity of the person who left the note. Carlson is informed and believes no such investigation was mounted, that corporate security disregarded the threatening note to Plaintiff, took no action such as monitoring in the area of the mailboxes where

the note was left and destroyed the video evidence reflecting the image of the person who left the first and every successive note.

96.    On 4-10-2019 Carlson received a second anonymous handwritten letter in his company mailbox. The handwriting on the second letter matched the first letter. In part the second letter author demanded "LEAVE SFO BEFORE YOU GET FIRED OR THROWN OUT – I HEAR THE PRIVATE INVESTIGATIVE TEAM HAS YOU #1 ON THE LIST OF MAFIA SUSPECTS?? THE HAMMER'S COMING DOWN BE -BEWARE."

97.    As with the first, Carlson delivered the second letter to Defendant Roth requesting that he be protected from the ongoing harassment of the letters. But it was not only the letters that Carlson was reporting to Roth. Carlson also made complaints regarding the harassing, inappropriate, bullying conduct of which he was a victim through the social media posts of his colleagues, other FAs at UA. Specifically, on 4-18-2019, based on social media posts, Carlson provided Roth the names of FAs Debbie Suarez Akel and Sheila Connors Ramirez as potential authors of the first two letters.

98.    Carlson had reason to suspect both Akel and Ramirez who were posting angry messages on UA's social media sites. For example, on or about 5-21-2019 Akel complained "It's been 5 months since the merger. ENOUGH" and "There's more intl flying and I'm more senior since the merger and there's nada intl trips" to which FA Dana Merritt responded "What's going on is totally wrong and **unethical** …we need to get the Mafia members names out there .. it's just a matter of time [thumbs down emoji]!! … *Start that list now*."

99.    On 4-19-2019, realizing that he hadn't heard back from Roth regarding any type of investigation or the results thereof, Carlson again reached out to Roth requesting information regarding the investigation and stating "I'm having a difficult time coming to work, because of all the stress and anxiety. I don't know if the severity of the note is being examined here, correctly. I am dropping trips left and right because of the impact the notes left on me is making it hard for me to want to work,  …for me to be threatened at my place of work in a secured area of the airport should have never happened. At this point to no resolve, almost a month later I'm

worried nothing will come of the investigation." Of course, what Carlson did not know at the time was that UA and his Union were investigating him, not the FAs leaving him threatening notes. Plaintiff is informed and believes that Defendants Roth and Petani were part of or supported the senior FAs who had created and were disseminating the Tricky Trader List.

100.    UA and Roth failed to respond to Plaintiff Carlson's inquiry.

101.    In the meantime Carlson was falsely accused and reported by vying FAs of having "emptied 2 entire mini bins [alcohol] for their Tahiti layover". This false and slanderous accusation was party of the harassment. As a result of this rumor Carlson received a call from the Union inquiring as to whether he was an alcoholic, which he is not. Nor is Carlson a thief. Carlson did not take anything out of the airplane for personal use or otherwise.

102.    Plaintiff Carlson was called a thief, the derogatory and defamatory nature of which need not be explained.

103.    One FA wrote "Devin Carlson the cheating trading mafia leader". Again, the derogatory and defamatory nature of being in the "mafia" need not be explained.

104.    On 4-24-2019 Carlson received a third threatening anonymous letter in his company mailbox, matching the handwriting of the previous two letters. This letter demanded to know "WHEN THE FUCK ARE YOU GONNA GO AWAY?" Plaintiff Carlson dropped off this note at Roth's office with a note asking "what is the company doing to protect me? Are they trying to figure out who did this?"

105.    On 4-25-2019, Carlson received a text message from Roth essentially stating that "the investigation" was going to take more time. She did not state exactly what or whom they were investigating.

106.    On or about 5-13-2019 Carlson became aware of the dissemination of the Tricky Trader List and that his name appeared in bold multiple times on this two page list. At some point later Carlson also learned that his name appeared on a short "Asshole List" also being disseminated by FAs.

-27-
COMPLAINT

107. Carlson, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

108. On 5-14-2019 Plaintiff Carlson found a fourth anonymous letter in his company mailbox, handwriting matching the previous 3 letters. Again Carlson submitted this letter to Roth in HR with a text message stating that he did not feel safe at work. The content of the fourth letter was particularly egregious calling Carlson "A LITTLE BOY" and "HEARD YOU WENT SCREAMING LIKE A LITTLE GIRL TO A SUPERVISOR FOR 'PROTECTION' THE LAST LETTER YOU GOT. TIME TO MOVE ALONG LITTLE BOY!!" The letter also made it clear that Carlson should be very careful of where he parks his car. How would this stalker know that Carlson had reported the letters to HR except for the fact that HR was either behind the letters, or knew who was leaving the letters and had told them that Carlson had reported the incidents to HR.

109. Nor were the letters the only way that the FAs let Carlson know that he was a target. On a UA social media post Kathy Clements wrote "Devin Carlson you do know that most of us know your name by now?"

110. Defendant McGee told FAs to "spread the word" about Carlson being on the list of junior Mafia.

111. At the same time, other FAs were promoting trading groups and asking for particular destinations, none of whom were designated as part of the "Mafia". For example when Roger Fadrsaer posted that he was looking for a London trip on certain days in July, Julie Humphreys Magowan responded "have you joined the other united trading groups as well? Lots of options out there to put the word out!" to which Jona Magadan responded "can U add me to the other groups [many emojis]."

112. Carlson is friends with FA Morgan Guist to whom he had lent $50.00 at the Disney store. On 6-17-2019 Morgan went on to Carlson's Venmo account and paid him back $50.00. Sometime later at the end of July or beginning of August Plaintiff Carlson noticed that "Minori Tanaka, Juliana Petani" "liked [with the use of a heart emoji]" this Venmo payment.

This payment was again "liked" by "Minori Tanaka, JP PJ [Juliana Petani's initials forward and backward], then again by "JP PJ @Mademoiselle_pj".

113.    Although at the time Carlson did not know who Juliana Petani was, this strange sequence of "likes" for a minor payment by one of his friends from somebody he did not know felt strange and harassing. When Carlson investigated he learned that Petani was a supervisor at UA. Carlson believed Petani might have something to do with the letters.

114.    On 8-1-2019 Carlson sent an email to Roth explaining that Petani, whom Carlson did not know but discovered was a UA supervisor, was harassing him online. Still in the dark as to the real purpose of the investigation, Carlson's email to Roth states his fear that "I am being targeted by a supervisor [Petani] with whom I have never interacted".

115.    Roth failed to respond to this email. However, and suspiciously, on 8-3-2019 Petani blocked Carlson from her Venmo account. In the meantime, during Carlson's own investigation of Petani, it becoming increasingly clear that UA was not going to do anything about the continued harassment, Carlson took some screenshots of Petani's Venmo account showing that Petani was receiving payment from other FAs with emojis that UA / McKeen had identified as meaning payment of money for trips. For example, on December 21, 2018, Roland Guti paid Petani with a speech balloon, a heart and a rabbit. Paula Leslie-Ann Brown paid Petani on December 20, 2018 with the words "Hong Kong", a world emoji, a heart and a speech balloon, and Daniel Rodriguez charged Petani for "Chinese prostitution" with the world emoji, two hearts and a speech balloon. All of this was transmitted to Roth who had no comment.

116.    In an email on 8-2-2019 Plaintiff Carlson reiterated that he was "distress[ed] that nothing is being done to help protect me in the workplace." Plaintiff Carlson also made clear that the letters appeared to him as harassment and discrimination based on sexual preference, homosexuality. Plaintiff Carlson reported to Roth that when he picked up his vehicle the tires all had low air seeming to indicate they had been tampered with.

117.    The reference to Plaintiff Carlson's sexuality is not limited to the anonymous letters. For example, when Zach Ketchum posted that he was traveling to Singapore from SFO,

Rhonda Short Brown responded "Devin is treating you good". Mr. Ketchum's sexuality is unknown but the post implies that Carlson and Ketchum know each other and that Ketchum's trip is tied directly to favoritism from Carlson, which was not the case.

### B. UA's Misrepresentations During Pretextual and Discriminatory Termination

118.    UA cited dishonesty, lack of professionalism and responsibility and unethical and fraudulent conduct, including parking related to trip trades as the basis for Claimant's termination. This was pretext.

119.    On 9-12-2019 UA hand-delivered to Plaintiff Carlson a letter stating that a meeting would be conducted on the same day at 08:30 at the SFO Flight Operations Conference Room which required his attendance. It was indicated the purpose of the meeting was to "investigate your trip trade activity from April 2019 to present." No other warning was provided.

120.    About 30 minutes before the start of the meeting, voluminous papers were handed to Plaintiff Carlson. UA's representatives stated that the documents reflected Carlson's trip trades. But the way the data was arranged made no sense and could not be correlated or understood in the half hour before the meeting. In fact, the documents did not reflect raw data and were not organized in any fashion. According to the heading of the document this information was "United Airlines – Corporate Security Analytics, 2019 Flight Attendant Trip Trading, All Pairing History, 4/1/19 – 6/30/19".

121.    The word "analytics" means the systematic computation analysis of data or statistics or information resulting from systematic analysis of data or statistics. As such, Carlson was not given raw data – perhaps a document that merely showed all of his trades (and no one else's) instead of analysis or how UA had chosen to interpret raw data. To this day Plaintiff Carlson has not been provided a straight forward list of his trips.

122.    Both the presentation at the meeting as well as the 10-14-2019 Termination Decision significantly omit or rearrange data to make trip trades appear as if they are "parking" when in fact they are trades for which Carlson always had the consent of the other FA with whom he was trading (otherwise he could not have traded with that other person) and were trades made

with an intent to work the trip. By way of example not limitation, UA presented the pairing F9XIA – position FA01 for flights 968 and 969 from SFO to AMS (Amsterdam) departing April 20th and returning April 22nd. UA evaluated the trade of this trip as "parking" because Plaintiff Carlson took the trip from FA Pamela Goynes and 13 hours and 51 minutes later dropped the trip back onto Goynes' line. Carlson still ended up working the trip but because the trip went back and forth from Goynes to Carlson, from Carlson to Goynes and then back to Carlson UA concluded that Carlson must've been parking to facilitate other trades. Not at all true. What was not reflected in the "analytics" is the fact that Carlson was trying to figure out whether the accommodations during the trip would be downtown Amsterdam or in Hague, a City about an hour away. When Carlson thought the accommodations would be in Hague he decided he wanted to wait for another trip where he would be staying downtown. But then he spoke to Goynes who told him his information was incorrect and that the accommodations would be in City Central. Plaintiff Carlson then took the trip back and worked the trip. There was no "parking" whatsoever and Plaintiff tried to explain this to UA's interrogators who were unwilling to listen because UA's real agenda was to terminate Carlson based on his sexuality for which he was "hated" by the other FAs.

123.     The irony as to the Amsterdam trip is that not only did Carlson work the trip, get fired even though he worked the trip but after having worked the trip Carlson had to suffer social media shaming about being "lucky" and "fast fingered" in obtaining the trip. In this particular case, neither was true. Carlson had received the trip from Goynes[3], gave it back to her when he thought he couldn't work it and then when he didn't like the accommodations. When those issues cleared up Carlson took and worked the trip. It should also be noted that the FAs were not watching their electronic footprint. They had been told and understood that they had an unlimited number of trades. There was no reason to be concerned with the frequency or velocity of trades, whether they went back and forth between FAs, were acquired or dropped into open time or

---

[3] Plaintiffs are informed and believe that Goynes was significantly harassed by UA into giving a "confession" and turning in her colleagues as to trip trading. As the evidence will show, UA wrongfully detained Goynes who was ill and in bereavement at the time the statement was given, who was denied food and water despite request for same and would have signed anything to be released from detention.

-31-

COMPLAINT

advertising. This was the normal trading pattern for many FAs and despite many years employment at Continental none of these FAs had been advised that they were violating any rule by their trading patterns.

124. In response to harassing social media posts mocking Carlson for having obtained the Amsterdam trip Carlson remained calm stating: "Oscar Colocho hi! Yes, the hotel I had on my AMS trip was lovely … One thing I am curious about, we are not friends on FB, nor are we in any capacity, friends. How did you know what hotel I stayed at on my layover, and why are you mentioning my name in any capacity on a Facebook thread. I find that quite disturbing."

125. In violation of the FEHA, UA never investigated Carlson's complaints regarding hate mail based on Carlson's sexuality or ever tried to correct the continued harassment of Carlson.

126. In violation of the WTG and OSHA rules based on the Code of Federal Regulations UA failed to provide Plaintiff with a safe workplace, thereby causing Plaintiff significant stress and anxiety.

## FACTS – PLAINTIFF HANNA MICHAL FADIDA

127. Plaintiff Fadida was hired by Continental on 05-16-2000.

128. Plaintiff Fadida was not only an excellent FA but a Speaker FA, being bi-lingual, English and Hebrew. In order to maintain her standing as a Speaker FA, Fadida must fly a certain number of hours on trips that require Hebrew speakers. Thereby Fadida's ability to trade trips is more limited than the remaining FAs, except for Ratter who was also a Speaker FA (French-English).

129. Plaintiff Fadida was a long time employee with outstanding reviews and no performance issues.

130. On 7-31-2019 UA hand-delivered a letter to Fadida notifying her of an investigatory meeting on the same day, 7-31-2019 at 1:30 PM at the SFO Flight Operations Conference Room "to investigate your trip trade activity from April 2019 to the present." Fadida

appeared for the meeting where she was handed documents similar to those described as to Ayson, Bowen and Carlson – a document purporting to be analytics regarding trip trades. The document was not understandable in the thirty or so minutes Fadida was given to consider it. In the personal statement UA mandated Fadida provide she stated that she never parked trips, or traded trips without any intent to work them; and that she has never received any compensation of any form from anyone in regard to trips. Fadida stated that her job is important to her and she would not risk it on improper trading activity. Present at the meeting was Fadida, Union representatives Kelly Norton and Diane Tucker, Corporate Security Manager Brenson, Human Resources Manager Colleen Roth and Supervisor, In-Flight Services, Petani.

131.    Again, UA's presentation was plagued by omissions of raw data and misrepresentations of pairing and trading activity.

132.    Fadida, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

133.    On 8-19-2019 UA issued Fadida a Separation Notice indicating that she had been terminated for substandard job performance and was not eligible for rehire. However Fadida's performance records showed no problems or issues.

134.    On 8-20-2019 Petani emailed Fadida the letter of termination stating that Fadida was being terminated for dishonesty, lack of responsibility, lack of professionalism, fraudulent and unethical conduct for personal gain related to trip trading and parking. The same letter states that on 8-31-2019 Petani gave Fadida a verbal directive not to change her schedule. Petani did not give Fadida any such directive. UA later amended the date of the directive to 7-31-2019 but again, Fadida denies receipt of any such demand.

135.    UA's termination of Fadida was without cause. Fadida's trip patterns were intended to create consecutive day trips to limit her commute between Denver and SFO and to maintain her Speaker position. Fadida is limited in her trading ability because her language base is approximately 40 FAs who must satisfy minimum required Speaker trip pairings. Her trading is consistent with policy, practice and the flexible and unlimited trading conducted through the

COMPLAINT

system.

136.    The malice towards Fadida is evident not only in the termination without cause and the misrepresentations but in UA's post-termination invasion of Plaintiff's right to privacy by disclosure of her employment information. UA, without any reason to do so, publicly posted on CCS that five employees, including Bowen, Fadida and Nguyen were taken off the organization's chart *because they had been terminated*, not merely because they have separated from UA.

## FACTS – PLAINTIFF LYNN HA

137.    Plaintiff Ha was hired by UA in 1996.

138.    For 23 years, Ha was a loyal and dedicated FA. She had an excellent employment record with consistently good job performance reviews. In all significant respects Ha was a model employee.

139.    While based out of Hong Kong in 2008-2009, Ha fell victim to multiple instances of sexual assault and harassment at the hands of other United employees. Despite complaints, UA did nothing to address these issues which resulted in Ha transferring to protect herself.

140.    In January 2019, Ha filed a written complaint reporting harassment, this time with supervisor Dessa Rosamonta. Plaintiff Ha complained that other FAs had accused her of videotaping a FA stealing UA's property. This demonstrably false accusation led to persistent ridicule, shaming and bullying of Ha by her fellow employees. UA's response was to ignore Ha's complaint but not without explicitly threatening her that she could be terminated if she shares her story with anyone inside or outside UA.

141.    In July 2019 Ha filed another written complaint of harassment, to yet another UA manager, John Wolfe. This complaint addressed Ha's unwarranted inclusion on the Tricky Trader List that FAs were widely disseminating. As a result of her inclusion on that list, Ha again suffered bullying and mistreatment by UA employees. This harassment included a physical threat to Ha. As with her prior complaints, Ha's complaint was ignored by UA. UA did nothing in

-34-
COMPLAINT

response except decide to terminate Ha in retaliation for her right to report harassment in the workplace. Ha's termination for alleged "tricky trades" was pre-textual. Ha was terminated in retaliation for reporting verbal and physical abuse and harassment in UA's workplace.

142.    On 8-1-2019 UA hand-delivered the LOI to Ha notifying her of an investigatory meeting on the same day, 8-1-2019 at 10:30 am at the SFO Flight Operations Conference Room "to investigate your trip trade activity from April 2019 to the present." Ha appeared for the meeting where she was handed documents similar to those described as to Ayson, Bowen, Carlson and Fadida – a document purporting to be analytics regarding trip trades. The document was not understandable in the thirty or so minutes she was given to consider it. In the personal statement UA mandated Ha provide, Ha pointed out that UA allows unlimited trading, that she acted well within her rights to trade trips, and that UA's "investigation" must be done as to all individuals who trade, not only the people on the Tricky Trader List because all FAs trade with friends, in groups and in all the other ways allowed.

143.    Ha, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

144.    Ha pointed out to no avail that FAs rely on social media for networking and for trading. UA knows of this practice and has not indicated that this practice is unacceptable or discouraged the use of social media for this purpose. These sites include but are not limited to the SFO I trade board, SFO trades, Slack, Telegraph, and other small groups of friends who trade through electronic communication. They can be regional groups, groups based "ori like flying", "1-day trips", or more directly when friends want to help friends. Such groups exist in SFO and across the entire system. If using these resources is against the WTG, UA should have notified its FAs in writing of these restrictions. Otherwise holding a small group of individuals responsible and subsequently terminating them is harassing, discriminatory and in Ha's case in retaliation for her complaints.

145.    The malice towards Ha, who was trading with junior FA formerly with Continental, is evident not only in the termination without cause and the misrepresentations but

-35-
COMPLAINT

in UA's post-termination invasion of Plaintiff's right to privacy by ensuring that Ha's crew members learned of her termination shortly before take-off. Ha had been terminated and Petani purposely left Ha in the scheduled flight (Ha no longer had access) so that UA could disclose Ha absence from the crew was due to her termination.

## FACTS – PLAINTIFF BRITNI HERBERT

146.   Plaintiff Herbert was hired by Continental on 12-7-2015.

147.   Herbert loves being a FA and takes pride in her work. Herbert goes above and beyond and is an example of the model values of the worth ethic. Herbert is loyal, dependable and honest and would never jeopardize her career over a few international trips.

148.   Herbert, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

149.   Herbert complained to Roth about being targeted by the Tricky Trader List. Herbert told Roth that "the list was circling around social media and that the company has known about this list for a while." Herbert called Roth's attention to "United's strict anti-bullying policy" stating that she was ashamed and appalled at the lack of action by UA to stop the dissemination of this defamatory and bullying material. Roth's response to Herbert's Complaint was generic and directed Herbert to another circular by McKeen. Interestingly Roth denied knowledge of the Tricky Trader List, a blatant misrepresentation in the handling of Herbert's complaint. Feeling unsafe and unprotected by UA, Herbert filed a complaint with airport police.

150.   On 8-16-2019 UA hand-delivered the LOI to Herbert notifying her of an investigatory meeting on the same day, 8-16-2019 at the SFO Flight Operations Conference Room "to investigate your trip trade activity from April 2019 to the present." Herbert appeared for the meeting where she was handed documents similar to those described as to Ayson, Bowen Carlson, Fadida and Ha – a document purporting to be analytics regarding trip trades. The document was not understandable in the thirty or so minutes she was given to consider it. In the personal statement UA mandated of Herbert she denied ever being a part of illicit trip brokering.

-36-
COMPLAINT

151.    During the meeting Herbert was asked the details of trading eight specific trips over the course of four months.  Herbert explained the trades to the best of her recollection stating that with each trade she has an intention to work the flight unless she found and could trade for a flight more suited to her preferences and schedule – which is the point of providing the FAs with unlimited trading.

152.    UA probed three of Herbert's Venmo account transactions.  Herbert explained that one transaction was for purchase of furniture, a second transaction was for dinner bought by a FA in Hong Kong and the third was dinner from a non-FA back home. Herbert declared that she has never bought, sold or parked trips. UA was unable to show otherwise.

153.    Nonetheless, Herbert was terminated by letter dated 8-28-2019 for the same alleged offenses as the remaining FAs, to wit, lack of honesty, responsibility and professionalism. All of these infractions, according to UA, stemmed from the fact that Herbert traded too often, too quickly, not quickly enough; that while she dropped one trip she picked up another and continued to trade until she landed on a trip she wanted to work. This activity is permitted by the JCBA.

## FACTS – PLAINTIFF CHRISTOPHER JENSEN

154.    Plaintiff Jensen was hired by Continental on 5-5-2012.

155.    Jensen was devoted to his work as a FA and to his employer. Jensen had no reason to endanger his career over a few international trips.

156.    Jensen, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

157.    On 7-31-2019 UA hand-delivered the LOI to Jensen notifying him of an investigatory meeting on the same day at the SFO Flight Operations Conference Room "to investigate your trip trade activity." Jensen appeared for the meeting where he was handed documents similar to those described as to Ayson, Bowen Carlson, Fadida, Ha and Herbert – a document purporting to be analytics regarding trip trades. The document was not understandable in the thirty or so minutes she was given to consider it. In the personal statement UA mandated

of Herbert she denied ever being a part of illicit trip brokering.

158.    During the meeting Jensen was asked the details of trading several specific trips over the course of four months.   Jensen explained the trades to the best of his recollection stating that with each trade he has an intention to work the flight. Sometimes he traded with friends he knew enjoyed certain locations. For instance Jensen was asked about pairing F6919, position FA01 for lights 857 and 858 round trip SFO – PBG (Shanghai). Jensen knew that Hunt liked this trip and since he wasn't going to work it or had located something else that he preferred more he gave it Hunt. When Hunt didn't want it and returned to Jensen he dropped the trip on Leslie Allison's line. The trip was traded two more times before another Flight Attendant ultimately flew the trip. Jensen explained there was nothing unusual about this trade. Jensen was trading other flights at or about the same time he was trading F6919. He had no "parked" it. Again, parking suggests that the FA wants to work the trip but needs to move it off of his line to facilitate other trades. Jensen did not end up working his trip. He had not parked it to enable him to move other trips and return to work this trip.

159.    Jensen's termination letter states that at the meeting "Corporate Security presented you with specific trade transactions showing that you placed trips on another Flight Attendant's line ("parking") to benefit yourself or a fellow Flight Attendant." First, this is not the definition of parking. Second, all of Jensen's trades were intended to benefit him and his schedule. Otherwise Jensen would not have engaged in the trade.

160.    Jensen was terminated by letter dated 8-20-2019 for the same alleged offenses as the remaining FAs, to wit, lack of honesty, responsibility and professionalism. All of these infractions, according to UA, stemmed from the fact that Jensen traded too often, too quickly, not quickly enough; that while he dropped one trip he picked up another and continued to trade until he landed on a trip he wanted to work. This activity is permitted by the JCBA.

-38-
COMPLAINT

## FACTS – PLAINTIFF NATHAN NGUYEN

161.    Plaintiff Nguyen commenced his employment with UA on 5-1-1999.

162.    Nguyen was an excellent employee with an appreciation for customer care and a devotion to job duties and responsibilities. Nguyen loved his job and would not have done anything to place that job in jeopardy.

163.    Like the other Plaintiffs, Nguyen was issued a LOI on 7-31-2019 and an investigatory meeting was held on the same day. Unlike the other Plaintiffs Nguyen did not receive any documents before the meeting.

164.    During the meeting, Nguyen was accused of facilitating trips by parking them on the lines of other FAs. But none of the other FAs identified in Nguyen's Letter of Termination were investigated or terminated for the alleged parking of trips stemming from Nguyen.

165.    In fact, all that Nguyen's trip trades show that he trades consistently with a group of friends; that he trades to accommodate his own schedule; that he does not facilitate or otherwise interfere with the trip lines of other FAs and that if the trip trades of most other FAs were evaluated it would show the same or similar activity as reflected by Nguyen's trip trades.

166.    The meeting was designed to be coercive and to instill fear. It was clear during the meeting that UA had made up its mind to terminate Nguyen based on the two trips traded with Carlson and UA was uninterested in any explanation by Nguyen.

167.    On multiple occasions Nguyen or the Union requested that UA's Corporate Security provide the same raw data they used to create UA's "analytics" from which UA's accusations of Nguyen's alleged wrongful conduct stemmed. The word "analytics" means the systematic computation analysis of data or statistics or information resulting from systematic analysis of data or statistics. Nguyen was not given raw data. To this day Nguyen has not been provided a straight forward list of her trip trades.

168.    By letter on 8-20-2019 Nguyen was terminated based on opinion, conjecture and without cause.

-39-
COMPLAINT

169. By emails over the course of three months Nguyen attempted to obtain wage statements and an itemized receipt with deductions for his final paycheck. In violation of California law UA initially refused to provide this information and provided same only after threat of being reported to government agencies.

170. The malice towards Nguyen is evident not only in the termination without cause and the intentional misclassification of ordinary trading activity as "parking" but in UA's post-termination invasion of Plaintiff's right to privacy by disclosure of his employment information. UA, without any reason to do so, publicly posted on CCS that five employees, including Bowen, Fadida and Nguyen were terminated (TRM) and taken off the organization's charge. Other FAs saw and understood UA's posting as is evidenced by FAs who called and texted Nguyen to ask about his termination as was published on CCS.

## FACTS – PLAINTIFF RONAN RATTER

171. Plaintiff Ratter commenced his employment with Continental in 11-30-2015. Ratter is a dedicated employee to UA who worked a lot of hours because he wanted to. Ratter kept a suitcase always packed for last minute trips other FAs could not make. His reviews showed that he met or exceeded expectations in every category. Like the other FAs Ratter loved his job and would not have done anything to place that job in jeopardy.

172. Like the other Plaintiffs, Ratter was issued a LOI on 8-15-2019 and an investigatory meeting was held on the same day. Thirty (30) minutes before the meeting Ratter and his Union Rep were handed approximately 200 pages of what appeared to be flights and trip trades. The document's print was tiny with dozens of flights / trades reflected on each page. Ratter was not told how the documents were relevant to the meeting. The document was called "UA – Corporate Security Analytics". Contrary to the provisions of Section 23 A 2 of the JCBA Ratter was not "notified in writing of the precise charge or chares being investigated".

173. The meeting was designed to be coercive and to instill fear. It was clear during the meeting that UA had made up its mind to terminate Ratter based on the Tricky Trader List

and was uninterested in any explanation by Ratter.

174.    Ratter, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

175.    During the meeting, pairing F5015, position FA01 for flights 990 and 984 from SFO to CDG (Paris) was presented as a pick up by Ratter from FA Poovalat, picked up by Carlson two days later and then put back onto Ratter's line. Ratter explained that he was from Paris, he wanted to go to Paris that month, Carlson who was his roommate had picked it up from his line and he had likely asked for it back. Ratter, who like Fadida is a Speaker FA, needs to fly a certain number of hours on flights with French speaking customers. Ratter's explanation was disregarded.

176.    Another pairing, F5017, position FA03 for flights 891 and 890 from SFO – PVG (Shanghai) was discussed and it was pointed out that the trips was awarded to FA Ackerman, picked up by FA Kondos, dropped by Kondos into Ratter's line, Ratter dropped the trip to FA Balangitao, then Balangitao dropped the trip back to Ratter, who gave the trip to FA Boitel. Missing from UA's analysis is the fact that Ratter did not work either the F5017 pairing or another pairing being traded in the same time frame (SFO-LHR). If Ratter were parking either of these pairings it would only stand to reason that Ratter wanted to work one or the other, couldn't work both and thus was "parking" one of them. But Ratter did not work either trip. These trades were merely the trades from this time period. Any string of trades occurring in the same basic time period can be correlated to suggest a meaning. But the limited data UA chose to disclose only shows unlimited trades, which Ronan had a right to.

177.    On 1-23-2020 the Union sent out a "Statement on Company Action to Restrict BOT Usage". The content of the message was that UA has knowledge of FAs using BOTS when the trading window opens to capture large numbers of trips. UA claimed that it knew BOTs were being used and that "those individuals whose activity appears to be 'BOT-like' in nature, will be locked out of the computer for a period of time and will be required to call the help desk … to have their sign-on unlocked." None of the Plaintiffs were ever locked out of the computer or had

their usage affected. None of the Plaintiffs used BOTs to obtain trips from CCS. During his meeting Ratter was accused of BOT-like activity but explained that he was familiar with the system, the number of clicks over about an hour could be in the thousands because there was competition for the High End Trips and being diligent and being fast was necessary to obtaining a profitable and full schedule. Again, UA's speculations were used to falsely accuse Plaintiff Ratter of wrong doing, in this case of using BOTs to obtain trips, when in fact Plaintiff Ratter never used BOTs and had no connection to the use of any electronic mechanism to enhance his trip trade activity.

FACTS – PLAINTIFF YONAH SEGAL

178.    Segal commenced her employment with Continental on 4-27-2015. Segal was an excellent employee with much recognition for devotion to her employer. Segal had no discipline on her record. Segal loved her job and would not have done anything to place that job in jeopardy.

179.    After hearing that she was on the Tricky Trader List and after being harassed at work a few times by other FAs Segal and Herbert complained to Roth about being targeted by the Tricky Trader List. Roth did nothing other than deny knowledge of the Tricky Trader List, a blatant misrepresentation. Feeling unsafe and unprotected by UA, Segal and Herbert filed a complaint with airport police.

180.    Like the other Plaintiffs, Segal was issued a LOI on 8-16-2019 and an investigatory meeting was held on the same day. Thirty (30) minutes before the meeting Segal and her Union Rep were handed multiple pages, single space, tiny print listing thousands of trade trips and called "UA – Corporate Security Analytics", one page of velocity pairing and nine pages of International Pairing History. Contrary to the provisions of Section 23 A 2 of the JCBA Segal was not "notified in writing of the precise charge or chares being investigated".

181.    UA provided no explanation regarding any of the documents or what each was supposed to represent or show, how to read it, or what part of the many entries were pertinent to the meeting. Hence, Segal and her Union Rep went into the meeting blind, without any real

-42-
COMPLAINT

information. But when the meeting began, UA focused on McKeen's 3-22-2019 letter stating that Segal had violated the directives of that letter. Throughout the investigation meeting UA referred to the McKeen letter as speaking directly to "parking". However the McKeen letter speaks to brokering, buying or selling trips – not parking. The concern of the letter is that FA are engaging in Trip Trading for "personal gain", an undefined term. Segal never brokered, bought or sold a trip. Nor did Segal engage in parking as more generically defined by the JCBA, as placing trips on other FAs lines to facilitate other trading.

182.    During the interview, UA went through several flight trades, maintaining that the trades demonstrated "parking". None of them did. By way of example and not limitation, Segal's termination letter references pairing F6023 position FA01 scheduled to depart SFO to TLV [Tel Aviv] on 6-29-2019. The trip was officially picked up by Segal on 5-20-2019. Twenty eight days later Segal decided she did not want to fly this trip and dropped it to FA Meng Ju Wu. Two days, 19 hours and 22 minutes later Wu returned the trip to Segal. Trade transactions prove the return trip was processed by Wu, not Segal. This is a practice pre-merger Continental FAs used for decades. If a FA picks up a trip or agrees to trade and later decides not to fly the trip the receiving FA returns it to the person who last had it.

183.    Segal prefers to fly the TLV flights and at the time was trying to fly as many trips as possible to practice her Hebrew in order to become Speaker qualified. Wu returned the trip to Segal on 6-20-2019. On 6-21-2019 Segal picked up F6104 departing on 6-26-2019. Knowing that she would be working back from TLV on 6-29-2019 Segal dropped F6104 so she would not arrive from TLV and depart to TLV in the same day. She then dropped the trip on 6-22-2019 and on 6-24-2019 picked up F6104 departing on 6-30-2019. Looking at the data provided by UA did not explain any of this. However, there was data UA could have relied upon and brought to the meeting for a full discussion. Looking at the line history and investigating Segal's individual reasons for exercising her right to a flexible schedule and for trading, UA would have found that Segal was acting well within her contractual rights to improve her schedule. Segal's trading only showed that she wants to fly international, just as she had for several years before, and prefers to

-43-

COMPLAINT

fly TLV to advance her position to a Speaker FA.

184.    UA's letter terminating Segal is based on misrepresentations stemming from an unfounded interpretation of data that was incomplete during the meeting as well as in the termination letter. Segal was wrongfully accused by brokering, selling or buying trips based on a single Venmo entry from a friend, FA Matthew Balangitao, returning funds paid for dinner, not for a trip. UA did not even bother to connect the Venmo payment to any trip from Segal to Balangitao or vis-a-versa.

185.    Segal explained throughout the interview and in her written statement that she had every intention of flying an international pairing if it worked with her personal parameters.

186.    One of the goals of trading is to "trade up", with the intent of eventually flying a pairing with the highest hours, or a favorite destination, or flying with your friends and in Segal's case to practice her Hebrew and advance her career to a Speaker position.

187.    The meeting was designed to be coercive and to instill fear. During the meeting Brenson demanded that Segal disclose the contents of a notebook Segal brought with her to the meeting. Segal refused but her refusal was held against her as if she had something to hide that was pertinent to the meeting. Segal was demeaned and treated as if she were a child in refusing to turn over the contents of her notebook when she had no obligation to do so. In all candor, the notebook had notes related to the rules and regulation pertaining to Trip Trading. As Segal's Union Rep later wrote regarding Segal's refusal to share her notebook, "[w]ith all the gossip on the line including her name being on a 'tricky trader' list document spread viciously around social media it was not a stretch for her [Segal] to deduce what she was potentially being called in for." In preparation for the meeting Segal had noted relevant JCBA provisions, but she was made to feel as if not sharing the content of her notebook was a violation of UA's Work Rules.

188.    Segal, who was identified as a "Tricky Trader" by the Individual Defendants was terminated.

189.    By letter on 8-28-2019 Plaintiff Segal was terminated based on opinion, conjecture and without just cause.

190.    Segal requested an itemized deduction for her final paycheck. Segal was told "We don't have that information, you will have to go onto your webportal to see your paycheck". The webportal did not show any deductions. Segal was given a hand delivered hand written check and when asked for the itemized deduction Segal was given a print out of what was on the webportal which did not match her pay. Because she was not given an itemization of the deductions from her final paycheck, Segal still does not know whether funds are missing or misallocated in her final pay.

191.    The malice towards Segal is evident not only in the termination without cause and the misrepresentations, but also the invasion of her privacy and probing regarding the "meaning" of a single Venmo transaction with a friend. Added to that is UA's pre-termination attempt to further violate Plaintiff's right to privacy by scrutinizing Segal's personal notebook at the investigatory meeting. UA's conduct and demands were made only bully and harass – to further scare Segal during the investigation process. In fact, this was not an investigation process but a formality before termination. Segal had been terminated before she walked into the investigation. No matter what she said the termination decision was not going to change because she, like the other Plaintiffs, was one of the scapegoats.

## FACTS – PLAINTIFF MARC THOMPSON

### A. UA's Mandatory Approval of Thompson's Family Medical Leave Act Request

192.    In or about November and December 2018 Thompson submitted to Respondent UA the necessary documentation related to his request for periodic leave pursuant to the Family Medical Leave Act. This medical documentation stated that Plaintiff suffered from HIV, depression and anxiety which caused gastrointestinal issues, including recurrent explosive diarrhea lasting multiple days.

193.    On or about 12-30-2018 UA approved intermittent FMLA leave by Thompson to address his medical and mental health issues as certified by his physician.

-45-
COMPLAINT

194. Thompson's condition is one which limits an individual's ability to participate in major life activities. During flareups Thompson is homebound and cannot serve passengers on a flight.

195. UA failed to engage Thompson in an interactive process regarding his disabilities.

196. UA failed and refused to accommodate Thompson's disability even when UA was informed at the investigatory meeting that Thompson was accommodating his own disability through the flexible and unlimited trading benefit of his position.

197. Soon after UA approved intermittent FMLA leave to Thompson, Thompson was discriminated against, harassed and terminated because of his medical and mental health conditions. After advising Brenson that he had medical conditions for which he had FMLA and that there were times that he did not work because of his medical conditions, which could change in the stretch of a day, Brenson was demeaning and dismissive of Thompson. Brenson harassed Thompson for offering to explain that Thompson accommodated his disability through unlimited trading rights. UA retaliated against Thompson for his assertion of the right to accommodate by falsely accusing Thompson of fraud and terminating Thompson employment on that pretext.

**B. Tricky Traders List.**

198. Thompson's name was on the Tricky Trader List which gave UA the pretext it needed to terminate Thompson's employment in violation of his rights under the FEHA.

**C. UA's Pretextual and Discriminatory Termination of Thompson**

199. On 8-14-2019, Thompson received a letter of investigation from UA stating that a mandatory meeting would be held on the same day. During the meeting Thompson was questioned about the exercise of his right to trade his trips.

200. Thompson used his ability to freely Trade Trips to accommodate his disability. When he was not feeling well, and knowing the limited time provided by FMLA, Thompson

-46-
COMPLAINT

accommodated his disability by Trading Trips or just dropping them into UA's Crew CCS where they could be picked up by other FAs.

201.    Thirty minutes before the 8-4-2019 meeting Thompson was handed a matrix of Trip Trades consisting of hundreds of trip trades. Thompson could not read, comprehend, or understand this document which had been generated by corporate security within the 30 minutes allotted prior to the meeting. Thompson had never seen such a matrix in his 19 years and 4 months as a FA.

202.    The matrix purported to represent Trip Trades beginning in April of 2019 through August of 2019. But the trips were in no particular order.

203.    Although during the meeting Thompson learned that UA had pre-selected specific trips they wanted to discuss, that information was not shared with Thompson before the meeting. Thompson was only given a massive amount of seemingly unorganized data based on the pretense that would be sufficient to "prepare" for the meeting.

204.    At the 8-4-2019 meeting Thompson was  asked questions about specific Traded Trips that had occurred over the course of 4 months. Thompson did his best, given the limited time to process and decipher the confusing language presented at meeting, to provide answers to UA's questions about the specific purpose of each Trip Trade.

205.    During the meeting, Thompson was told that he was not being honest about the information he provided, and that he must know more about either his or the Trip Trading activity of others. Thompson said he was trying to answer the questions based on his recollection. Thompson at all times denied trading or parking trips to broker, buy or sell trips.

206.    Thompson was then asked to provide his phone to the investigator and told that if he failed to do so that would be deemed as evidence that Thompson had something to hide from UA. Although feeling invaded, Thompson felt he had no option but to permit Ben Brenson to examine his phone. Brenson admitted that he found no evidence of Thompson's alleged coordinating, parking, or bartering of trips on Thompson's phone.

-47-
COMPLAINT

207.    Again Thompson was accused of not being honest about his Trip Trade practices. But Thompson had given not only his recollections but attempted to explain his circumstances, to wit, that he used trading of trips to accommodate his disability and that because he commuted from Denver to SFO sometimes weather conditions did not permit him to work a trip he had intended to work.

208.    UA intentionally withheld information that would have been useful in determining the reasons behind specific trades by Thompson. United did not provide meteorological information, non-revenue loads, or check-in times for the specific trips Thompson was questioned about. This would have allowed Thompson to better recall the specific trips in question, and the reasons for trading those specific trips. By way of example rather than limitation, one of the Trade Trips being questioned was on 4-10-2019. Had Thompson remembered or been told there was a blizzard warning for Denver on that day, he would have known that he dropped the trip on that day because of resulting congestion and cancelled flights the morning he was departing to San Francisco.

209.    By way of another example, Thompson's Termination Letter discusses pairing F6014 PVG (Shanghai) on 4-4-2019.  Thompson learned after his meeting that this was a commuting issue due to load factors and check-in times which would not have allowed Thompson to report for duty on time for the trip departing 4-4-2019.

210.    UA knew that Thompson would not recall the details of each specific trade and used this meeting to terminate Plaintiff based on the pretext that his trades were "tricky", which they were not. In fact, Thompson's Trip Trades were well within his rights and compliant with his contractual obligations to UA.

211.    Despite the fact that the JCBA calls for progressive discipline, Thompson was subsequently fired by UA because he had requested and received approval of FMLA, because of his disability, in retaliation for having reported his disability and sought accommodation.

212.    In the process Thompson's privacy was invaded by Ben Brenson, individually on behalf of UA when Thompson was forced by Brenson to surrender his phone for inspection by Brenson on behalf of UA.

## FIRST CAUSE OF ACTION

### WRONGFUL TERMINATION

(All Plaintiffs against Defendant UA)

213.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

214.    Plaintiffs have performed all conditions, covenants and promises on their part to be performed under the WTG.

215.    Plaintiffs were terminated for violating the following WTG: Honesty, Responsibility, Professionalism, Information and Social Networking. The WTG are an entirely separate, non-union negotiated set of rules, much in the order of work rules, to which UA subjects the employment of all employees – the agreement by which the employment of all UA employees are governed, irrespective of whether the employee is a members of the union. The JCBA provides that Plaintiffs may be terminated only for cause.

216.    Plaintiffs' termination based the WTG is exemplified, by way of example and not limitation, by the termination decision rendered to Plaintiff Segal, a true and correct copy of which is attached hereto as Exhibit E. The termination decision identifies the basis for termination as work rule violations of the WTG, to wit, Honesty, Responsibility, Professionalism, Information and Social Networking. Likewise, on or about 9-16-2019, in an EDD appeal UA wrote "The claimant [Segal] was discharged due to violation of company policy", not because she violated any term of the JCBA.

217.    Defendants' termination of Plaintiffs was wrongful and breached the for cause provision of the JCBA in that Plaintiffs' trading practices were consistent with policy and practice at UA. Plaintiffs were terminated by UA without cause as a way of prevent UA's FA from

-49-
COMPLAINT

striking on the basis of UA's adoption of Continental's trip trading rules. UA terminated Plaintiffs to defuse a disgruntled work force after the merger, not based on any cause.

218. To the extent Plaintiffs were terminated as a result of the alleged violation of JCBA Section 7.I.19 (placement of trips on other FA's lines to facilitate trading) UA changed the terms, applicability and implementation of the JCBA Section 7.I.19 in violation of its statutory duty to bargain collectively, thereby benefiting some FAs over others. UA agreed with its senior FAs to change JCBA § 7.J.1 ("Flight Attendants will have unlimited trip trades …") that provides for unlimited trip trading. This change significantly affected the contractual rights of Plaintiffs in at least the following ways: (i) affected Plaintiff FAs' rights to "trade up" and obtain High End Trips, (ii) affected Plaintiff FAs' right to flexible scheduling, (iii) affected Plaintiff FAs' rights to accommodate commuter restrictions (such as weather and frequency of travelling to and from the SFO hub), and (iv) affected Plaintiff FAs' rights to garner hours including garnering specialty hours such as a Speaker FA.

219. UA knew that JCBA § 7.J.1 ("Flight Attendants will have unlimited trip trades …") made the velocity of trip trades irrelevant. The word "unlimited" meant "unlimited". Thus, whether the FA had 10 or 1,000 trades in a month is irrelevant to the issue of whether they were "parking". Further, (i) Without unlimited trading the Plaintiff FAs were not afforded the same schedule flexibility as the complaining senior FAs. Thereby UA changed Plaintiffs' terms of employment without bargaining over the change. (All Plaintiffs) (ii) Without unlimited trading the junior FAs do not have the ability to secure High End Flights in the same manner as senior FAs. Thereby UA changed the junior FAs' terms of employment without bargaining over the change. (Ayson, Bowen, Carlson, Herbert, Jensen, Ratter, Segal) (iii) Without unlimited trading the commuter FAs do not have the same flexibility afforded to senior FAs. Thereby UA changed the commuter FAs' terms of employment without bargaining over the change (Fadida, Thompson). (iv) Without unlimited trading the Speaker FAs do not have the same flexibility afforded to senior FAs. Thereby UA changed the Speaker FAs' terms of employment to garner as many speaking flights without bargaining over the change (Fadida, Ronnan, Segal [Speaker

in-training]).

220. UA breached its agreement to limit terminations to cause and terminated Plaintiffs without cause.

221. As a legal cause of Defendants' breach of contract Plaintiffs were damaged in such a way so as to cause a past, present and future loss of earnings and benefits and have suffered and will continue to suffer a diminution of earning capacity. Leave of Court will be sought to set forth the exact amount of damage when ascertained, or upon proof at time of trial.

## SECOND CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(All Plaintiffs against Defendant UA)

222. Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

223. The implied covenant of good faith and fair dealing is implied by law in every contract, including contracts of employment. The covenant functions as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which frustrates the other party's rights to the benefits of the contract. The covenant also requires each party to do everything the contract presupposes the party will do to accomplish the agreement's purposes. A breach of the implied covenant of good faith is a breach of the contract and breach of a specific provision of the contract is not necessary.

224. Here Defendants terminated Plaintiffs without cause which breached the contract. But they did more: Defendants intentionally targeted employees named by other employees on the Tricky Trader List, thereby giving credence to the rumors, innuendo and charges of wrongdoing levied by one set of employees against another set of employees; Defendants suspended the employment of some of the Plaintiffs without cause; Defendants caused fear and intimidation in the pre-interview process by failing to designate any charges before the meeting, by giving Plaintiffs stacks of documents without explaining what they should be looking for;

-51-
COMPLAINT

during the meeting Defendants were derogatory towards the Plaintiffs either directly stating or insinuating that Plaintiffs were not truthful during their responses; during the meeting Defendants invaded Plaintiffs' right of privacy demanding to examine personal items such as Segal's notebook and Thompson's phone; during the meeting Defendants demanded that Plaintiffs turn over other FAs engaged in allegedly unlawful trading – a tactic usually reserved to military interrogations rather than employment interviews; during the meetings UA blatantly misrepresented fact or omitted information that would have disclosed the circumstances under which trading decisions were made; and UA again acted in bad faith when in the termination letters it regurgitated the misrepresentations and misquoted Plaintiffs' interview statements. Perhaps most offensive is the fact that UA used Plaintiffs as scape goats in a sweltering employee conflict it did not know how to control. Instead of dispute resolution, implementation of new software to restrict trading (if that was agreed by the Union) or some other means of compromise amongst disputing flight crews, UA terminated Plaintiffs to show they had "done something" to abate the rising tide of disgruntlement in their ranks. Instead, UA marred the clean employment records of Plaintiffs with accusations of fraud and unethical conduct, none of which was remotely accurate or true.

225. In or about August 2019 Defendants terminated Defendants' employment and accused all Plaintiffs of being dishonest, untruthful, not professional and, essentially, of thieving trips – and after thieving them withholding same from the force of FAs in violation of the WTG. Defendants levied these accusations even though they knew that trading with friends was common among all FA, including the FAs who were complaining about the Tricky Traders.

226. Defendants' termination of Plaintiffs and the accusations of dishonesty as now reflected in Plaintiffs' employment records and history breached the covenant of good faith and fair dealing, was made with malice and intended to wrongfully deprive Plaintiffs of not only their jobs but their careers and as such warrants the imposition of punitive damages in this case.

227. As a legal cause of Defendants' breach of covenant of good faith and fair dealing Plaintiffs were damaged in such a way so as to cause a past, present and future loss of earnings

and benefits and have suffered and will continue to suffer a diminution of earning capacity. Leave of Court will be sought to set forth the exact amount of damage when ascertained, or upon proof at time of trial.

228.    As a further legal cause of Defendants' harassing statements, and each of them, Plaintiffs were injured in their health and suffered emotional distress. Leave of Court will be sought to set forth the nature and extent of these damages and the amount thereof when ascertained.

## THIRD CAUSE OF ACTION

## CIVIL HARASSMENT

(All Plaintiffs against All Defendants)

229.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

230.    Code of Civil Procedure Section 527.6 was enacted to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution. It does so by providing expedited injunctive relief to victims of harassment. *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.

231.    The elements of unlawful harassment, as defined by the language in section 527.6, are as follows: (1) 'a knowing and willful course of conduct' entailing a 'pattern' of 'a series of acts over a period of time, however short, evidencing a continuity of purpose'; (2) 'directed at a specific person'; (3) '[that] seriously alarms, annoys, or harasses the person'; (4) '[that] serves no legitimate purpose'; (5) [that] 'would cause a reasonable person to suffer substantial emotional distress' and 'actually cause[s] substantial emotional distress to the [the person to be protected by the order]'; and (6) which is not a '[c]onstitutionally protected activity.' " (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762, 283 Cal.Rptr. 533.) Section 527.6, subdivision (i), requires "clear and convincing evidence that unlawful harassment exists. *Parisi v. Mazzaferro* (2016) 5 Cal. App. 5th 1219, 1227.

232. Since late 2018 Defendants have knowingly and willfully repeated the false, defamatory, libelous and slanderous statements pertaining to Plaintiffs' alleged "tricky trading". Plaintiffs have never been "tricky" about their trading. Plaintiffs are quick, they know the system, they spent significant time looking for trips to continually increase the value of the trips they flew but there was nothing "tricky", meaning deceitful or crafty, about their conduct. Irrespective, Defendants have engaged in a course of conduct entailing a pattern of a series of acts over a period of time, however short, evidencing a continuity of purpose to harass the Plaintiffs with untrue statements about Plaintiffs' tricky trading activities.

233. These statements have been both verbal and in writing, particularly in social media postings, text message, Facebook and other chat groups. The verbal statements have been made to UA's corporate and HR and were encouraged by UA's McKeen's statement in March 2019.

234. Defendants' defamatory, libelous, slanderous and false statements were directed to Plaintiffs and the community of FAs to foment hatred and loathing of Plaintiffs and the other persons identified on the Tricky Trader List.

235. Defendants' defamatory, libelous, slanderous and false statements accusing Plaintiffs of trading in violation of the rules at UA seriously alarmed, annoyed, or harassed Plaintiffs who not only had to endure the List but were confronted with hostility from other FAs both accusing them of abusing the trading system and asking them about the alleged tricky trading.

236. Defendants' defamatory, libelous, slanderous and false statements accusing Plaintiffs of abusing UA's trading system served no legitimate purpose.

237. Defendants' defamatory, libelous, slanderous and false statements accusing Plaintiffs of abusing UA's trading system would cause a reasonable person to suffer substantial emotional distress and these statements did actually cause Plaintiffs substantial emotional distress.

COMPLAINT

238. Defendant UA's defamatory, libelous, slanderous and false statements accusing Plaintiffs of dishonesty, lack of responsibility, lack of professionalism, fraudulent and unethical conduct for personal gain and UA's dissemination of information related to investigatory meetings with the tricky traders as published to the other FAs were intended for no purpose other than to harass Plaintiffs and to cause Plaintiffs emotional, reputational and financial injury. Likewise UA's public postin on CCS that five employees, including Bowen, Fadida and Nguyen were terminated (TRM) and taken off the organization's chart was intended to and did cause Plaintiffs emotional, reputational and financial injury.

239. Defendants' UA's defamatory, libelous, slanderous and false statements accusing Plaintiffs of abusing UA's trading system being dishonest, lacking responsibility and professionalism, being a fraud and lacking ethics is not constitutionally protected activity and these statements were intended for no purpose other than to harass Plaintiffs and to cause Plaintiffs emotional, reputational and financial injury.

240. Plaintiffs seeks a Preliminary and Permanent injunction preventing Defendants from continuing to make defamatory, libelous, slanderous and false statements accusing Plaintiffs of being "tricky traders", abusing UA's trading system being dishonest, lacking responsibility and professionalism, being a fraud and lacking ethics.

241. As a legal result of Defendants' harassing statements, and each of them, Plaintiffs suffered injury which injury is irreparable, all of which has damaged Plaintiff in an amount according to proof.

242. As a legal cause of Defendants' harassing statements, and each of them, Plaintiffs were hurt and injured in their health, strength and activity, sustaining shock and injury to their nervous system and person, all of which said injuries have caused and continue to cause said Plaintiffs great mental, physical and nervous pain and suffering. Plaintiffs are informed and believe, and thereupon allege, that said injuries will result in permanent disability to them, all to their general damages in a sum not yet ascertained but to be proven at trial.

COMPLAINT

243.    As a further legal cause of Defendants' harassing statements, and each of them, Plaintiffs were damaged in such a way so as to cause a loss of earnings and to diminish their capacity for earning compensation, and they are informed and believe, and thereon allege, that they will hereafter sustain a future loss of earnings and a diminution of earning capacity. Leave of Court is sought to set forth the exact amount thereof when ascertained, or upon proof at time of trial.

244.    Defendants' conduct as described herein was despicable and carried on by the Defendants with a willful and conscious disregard of Plaintiffs' rights or safety or subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights for which Plaintiffs seek exemplary damages in the within action in a sum according to proof.

## FOURTH CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION (CONCEALMENT)

(All Plaintiffs against Defendants UA, Roth, Petani, Bellazain and Brenson)

245.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

246.    The elements of fraud,    which give rise to    the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage. *Golden Eagle Land Inv., L.P. v. Rancho Santa Fe Assn.* (2018) 19 Cal. App. 5th 399, 428.

247.    UA made the following misrepresentations by concealing information from the Plaintiffs:

A.    That UA was investigating "bots", and "buying, selling and brokering trips";

B.    That each of the Defendants' trip trading activity reflected parking;

C.    That the WTG were in place for the mutual benefit of the employees and would protect Plaintiffs in the event that they were unfairly treated. In fact, the intent behind the WTG

-56-
COMPLAINT

has always been to enable UA to circumvent the requirement of good cause termination as required by the JCBA.

        D.    BOWEN and FADIDA

        1. Incomplete records on which accusations against Bowen and Fadida were made at the investigatory meeting and subsequently in the termination letter.

        2. Failure to provide raw data used to create the "analytics"

        3. Misrepresentations in the termination letter of statements purportedly made by Bowen and Fadida in the meeting.

        4. Misrepresentation that Bowen and Fadida had been told not to change their schedules about a month before the investigatory meeting when in fact Bowen and Fadida had never been given any such directive.

        E.    CARLSON

        1. UA's misrepresentation to Carlson that there was no video in the employee mailbox area to investigate who was leaving the threatening letters to Carlson.

        2. UA's misrepresentation to Carlson that UA was investigating the threats against Carlson.

        3. Incomplete records on which accusations against Carlson were made at the investigatory meeting and subsequently in the termination letter.

        4. Failure to provide raw data used to create the "analytics"

        5. Misrepresentations in the termination letter of statements purportedly made by Carlson in the meeting.

        F.    HA

        1. Incomplete records on which accusations against Ha were made at the investigatory meeting and subsequently in the termination letter.

COMPLAINT

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics"

4. Misrepresentations in the termination letter of statements purportedly made by Ha in the meeting.

5. Misrepresentation that UA was investigating any of Ha's complaints, particularly Ha's last complaint of harassment related to her including on the Tricky Trader List.

G.    HERBERT and SEGAL

1. Incomplete records on which accusations against Herbert and Segal were made at the investigatory meeting and subsequently in the termination letter.

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics"

4. Misrepresentations in the termination letter of statements purportedly made by Herbert and Segal in the meeting.

5. Misrepresentation that UA was investigating any of Herbert and Segal's complaints.

6. Misrepresentation that UA knew nothing of a Tricky Trader List.

H.    JENSEN, NGUYEN, RATTER

1. Incomplete records on which accusations against Jensen, Nguyen, and Ratter were made at the investigatory meeting and subsequently in the termination letter.

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics"

4. Misrepresentations in the termination letter of statements purportedly made by Jensen, Nguyen, and Ratter in the meeting.

I.    THOMPSON

1. Incomplete records on which accusations against Thompson were made at the

-58-
COMPLAINT

investigatory meeting and subsequently in the termination letter.

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics".

4. Misrepresentations in the termination letter of statements purportedly made by Thompson in the meeting.

5. Misrepresentation that FMLA was approved without consequence.

248.    As applicable herein, UA through its employees and agents Roth, Petani and Brenson intended to defraud Plaintiffs, whom they were using as pawns in a game to appease the swell of discontentment among FAs since the merger. Defendants' intended to convince Plaintiffs that they were being terminated for violation of the WTG by falsely accusing Plaintiffs of dishonesty, irresponsibility, lack of professionalism, fraud and unethical conduct. These misrepresentations included but were not limited to:

(i) Withholding information during the investigatory meetings and in the termination letters relevant to trip trading activity, thereby terminating Plaintiffs on an incomplete and thereby false record;

(ii) Presenting data as if it demonstrated dishonesty when in fact the data was manipulated to misrepresent its significance;

(iii) Misrepresenting the applicable details of trip trades;

(iv) Misrepresenting in the termination letters Plaintiffs' statements allegedly made by during the investigatory meeting; and

(v) Prior to the investigatory meetings misrepresenting to Carlson, Ha, Herbert and Segal that Defendants would investigate their complaints related to being included on the Tricky Trader List.

249.    Defendants' misrepresentation were made to navigate around the requirement of termination for cause only.

250.    Defendants UA through its employees and agents intended to defraud the

-59-
COMPLAINT

Plaintiffs in making the assertions at the meetings and in the termination letters and intended that Plaintiffs would rely on incomplete information to conclude they had acted wrongfully for which they were being properly terminated. Defendants also intended to prevent Plaintiffs from successfully seeking EDD benefits after the termination.

251. Plaintiffs were denied access to their line history, trip trade history, full CCS schedules, master schedules and like documents because those documents would demonstrate that Plaintiffs were only trading, not "parking" as allegedly by UA. If Plaintiffs were not parking then they were not "dishonest, irresponsible, unprofessional, frauds or unethical" as represented by Defendants.

252. Defendants used the WTG to make conclusory accusations against Plaintiffs on which Plaintiffs justifiably relied and thereby defrauded Plaintiffs from their right to a full investigation, the right to prove they had not violated any of the rules.

253. As a legal result of Defendants' intentional misrepresentations Plaintiffs suffered injury which injury is irreparable, all of which has damaged Plaintiff in an amount according to proof.

254. As a legal cause of Defendants' intentional misrepresentations, Plaintiffs lost jobs they love, significant sums in earnings, a tarnished reputation that will not permit them to obtain employment with other airlines as no airline would willingly hire a FA terminated by a major airline like UA for fraud and unethical conduct.

255. As a legal cause of Defendants' intentional misrepresentations, Plaintiffs were hurt and injured in their health, strength and activity, sustaining shock and injury to their nervous system and person, all of which said injuries have caused and continue to cause said Plaintiffs great mental, physical and nervous pain and suffering.

256. Defendants' conduct as described herein was despicable and carried on by the Defendants with a willful and conscious disregard of Plaintiffs' rights or safety or subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights for which Plaintiffs seek exemplary damages in the within action in a sum according to proof.

-60-
COMPLAINT

## **FIFTH CAUSE OF ACTION**

## NEGLIGENT MISREPRESENTATION

(All Plaintiffs against Defendants UA, Roth, Petani, Bellazain and Brenson)

257. Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

258. The elements of negligent misrepresentation are well established. A plaintiff must prove the following in order to recover. Misrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage. *Hydro-Mill Co. v. Hayward, Tilton & Rolapp Ins. Assocs., Inc.* (2004) 115 Cal. App. 4th 1145, 1154.

259. UA made the following misrepresentations by concealing information from the Plaintiffs:

A. That UA was investigating "bots", and "buying, selling and brokering trips";

B. That each of the Defendants' trip trading activity reflected parking;

C. That the WTG were in place for the mutual benefit of the employees and would protect Plaintiffs in the event that they were unfairly treated. In fact, the intent behind the WTG has always been to enable UA to circumvent the requirement of good cause termination as required by the JCBA.

D. BOWEN and FADIDA

1. Incomplete records on which accusations against Bowen and Fadida were made at the investigatory meeting and subsequently in the termination letter.

2. Failure to provide raw data used to create the "analytics".

3. Misrepresentations in the termination letter of statements purportedly made by Bowen and Fadida in the meeting.

4. Misrepresentation that Bowen and Fadida had been told not to change their schedules

-61-
COMPLAINT

about a month before the investigatory meeting when in fact Bowen and Fadida had never been given any such directive.

E.    CARLSON

1. UA's misrepresentation to Carlson that there was no video in the employee mailbox area to investigate who was leaving the threatening letters to Carlson.

2. UA's misrepresentation to Carlson that UA was investigating the threats against Carlson.

3. Incomplete records on which accusations against Carlson were made at the investigatory meeting and subsequently in the termination letter.

4. Failure to provide raw data used to create the "analytics".

5. Misrepresentations in the termination letter of statements purportedly made by Carlson in the meeting.

F.    HA

1. Incomplete records on which accusations against Ha were made at the investigatory meeting and subsequently in the termination letter.

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics".

4. Misrepresentations in the termination letter of statements purportedly made by Ha in the meeting.

5. Misrepresentation that UA was investigating any of Ha's complaints, particularly Ha's last complaint of harassment related to her including on the Tricky Trader List.

G.    HERBERT and SEGAL

1. Incomplete records on which accusations against Herbert and Segal were made at the investigatory meeting and subsequently in the termination letter.

-62-
COMPLAINT

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics".

4. Misrepresentations in the termination letter of statements purportedly made by Herbert and Segal in the meeting.

5. Misrepresentation that UA was investigating any of Herbert and Segal's complaints.

6. Misrepresentation that UA knew nothing of a Tricky Trader List.

H.   JENSEN, NGUYEN, RATTER

1. Incomplete records on which accusations against Jensen, Nguyen, and Ratter were made at the investigatory meeting and subsequently in the termination letter.

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics".

4. Misrepresentations in the termination letter of statements purportedly made by Jensen, Nguyen, and Ratter in the meeting.

I.   THOMPSON

1. Incomplete records on which accusations against Thompson were made at the investigatory meeting and subsequently in the termination letter.

2. Failure to provide a complete record on which the accusations were based.

3. Failure to provide raw data used to create the "analytics".

4. Misrepresentations in the termination letter of statements purportedly made by Thompson in the meeting.

5. Misrepresentation that FMLA was approved without consequence.

260.   As applicable herein, UA through its employees and agents Roth, Petani and Brenson intended to defraud Plaintiffs, whom they were using as pawns in a game to appease the swell of discontentment among FAs since the merger. Defendants' intended to convince

Plaintiffs that they were being terminated for violation of the WTG by falsely accusing Plaintiffs of dishonesty, irresponsibility, lack of professionalism, fraud and unethical conduct. These misrepresentations included but were not limited to:

(i) Withholding information during the investigatory meetings and in the termination letters relevant to trip trading activity, thereby terminating Plaintiffs on an incomplete and thereby false record;

(ii) Presenting data as if it demonstrated dishonesty when in fact the data was manipulated to misrepresent its significance;

(iii) Misrepresenting the applicable details of trip trades;

(iv) Misrepresenting in the termination letters Plaintiffs' statements allegedly made by during the investigatory meeting; and

(v) Prior to the investigatory meetings misrepresenting to Carlson, Ha, Herbert and Segal that Defendants would investigate their complaints related to being included on the Tricky Trader List.

261. Defendants' misrepresentation were made to navigate around the requirement of termination for cause only.

262. Defendants UA through its employees and agents intended to defraud the Plaintiffs in making the assertions at the meetings and in the termination letters and intended that Plaintiffs would rely on incomplete information to conclude they had acted wrongfully for which they were being properly terminated. Defendants also intended to prevent Plaintiffs from successfully seeking EDD benefits after the termination.

263. Plaintiffs were denied access to their line history, trip trade history, full CCS schedules, master schedules and like documents because those documents would demonstrate that Plaintiffs were only trading, not "parking" as allegedly by UA. If Plaintiffs were not parking then they were not "dishonest, irresponsible, unprofessional, frauds or unethical" as represented by Defendants.

COMPLAINT

264.    Defendants used the WTG to make conclusory accusations against Plaintiffs on which Plaintiffs justifiably relied and thereby defrauded Plaintiffs from their right to a full investigation, the right to prove they had not violated any of the rules.

265.    As a legal result of Defendants' negligent misrepresentations Plaintiffs suffered injury which injury is irreparable, all of which has damaged Plaintiff in an amount according to proof.

266.    As a legal cause of Defendants' negligent misrepresentations, Plaintiffs lost jobs they love, significant sums in earnings, a tarnished reputation that will not permit them to obtain employment with other airlines as no airline would willingly hire a FA terminated by a major airline like UA for fraud and unethical conduct.

267.    As a legal cause of Defendants' negligent misrepresentations, Plaintiffs were hurt and injured in their health, strength and activity, sustaining shock and injury to their nervous system and person, all of which said injuries have caused and continue to cause said Plaintiffs great mental, physical and nervous pain and suffering.

## SIXTH CAUSE OF ACTION

### INVASION OF PRIVACY

(Plaintiffs Bowen, Fadida, Nguyen & Thompson against

Defendants UA, Brenson, Petani & Roth)

268.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

269.    The elements to state a constitutional cause of action for invasion of privacy are (i) the identification of a specific, legally protected privacy interest, (ii) a reasonable expectation of privacy on plaintiff's part and (iii) an invasion of privacy that is serious in its nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right. *Hill v. Nat'l Collegiate Athletic Assn.* (1994) 7 Cal. 4th 1, 35-37.

### A.   Demand for Segal's Notebook

270.   Imagine being in an adversarial meeting wherein your adversary demands to see your notes and your refusal to share those notes is deemed an admission of wrongdoing. That is what happened to Segal. While Segal was trying to defend herself against her employer's unwarranted accusations, trumped up by co-employees in a labor dispute, UA through Brenson and Brenson individually demanded that Segal show Brenson the entire content of the notebook Segal brought with her to the investigatory meeting. The notebook belonged to Segal; it was not employer issued; it was not an employment related document; the notebook contained Segal's thoughts and impressions, nothing more. The demand that Segal show Defendants the content of her notebook invaded Segal's right to privacy.

### B.   Demand for Thompson's Cell Phone

271.   In 2014, the United States Supreme Court held that mobile phone records are protected by the user's right to privacy. *Riley v. California* (2014) 134 S. Ct. 2473. The Court noted unanimously, "Cell phones, however, place vast quantities of personal information literally in the hands of individuals." *Id.* at 2485. Cell phones have privacy protections due to their ability to save information unlike any device before: "there is an element of pervasiveness that characterizes cell phone but not physical records." *Id.* at 2490. The Supreme Court concluded that information sought from a person's cell phone carries a great weight of privacy interests. UA through Brenson and Brenson individually demanded that Thompson show Brenson the entire content of Thompson's cell phone to allegedly enable Brenson to find data showing that Thompson was "parking" trips. First, Thompson should not have been in the meeting if UA and Brenson did not already have evidence that Thompson was parking trips – which he was not. Second, Thompson allowed Brenson to invade his privacy by looking through his phone because he knew he if he refused UA would fire him for failing to cooperate in the investigation and because he was being bullied by Brenson for the phone. Even when Brenson found nothing on Thompson's phone to suggest improper trading that was insufficient to "exonerate" Thompson. Thus the intrusion was only for the sake of harassment, not to clear Thompson of false and phony

charges. Third, UA and Brenson had no right to demand Thompson's phone or to look through it, all of which was a serious invasion of Plaintiff's right of privacy.

**C.    Bowen, Fadida and Nguyen.**

272.    UA posted the termination of Bowen, Fadida and Nguyen on CCS in a way that it would be advertised to all FAs.  UA went out of its way to disclosed Plaintiffs' private employment information – to advertise the terminations to the other FAs.

**D.    Ha.**

273.    Petani was responsible for ensuring that Ha's fights would be reassigned to other FAs after Ha's termination. Petani intentionally failed to advise the flight crew of the flight on which Ha was booked to fly directly after Ha's termination. When Ha did not appear for the flight, the crew out of concern was texting and looking for Ha. Petani created a situation in which she "had to disclose" that Ha had been terminated. Ha is informed and believes that Petani intentionally failed to take Ha off the schedule so that she could disclose to other FAs that Ha had been terminated.

274.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiffs' privacy was invaded, their emotional wellbeing has substantially suffered and will continue to suffer. Plaintiffs have experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiffs allege that they have and will continue to suffer substantial losses in earnings, other employment benefits and opportunities and other damages, the precise amounts to be proven at trial.

275.    Defendants' despicable conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiffs rights. Defendants' acts were designed to humiliate and oppress Plaintiffs; and they had that effect. Thus, Plaintiffs are entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code§ 3294.

-67-
COMPLAINT

## SEVENTH CAUSE OF ACTION

### DEFAMATION

(All Plaintiffs against All Defendants)

276.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

277.    The speech identified herein was clearly recognized as defamatory by those who heard it. For example, Cherise Villar posted: "I feel like a tricky trader list could turn into a slander lawsuit, it's not merited and its slander in the workplace, … it's definitely [] bullyish". Kelsey Ryan posted: "I was on the tricky trading list early 2019 edition! Tricky apparently means "read all the pamphlets about trading, uses mutual ads and open time like a boss, and checks CCS open time at weird hours and when bad weather happens to get good trips". Lauren Burns posted: "Is my name gonna be circulated on another list? Which I happen to consider a rite of passage in my career … Falsely accused!" Denon Muhammad posted: "This sounds like a capital bigggg Class Action Lawsuit for former CAL employees!!!! It's called unlimited trip trades as long as you are not making money for selling trips … BTW there is no such thing as parking trips, it's still a mutual trip trade."

278.    The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. *Taus v. Loftus* (2007) 40 Cal.4th 683, 720.

279.    Defendants' defamatory statements pertaining to Plaintiffs' "tricky trading" were published to many recipients, including the entirety of the community FAs at UA.

280.    Defendants' defamatory statements pertaining to Plaintiffs' alleged "tricky trading" were false. Plaintiffs were not "tricky trading" but exercising their right to unlimited trades.

281.    Defendants' defamatory statements pertaining to Plaintiffs' alleged "tricky trading" were defamatory in that they suggest and state that Plaintiffs' are violating work rules of honesty, ethics and professionalism. The word "tricky" means deceitful and crafty.

Defendants' statements were recognized as defamatory by other FAs, some of whose posts are incorporated herein.

282.    Defendants' defamatory statements pertaining to Plaintiffs' alleged "tricky trading" were not privileged. Defendants had no right to make statements expressly or impliedly calling into question Plaintiffs' honesty, ethics and professionalism.

283.    Defendants' defamatory statements pertaining to Plaintiffs' alleged "tricky trading" had a natural tendency to injure or causes special damage to Plaintiffs' professional reputations and to Plaintiffs' employer who used said statements as the basis for terminating Plaintiffs for dishonesty, unethical and fraudulent conduct.

284.    As a legal result of Defendants' defamatory statements, and each of them, Plaintiffs suffered emotional injury which injury is irreparable, and for which Plaintiffs were terminated resulting in lost wages, loss of standing within the FA community, reputational harm and affecting Plaintiffs' ability to acquire other employment and other damages according to proof.

285.    Defendants' conduct as described herein was despicable and carried on by the Defendants with a willful and conscious disregard of Plaintiffs' rights or safety or subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights for which Plaintiffs seek exemplary damages in the within action in a sum according to proof.

**EIGHTH CAUSE OF ACTION**

**LIBEL PER SE**

(All Plaintiffs against All Defendants)

286.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

287.    Civil Code section 45 provides, "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

288. Statements that contain such a charge directly, and without the need for explanatory matter, are libelous per se. A statement can also be libelous per se if it contains a charge *by implication* from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter. *Wong v. Jing* (2010) 189 Cal. App. 4th 1354, 1369.

289. Defendants' libelous statements pertaining to Plaintiffs' "tricky trading" were published to many recipients, including the entirety of the community FAs at UA.

290. Defendants' libelous statements pertaining to Plaintiffs' alleged "tricky trading" were false. Plaintiffs were not "tricky trading" but exercising their right to unlimited trades.

291. Defendants' libelous statements pertaining to Plaintiffs' alleged "tricky trading" were libel *per se* in that they suggest and state that that Plaintiffs are violating work rules of honesty, ethics and professionalism. The word "tricky" means deceitful and crafty. Defendants' statements were recognized as libel *per se* by other FAs, some of whose posts are incorporated herein.

292. Defendants' libelous statements pertaining to Plaintiffs' alleged "tricky trading" were not privileged. Defendants had no right to make statements expressly or impliedly calling into question Plaintiffs' honesty, ethics and professionalism.

293. Defendants' libelous statements pertaining to Plaintiffs' alleged "tricky trading" had a natural tendency to injure or causes special damage to Plaintiffs' professional reputations and to Plaintiffs' employer who used said statements as the basis for terminating Plaintiffs for dishonesty, unethical and fraudulent conduct.

294. As a legal result of Defendants' libelous statements, and each of them, Plaintiffs suffered injury which injury is irreparable, and for which Plaintiffs were and are required to obtain medical care and incur medical expenses, all of which has damaged Plaintiffs in an amount according to proof.

295. As a further legal cause of Defendants' libelous statements, and each of them, Plaintiffs suffered emotional injury which injury is irreparable, and pursuant which Plaintiffs

were terminated resulting in lost wages, loss of standing within the FA community, reputational harm and affecting Plaintiffs' ability to acquire other employment and other damages according to proof.

296.    Defendants' conduct as described herein was despicable and carried on by the Defendants with a willful and conscious disregard of Plaintiff's rights or safety or subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights for which Plaintiffs seeks exemplary damages in the within action in a sum according to proof.

**NINTH CAUSE OF ACTION**

**SLANDER PER SE**

(All Plaintiffs against All Defendants)

297.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

298.    A slander that falls within the first four subdivisions of Civil Code §46 is slander per se and require no proof of actual damages. *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 107. Civil Code §46 provides: "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; 4. Imputes to him impotence or a want of chastity; or 5. Which, by natural consequence, causes actual damage."

299.    Defendants' defamatory, libelous and slanderous statements pertaining to Plaintiffs' "tricky trading" were published to many recipients, including the entirety of the community FAs at UA.

-71-

COMPLAINT

300.    Defendants' defamatory, libelous and slanderous statements pertaining to Plaintiffs' "tricky trading" imputes to Plaintiffs the loathsome afflictions of dishonesty, lack of ethics and fraud. The word "tricky" means deceitful and crafty.

301.    Defendants' defamatory, libelous and slanderous statements pertaining to Plaintiffs' "tricky trading" tends directly to injure Plaintiffs in respect to their profession, trade or business, by imputing to them general disqualification for the profession, trade, or business of serving as a FA for an airline wherein trust of the employee is paramount.

302.    As a legal result of Defendants' slanderous statements, and each of them, Plaintiffs suffered injury which injury is irreparable, and for which Plaintiffs were and are required to obtain medical care and incur medical expenses, all of which has damaged Plaintiffs in an amount according to proof.

303.    As a further legal cause of Defendants' slanderous statements, and each of them, Plaintiffs suffered emotional injury which injury is irreparable, and pursuant which Plaintiffs were terminated resulting in lost wages, loss of standing within the FA community, reputational harm and affecting Plaintiffs' ability to acquire other employment and other damages according to proof.

304.    Defendants' conduct as described herein was despicable and carried on by the Defendants with a willful and conscious disregard of Plaintiffs' rights or safety or subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights for which Plaintiffs seek exemplary damages in the within action in a sum according to proof.

## TENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(All Plaintiffs against all Defendants)

305.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

COMPLAINT

306. The tort of intentional infliction of emotional distress is comprised of three elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct. *KOVR–TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1028.

307. Defendants' defamatory, libelous and slanderous statements pertaining to Plaintiffs' alleged "tricky trading", dishonesty and lack of ethics, professionalism and responsibility are lies and therefore extreme and outrageous conduct by the Defendants directed to Plaintiffs for the purpose of causing Plaintiffs emotional distress by exposing Plaintiffs to ridicule and potential discipline by Plaintiffs' employer.

308. Defendants' repeated these lies over and over again, without any factual basis or any reasonable belief in the truth of the assertion with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

309. Being accused of being a "tricky trader", "Mafia" and other derogatory terms which were repeated by Plaintiffs' employer in their termination caused Plaintiffs to suffer harassment and severe or extreme emotional distress in the form of grief, crying, headaches, anxiety and depression.

310. Plaintiffs' injuries were actually and proximately caused by the Defendants' outrageous conduct and Plaintiffs did not suffer from these conditions before being subjected to Defendants' lies about their allegedly dishonest trading.

311. As a legal result of Defendants' libelous statements, and each of them, Plaintiffs suffered injury which injury is irreparable, and for which Plaintiffs were and are required to obtain medical care and incur medical expenses, all of which has damaged Plaintiffs in an amount according to proof.

312. As a further legal cause of Defendants' libelous statements, and each of them, Plaintiffs suffered emotional injury which injury is irreparable, and pursuant which Plaintiffs

COMPLAINT

were terminated resulting in lost wages, loss of standing within the FA community, reputational harm and affecting Plaintiffs' ability to acquire other employment and other damages according to proof.

313.    Defendants' conduct as described herein was despicable and carried on by the Defendants with a willful and conscious disregard of Plaintiffs' rights or safety or subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights for which Plaintiffs seek exemplary damages in the within action in a sum according to proof.

## ELEVENTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA LABOR CODE §226 AND §1198.5 –

### FAILURE TO PROVIDE WAGE STATEMENTS AND PERSONNEL RECORDS

(All Plaintiffs against Defendant UA)

314.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

315.    Plaintiffs requested of Defendants, in writing, production and inspection of their personnel file, wage, payroll and time records pursuant to her rights under Labor Code sections 226 and 1198.5. In violation of the California Labor Code, Defendants did not provide complete copies of such documents within the mandated time frame.

316.    By engaging in such conduct, Defendants violated the California Labor Code, in addition to other laws and regulations including, without limitation, by failing to provide copies of Plaintiffs wage, payroll and time records in a timely manner and failing to pay them all payroll amounts due and owing, including reimbursement of reasonable business expenses, within 24 hours of their wrongful termination.

317.    As a result of said violations, Plaintiffs seek payment for all amounts owed as well as all fines, penalties, appropriate interest, attorneys' fees as well as other amounts due or penalties owed under the California Labor Code, its regulations, the applicable Industrial Wage Order, the DLSE manual and the DLSE's interpreting opinions.

-74-
COMPLAINT

**TWELFTH CAUSE OF ACTION**

VIOLATION OF CALIFORNIA LABOR CODE §2802 –

FAILURE TO REIMBURSE BUSINESS EXPENSES

(Plaintiffs Bowen, Ha, Herbert & Segal against Defendant UA)

318.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

319.    Upon terminating Plaintiffs, Defendants failed to pay Plaintiffs all payroll amounts due to them. Defendants failed to reimburse Plaintiffs for business expenses incurred. This conduct is in violation of California Labor Code requiring employers to reimburse business expenses reasonably incurred by employees.

320.    Defendants willfully, knowingly and intentionally committed these California Labor Code violations knowing that Plaintiff were owed reimbursement of business expenses reasonably incurred.

321.    Plaintiffs seek payment for all amounts owed as well as all fines, penalties, appropriate interest, attorneys' fees as well as other amounts due or penalties owed under the California Labor Code, its regulations, the applicable Industrial Wage Order, the DLSE manual and the DLSE's interpreting opinions.


**THIRTEENTH CAUSE OF ACTION**

VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

HARASSMENT

(Plaintiff Carlson against Defendants UA, Bellazain, Brenson, Petani & Roth)

322.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

323.    Defendants' actions constitute a continuing course of conduct of harassment in violation of the California Fair Employment and Housing Act, Cal. Gov't Code § 12940(j). As described herein, Plaintiff Carlson was subjected to unwanted harassing behavior by Defendants,

-75-
COMPLAINT

including without limitation from UA's HR representative Roth, Security Consultant Brenson and investigators and supervisors Bellazain and Petani. Further, Carlson was harassed by DOES 1 – 10 who authored the four letters left in Carlson's mailbox, based on his sex/gender and sexual orientation, his largely ignored complaints to UA and Roth, by Petani's rummaging of Carlson's Venmo account and leaving him creepy messages on line, by Brenson and Bellazain's insistence that the harassers were correct and that Carlson did not deserve the reasonable protection and investigation he had requested.

324.    At all times discussed herein, Roth and Petani manifested ill will and malice towards Plaintiff Carlson arising from Plaintiff Carlson's sex/gender and sexual orientation and did nothing to control the harassment of Carlson in the workplace. In fact, these Defendants contributed to Carlson's anxiety by failing to investigate and prowling around in his Venmo account, leaving unsettling messages to further harass Plaintiff.

325.    At all times discussed herein, Roth, Petani, Bellazain and Brenson manifested ill will and malice towards Plaintiff Carlson arising from Plaintiff Carlson's sex/gender and sexual orientation and did nothing to control the harassment of Carlson in the workplace. In fact, these Defendants contributed to Carlson's anxiety not only by failing to investigate Plaintiff's harassers but by instead investigating Plaintiff for the alleged conduct Plaintiff's harassers were using to threaten Plaintiff, based on Plaintiff's sex/gender and sexual preference.

326.    Defendants' harassment of Plaintiff Carlson was severe and pervasive.

327.    A reasonable person in Plaintiff Carlson's circumstances would have considered the work environment created by Defendants hostile and abusive.

328.    UA knew or should have known, and actually did know, by reason of Plaintiff Carlson's several complaints to UA's HR employee Roth of the harassment, but failed to take immediate and appropriate corrective actions. Instead Roth joined in the harassment by ignoring Carlson's genuine concerns and teaming with Petani to cover Petani's electronic footprint in stalking Carlson and Brenson and Bellazain seeking to terminate Carlson.

COMPLAINT

329.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff Carlson's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff Carlson has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff Carlson alleges that he had and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

330.    Defendants' conduct was a substantial factor in causing the aforesaid harm to Plaintiff Carlson.

331.    Defendants' conduct as described herein was despicable, malicious and oppressive and done with a conscious disregard of Plaintiff Carlson's rights. Defendants' acts were designed to humiliate and oppress Plaintiff; and they had that effect. Thus, Plaintiff Carlson is entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code § 3294.

## FOURTEENTH CAUSE OF ACTION

## VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

## DISCRIMINATION, SEX/GENDER/SEXUAL PREFERENCE

(Plaintiff Carlson against Defendant UA)

332.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

333.    Defendants' actions as described herein constitute a continuing course of conduct of discrimination based on sex/gender and sexual orientation, in violation of the California Fair Employment and Housing Act, Cal. Gov't Code § 12940 et seq. Defendants were aware, and continue to be aware, that Plaintiff Carlson was being harassed by other FAs who were frightening Carlson preventing him from focusing on his work rather than his own safety. Defendants were further aware of social media posts that belittled Carlson and at a minimum hinted at his sexual orientation.

COMPLAINT

334.  Nonetheless, Defendants failed to provide Plaintiff Carlson with any assurance that they would properly investigate to determine who was threatening Carlson. In fact, Defendants largely ignored Plaintiff's complaints and refused to view or produce the video from the mailroom that would have shown the person(s) leaving the threatening letters for Carlson. Because of Carlson's sex/gender and sexual orientation Defendants intentionally did not investigate the threats against Carlson. As such Defendants treated Plaintiff Carlson differently from other similarly situated employees in terms and conditions of employment due to his sex/gender and sexual orientation, subjecting him to harassment, discrimination and retaliation including without limitation to requiring Carlson to endure and tolerate a hostile work environment, refusing to properly investigate, prevent and/or correct the harassment, discrimination and retaliation meted out by the Individual Defendants, and retaliating against Plaintiff for protesting and opposing Defendants' FEHA, OSHA and WTG violations.

335.  As a result of his sex/gender and sexual orientation Defendants discriminated against Plaintiff Carlson in terms and conditions of employment by, without limitation, requiring him to tolerate a hostile work environment and then by terminating him. Others similarly situated, including more than 25 other employees named on the Tricky Trader List were not treated in the same manner.

336.  At all times discussed herein, UA employees Roth and Petani manifested ill will and malice towards Plaintiff Carlson arising from Plaintiff Carlson's sex/gender and sexual orientation and did nothing to control the harassment of Carlson in the workplace. In fact, these Defendants contributed to Carlson's anxiety by failing to investigate and prowling around in his Venmo account, leaving unsettling messages to further harass Plaintiff.

337.  Plaintiff Carlson's sex/gender and sexual orientation were substantial motivating reasons for the various adverse employment actions taken toward Plaintiff Carlson as described herein.

338.  As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff Carlson's emotional wellbeing has substantially suffered and will continue to suffer.

COMPLAINT

Plaintiff Carlson has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff Carlson also alleges that he has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

339.    Defendants' conduct was a substantial factor in causing the aforesaid harm to Plaintiff Carlson.

340.    Defendants' conduct as described herein was despicable, malicious and oppressive and done with a conscious disregard of Plaintiff Carlson's rights. Defendants' acts were designed to humiliate and oppress Plaintiff Carlson; and they had that effect. Thus, Plaintiff Carlson is entitled to punitive damages against PIMCO and DOES 1-100 under California Civil Code §3294.

# FIFTEENTH CAUSE OF ACTION

## VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

## RETALIATION

(Plaintiff Carlson against Defendant UA)

341.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

342.    This cause of action arises under the public policies of the State of California and the United States, and Defendants' retaliation against Plaintiff in terms and conditions of employment was in violation of such policies, including those set forth in statutes and regulations prohibiting discrimination, harassment due to sex/gender, sexual preference, including, but not limited to the California Fair Employment and Housing Act, and California Constitution, those set forth in statutes and regulations regulating compensation, among other public policies. Defendants retaliated in violation of public policy against Plaintiff in terms and conditions of employment, as set forth herein.

343.   As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff alleges that he has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

344.   Defendants' despicable conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiff's rights. Defendants' acts were designed to humiliate and oppress Plaintiff; and they had that effect. Thus, Plaintiff is entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code§ 3294.

## SIXTEENTH CAUSE OF ACTION

### VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

### FAILURE TO INVESTIGATE / CORRECT

(Plaintiff Carlson against Defendant UA)

345.   Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

346.   Defendants' actions constituted a failure to investigate and/or take corrective action to address FEHA and OSHA violations and complaints of FEHA and OSHA violations by Plaintiff in violation of the FEHA and OSHA mandates. As alleged herein, Plaintiff complained about FEHA, OSHA and WTG violations yet UA refused to conduct investigations and instead targeted the complaining Plaintiff for retaliation, including falsely attacking job performance, reputation, credibility and general good will.

347.   As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff alleges that he has and will continue to suffer substantial losses in earnings, other

employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

348.   Defendants' despicable conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiff's rights. Defendants' acts were designed to humiliate and oppress Plaintiff; and they had that effect. Thus, Plaintiff is entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code§ 3294.

## SEVENTEENTH CAUSE OF ACTION

### VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

### MEDICAL CONDITION/DISABILITY/PRECEIVED DISABILITY –

### DISCRIMINATION

(Plaintiff Thompson against Defendant UA)

349.   Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

350.   Defendants' actions as described herein constitute a continuing course of conduct of discrimination based on medical condition, disability/perceived disability, in violation of the California Fair Employment and Housing Act, Cal. Gov't Code § 12940 et seq. Defendants were aware, and continue to be aware, that Plaintiff Thompson had a medical condition and physical disability that placed limitations on his ability to perform his essential job functions during flare ups of his condition. Thompson was able to perform his essential job functions with reasonable accommodations (including, without limitation, the option of rearranging his schedule to accommodate flare ups of his medical issues) for his physical disability. Nonetheless, Defendants failed to accept Plaintiff Thompson's explanation of this means as a reasonable accommodation for his physical and mental disabilities / medical condition and instead terminated Thompson when he used his contractual rights to accommodate his own disabilities. Defendants failed to treat Plaintiff Thompson the same as similarly situated employees in terms and conditions of employment due to his medical condition, disability/perceived disability and subjected him to

-81-
COMPLAINT

harassment, discrimination and retaliation including without limitation terminating Thompson without cause.

351.    Thompson was harassed, discriminated against and retaliated against in violation of the FEHA, including without limitation, in terms and conditions of his employment and was terminated due to being a member of protected categories. Thompson was retaliated against for having obtained FMLA status and for using the permitted trip trading policies and practices to accommodate his disabilities. UA retaliated against Thompson for pursuing his FEHA rights including his right to be free from FEHA violations, to seek and obtain reasonable accommodation and to engage in an interactive process and due to being a member of protected categories. In addition, UA failed to prevent FEHA violations from occurring and failed to investigate and/or correct FEHA violations.

352.    As a result of his physical disability and need for reasonable accommodations, Defendants discriminated against Plaintiff Thompson in terms and conditions of employment by, without limitation, terminating Plaintiff Thompson without cause.

353.    Plaintiff Thompson's medical condition, physical disability / perceived disability were substantial motivating reasons for the various adverse employment actions taken toward Plaintiff Thompson as described herein.

354.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff Thompson's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff Thompson has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff Thompson also alleges that he has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

355.    Defendants' conduct was a substantial factor in causing the aforesaid harm to Plaintiff Thompson.

356.    Defendants' conduct as described herein was despicable, malicious and oppressive and done with a conscious disregard of Plaintiff Thompson's rights. Defendants' acts

were designed to humiliate and oppress Plaintiff Thompson; and they had that effect. Thus, Plaintiff Thompson is entitled to punitive damages against PIMCO and DOES 1-100 under California Civil Code §3294.

### EIGHTEENTH CAUSE OF ACTION

### VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

### MEDICAL CONDITION/DISABILITY/PRECEIVED DISABILITY –

### HARASSMENT

(Plaintiff Thompson against Defendant UA, Roth, Brenson, Bellazain)

357.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

358.    Defendants' actions constitute a continuing course of conduct of harassment in violation of the California Fair Employment and Housing Act, Cal. Gov't Code § 12940(j). As described herein, Plaintiff Thompson was subjected to unwanted harassing behavior by Defendants, including without limitation from UA's HR representative Roth, Security Consultant Brenson and investigators and supervisors Bellazain and Petani. Thompson was harassed based on his disability and medical condition when he tried to explain that UA had never accommodated his disability and medical condition, that he was required to accommodate his own disability and medical condition via his contractual right to unlimited trades to set his schedule, that without the ability to change his schedule as need with unlimited trades he would not be able to accommodate his disability and medical condition. Defendants disregarded Plaintiff's explanation and proceeded to the termination, which at the time of the investigation was already a *fait accompli*.

359.    Defendants' harassment of Plaintiff Thompson by ignoring his explanation and then labeling Plaintiff's explanation of accommodating his medical condition and disability through trip trades as dishonest and fraudulent was severe and pervasive.

360. A reasonable person in Plaintiff Thompson's circumstances would have considered the work environment created by Defendants hostile and abusive.

361. At all times discussed herein, Brenson, Roth and Bellazain manifested ill will and malice towards Plaintiff Thompson arising from Plaintiff Thompson's medical condition, disability/perceived disability.

362. UA knew or should have known, and actually did know, by reason of Plaintiff Thompson's FMLA approval that Plaintiff had medical conditions and disability that he needed to accommodate. Despite this knowledge Defendants harassed and mocked Plaintiff's explanation. None of the Defendants took immediate and appropriate corrective actions but continued the harassment in issuing the letter of termination wherein Plaintiff's explanation was again ignored.

363. As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff Thompson's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff Thompson has experienced and continue to experience severe emotional distress, in an amount to be proven at trial. Plaintiff Thompson alleges that he have and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

364. Defendants' conduct was a substantial factor in causing the aforesaid harm to Plaintiff Thompson.

365. Defendants' conduct as described herein was despicable, malicious and oppressive and done with a conscious disregard of Plaintiff Thompson's rights. Defendants' acts were designed to humiliate and oppress Plaintiff; and they had that effect. Thus, Plaintiff Thompson is entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code § 3294.

## NINTEENTH CAUSE OF ACTION

## VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

## MEDICAL CONDITION/DISABILITY/PRECEIVED DISABILITY –

## RETALIATION

(Plaintiff Thompson against Defendant UA)

366.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

367.    This cause of action arises under the public policies of the State of California and the United States, and Defendants' retaliation against Plaintiff in terms and conditions of employment was in violation of such policies, including those set forth in statutes and regulations prohibiting discrimination, harassment and retaliation due to medical condition, disability/perceived disability, including, but not limited to the California Fair Employment and Housing Act, and California Constitution, those set forth in statutes and regulations regulating compensation, medical leaves, among other public policies. Defendants retaliated in violation of public policy against Plaintiff in terms and conditions of employment, as set forth herein.

368.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff alleges that he has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

369.    Defendants' despicable conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiff's rights. Defendants' acts were designed to humiliate and oppress Plaintiff; and they had that effect. Thus, Plaintiff is entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code§ 3294.

-85-
COMPLAINT

## TWENTITH CAUSE OF ACTION

### VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT –

### FAILURE OF INTERACTIVE PROCESS

#### (Plaintiff Thompson against Defendant UA)

370.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

371.    Defendants' actions constituted a continuing course of failure to engage in the interactive process in violation of the California Fair Employment and Housing Act, Cal. Gov't Code§ 12940 et seq. Defendants were aware and continue to be aware that Plaintiff has medical and mental health conditions, disability and/or perceived disability, yet refused to properly consider, discuss and/or properly engage in the interactive process. Instead, Defendants subjected Plaintiff to harassment, discrimination and retaliation and additional FEHA violations. Defendants' conduct also constituted retaliation in violation of the FEHA due to Plaintiff's objections to said FEHA violations and as a result of his need for and/or request for and/or perception of the need for reasonable accommodation and/or interactive process.

372.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff alleges that he has and will continue to suffer substantial losses in earnings, other employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

373.    Defendants' despicable conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiff's rights. Defendants' acts were designed to humiliate and oppress Plaintiff; and they had that effect. Thus, Plaintiff is entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code§ 3294.

## TWENTY FIRST CAUSE OF ACTION

## VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT – FAILURE TO

## PROVIDE REASONABLE ACCOMMODATION

### (Plaintiff Thompson against Defendant UA)

374.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

375.    Defendants' actions constituted a continuing course of failure to accommodate Plaintiff's medical condition, disability and/or perceived disability, including Plaintiff's physical and mental health related disabilities in violation of the California Fair Employment and Housing Act, Cal. Gov't Code§ 12940 et seq. Defendants were aware and continue to be aware that Plaintiff has a medical condition / disability and/or perceived disability and yet refused to properly consider and/or offer reasonable accommodations for Plaintiff in good faith and refused to properly engage in the interactive process. Instead, Defendants subjected Plaintiff to discrimination, harassment and retaliated against Plaintiff from seeking FMLA leave in violation of the FEHA and the FMLA. When Plaintiff tried to explain that he uses his contractual right to trip trading as a way to accommodate his medical condition / disability / perceived disability, Plaintiff's explanation was disregarded and mocked. Plaintiff was called "dishonest" and "unethical" in attempting to explain that he was not "parking" but trading to suit and accommodate his need for time off to address his medical condition / disability / perceived disability. Defendants' conduct also constituted retaliation in violation of the FMLA due to Plaintiff's objections to said FMLA violations during the meeting as recited by Plaintiff's termination letter and as a result of her need for and/or request for and/or perception of the need for reasonable accommodation and/or interactive process.

376.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff's emotional wellbeing has substantially suffered and will continue to suffer. Plaintiff has experienced and continues to experience severe emotional distress, in an amount to be proven at trial. Plaintiff alleges that he has and will continue to suffer substantial losses in earnings, other

employment opportunities, employment benefits and other damages, the precise amounts to be proven at trial.

377.   Defendants' despicable conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiff's rights. Defendants' acts were designed to humiliate and oppress Plaintiff; and they had that effect. Thus, Plaintiff is entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code§ 3294.

## TWENTY SECOND CAUSE OF ACTION

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

(Plaintiffs Carlson and Thompson against Defendant UA)

378.   Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

379.   This cause of action arises under the public policies of the State of California and the United States, and Defendants' retaliation against Plaintiffs in terms and conditions of employment was in violation of such policies, including those set forth in statutes and regulations prohibiting discrimination, harassment and retaliation due to gender/sex/sexual preference/medical condition/disability and/or perceived disability, including, but not limited to the California Fair Employment and Housing Act, and California Constitution, those set forth in statutes and regulations regulating compensation, among other public policies.

380.   Defendants' termination of Plaintiffs violated the public policy against harassment, discrimination and retaliation due to gender/sex/sexual preference/medical condition/disability and/or perceived disability and was thus wrongful.

381.   As a direct and proximate result of Defendants' conduct as set forth above, Plaintiffs emotional wellbeing has substantially suffered and will continue to suffer. Plaintiffs have experienced and continue to experience severe emotional distress, in an amount to be proven at trial. Plaintiffs allege that they have and will continue to suffer substantial losses in earnings, loss of other employment opportunities, employment benefits and other damages, the precise

-88-

COMPLAINT

amounts to be proven at trial.

382. Defendants' despicable conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiffs' rights. Defendants' acts were designed to humiliate and oppress Plaintiffs; and they had that effect. Thus, Plaintiffs are entitled to punitive damages against all Defendants and DOES 1-100 under California Civil Code §3294.

### TWENTY THIRD CAUSE OF ACTION

### MANDATORY, PRELIMINARY AND PERMANENT INJUNCTION –

### REINSTATEMENT AND RETRACTION OF TERMINATION LETTERS

(All Plaintiffs against Defendant UA)

383. Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

384. Plaintiffs will prevail on their claims for breach of contract, intentional misrepresentation, harassment, defamation, slander per se, libel per se and the remainder of the claims asserted herein.

385. As a direct and proximate result of Defendants' wrongful acts as described herein, Plaintiffs have suffered irreparable harm in that Plaintiff's personal and business reputation has been damaged as a result of UA's unjustified accusation, investigatory meeting and swift terminations without cause all of which has caused Plaintiffs not only loss of income by permanent damage to their professional reputations.

386. As a preliminary matter, Plaintiffs have not been dishonest with UA, have committed no acts of fraud and have not been unethical in their conduct. There was never any cause to terminate Plaintiffs' employment. As such Defendants should be reinstated in their positions at UA with the same seniority, rights and privileges they held prior to termination. Further, all documents related to the so called investigation, the investigatory meetings and the termination letters must be permanently destroyed to protect Plaintiffs from the stains on their reputations caused by the events described herein.

-89-
COMPLAINT

387.    Plaintiffs seek a mandatory, preliminary and permanent injunction, to prevent Defendants from continuing to make representations that Plaintiffs engaged in dishonest, fraudulent, unethical conduct and to reinstate Plaintiffs to their former positions at UA with the same seniority, rights and privileges they held prior to termination.

388.    Plaintiffs have no adequate remedy at law, and it will be impossible for Plaintiffs to determine the precise amount of damage they will suffer if Defendants are allowed to continue to malign their character, reputation, professional and personal with the most heinous of unproven accusations – that of fraud and lack of ethics.

## TWENTY FOURTH CAUSE OF ACTION

### VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200

(All Plaintiffs against Defendant UA)

389.    Plaintiffs hereby incorporate herein by reference all preceding paragraphs alleged herein as though fully set forth.

390.    California Business and Professions Code §17200 broadly prohibits any "'unlawful, unfair or fraudulent business act or practice ....' An unfair business practice includes practices that are deceptive such as the denial of insurance coverage where such coverage, per the terms of the Policy should be afforded. (See, e.g., *People ex rel. Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 772, 20 Cal.Rptr. 516 [What constitutes  an unfair or fraudulent business practice under any given set of circumstances is a question of fact, the essential test being whether the public is likely to be deceived.]

391.    Plaintiffs allege that Defendant UA's targeting of Plaintiffs based on rumor and inuendo created and fomented by other FAs, with their own motives and speculations is unfair, that the so-called investigation of some but not all FAs with voluminous trade activity was not only an unfair business practices but was also deceptive in that the so-called investigation "meeting" was only for show; that UA had decided to terminate the employment of a certain employees based on the tricky trader list – thereby allowing some FAs to decide the terms of

-90-
COMPLAINT

employment of other FAs – and unfairly deprived Plaintiffs of their jobs and careers, marring their employment records with accusations of fraud and dishonesty. It was an unfair business practice to use Plaintiffs as scape goats to remedy a growing workforce issue fueled by other employees. Defendants deprived Plaintiffs not only of their UA job but impacted each Plaintiff's ability to secure employment in the airline industry and forever impacted their ability to earn money in any position that requires a security check of any kind. UA carried out these unfair and deceptive practices based on intentionally incomplete and misleading records to secure the dismissal of certain employees, some of which were suffering from in-house threats based on their sexual preferences and others of which were accommodating their schedules in relation to medical conditions/disability/perceived disability.

392.    Furthermore, Defendants' justification for these unfair and deceptive tactics, to wit, the notion that Plaintiffs' actions deprived other FAs of the wealth of UAs flights is the same conduct UA has engaged in for years. As alleged by FAs Kim Guillory and Sharon Tesler in *Guillory v. United Airlines, Inc.*, San Mateo Superior Court, Case No. 20-CIV-03889, UA has charter flights which it staffs with only the youngest and prettiest FAs for various sports teams and other persons of accolade. UA has discriminatory practices that assign "dedicated crews" to charter flights thereby withholding those trips from the segment of FAs who are no longer young and attractive. Defendants accused Plaintiffs of withholding trips from the full body of UA FAs by failing to put all unwanted trips into CCS. Defendants know or have reason to know that the vast majority of its FAs withholding trips from the full body of UA FAs by failing to put all unwanted trips into CCS. Defendants themselves withhold trips from the full body of UA FAs by failing to put charter flight trips into CCS.

393.    In committing unfair business acts, Defendants violated B&P §17200.

394.    Plaintiffs allege that Defendant UA violated B&P §17200 as set forth herein, including, by terminating Plaintiffs for conduct it engages in directly and via the vast majority of its FAs and by falsely marring Plaintiffs' otherwise impeccable employment history with accusations and purported findings of fraud and dishonesty.

395. Defendants' wrongful conduct caused Plaintiffs injury for which Plaintiffs seek compensatory and general damages and injunctive relief in the within action in a sum according to proof.

WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as follows:

1. For injunctive relief, including but not limited to reinstatement of each Plaintiff to the position(s) they held with UA with the same seniority and rights and privileges as held prior to termination and as held by other employees protected by the Union as prayed herein;

2. For injunctive relief, including but not limited to retraction of all accusations of wrong doing including permanent destruction of the termination letters or separation notices issues to each Plaintiff;

3. For declaratory relief as prayed herein reinstating each Plaintiff to the position(s) they held prior to termination with all rights and privileges and retraction of all accusations of wrong doing including permanent destruction of the termination letters or separation notices issues to each Plaintiff;

4. For an order that Defendants pay Plaintiffs compensatory and general damages according to proof at trial, including without limitation back pay and front pay owed;

5. That Defendants be ordered to pay Plaintiffs prejudgment interest;

6. That this Court award Plaintiffs reasonable attorneys' fees pursuant to, without limitation the FEHA and the Labor Code;

7. That this Court order Defendants to pay penalties, liquidated damages, interest and any other remedies to Plaintiffs pursuant to, without limitation, the Government Code and Labor Code;

8. That this Court order injunctive relief enjoining UA's continued violations of the FEHA and Labor Code violations, as alleged herein, ordering Defendants to

-92-
COMPLAINT

comply with their legal obligations under the FEHA, including without limitation, to provide proper training to its managers, supervisors and other employees, to provide and maintain a hostile-free workplace for its employees with medical conditions, disabilities/perceived disabilities, and that sexual preferences not be a consideration in decision making other than to eradicate harassment, discrimination and retaliation policies, and to properly investigate and take corrective action to remedy the hostile workplace that it maintains against its employees with alternative sexual preferences / with medical conditions / disabilities / perceived disabilities,;

9. That Defendants be ordered to pay punitive damages or exemplary damages per the relevant claims;

10. For costs of suit incurred herein; and

11. For such other and further relief as the court may deem proper.

LAW OFFICE OF SOHAILA SAGHEB

DATED: June 11, 2021

/s/ Sohaila Sagheb
SOHAILA SAGHEB
Attorney for Plaintiffs Michael Ayson, Christina Bowen, Devin Carlson, Hanna Michal Fadida, Lynn Ha, Britni Herbert, Christopher Jensen, Nathan Nguyen, Ronan Ratter, Yonah Segal, Marc Thompson

-93-
COMPLAINT

# EXHIBIT A



# CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
## RIGHT-TO-SUE
## AMENDED

Your submission of this document acknowledges that you have read and agree to the DFEH's Privacy Policy. By submitting this document, you are declaring under penalty of perjury under the laws of the State of California that to the best of your knowledge all information stated is true and correct, except matters stated on information and belief, which you believe to be true.

**DFEH CASE NUMBER (IF APPLICABLE):** 201909-07562815

**COMPLAINANT:**

| NAME: | TELEPHONE NUMBER: |
|---|---|
| Devin Carlson | 401-932-7035 |

| ADDRESS: | EMAIL ADDRESS: |
|---|---|
| 4020 Utah Street, Apt #6 | DevinCarlson.J@ hotmail.com |

CITY/STATE/ZIP:
San Diego, CA 92104

**RESPONDENT:**

| NAME: | TELEPHONE NUMBER: |
|---|---|
| United Airlines, Inc. | 1-800-864-8331 |

ADDRESS:

San Francisco International Airport, Terminal 3

CITY/STATE/ZIP:

San Francisco, California 94128

NUMBER OF EMPLOYEES: <5,000        TYPE OF EMPLOYER: Airline

**ADD CO-RESPONDENT:**

NAME: PLEASE SEE ATTACHED COMPLAINT _____

TITLE:_____

ADDRESS:_____

_____

TELEPHONE NUMBER:_____

**ADD CO-RESPONDENT:**

NAME:_____

TITLE:_____

ADDRESS:_____

_____

TELEPHONE NUMBER:_____

**DATE OF HARM:**

LAST DATE OF HARM (Month/Day/Year):    10/14/2019 _____

1.  I ALLEGE THAT I EXPERIENCED: ☑ Discrimination    ☑ Harassment

**BECAUSE OF MY ACTUAL OR PERCEIVED:**

☐ Age (40 and over)

☐ Ancestry

☐ Association with a member of a protected class

☐ Color

☐ Criminal History

☐ Disability (physical or mental)

☐ Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Gender Identity or Expression

☐ Genetic Information or Characteristic

☐ Marital Status

☐ Medical Condition (cancer or genetic characteristic)

☐ Military and Veteran Status

☐ National Origin (includes language restrictions)

☐ Race

☐ Religious creed (includes dress and grooming practices)

☑ Sex/Gender

☑ Sexual harassment – hostile environment

☐ Sexual harassment – quid pro quo

☑ Sexual orientation

☑ Other (specify) Please see attached

**AS A RESULT, I WAS:**

☐ Asked impermissible non-job-related questions

☐ Demoted

☐ Denied accommodation for pregnancy

☐ Denied accommodation for religious beliefs

☐ Denied any employment benefit or privilege

☐ Denied employer paid health care while on pregnancy disability leave

☐ Denied equal pay (includes violations of the Equal Pay Act)

☐ Denied Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Denied hire or promotion

☐ Denied or forced to transfer

☐ Denied reasonable accommodation for a disability

☐ Denied the right to wear pants

☐ Denied work opportunities or assignments

☐ Forced to quit

☐ Laid off

☑ Reprimanded

☑ Suspended

☑ Terminated

☑ Other (specify) Please see attached - Amended Complaint _____

**I ALLEGE THAT I EXPERIENCED:**    ☑ Retaliation

**BECAUSE I:**

☐ Participated as a witness in a discrimination or harassment complaint

☑ Reported or resisted any form of discrimination or harassment

☐ Reported patient abuse (hospital employees only)

☐ Requested or used a disability-related accommodation

☐ Requested or used a pregnancy-disability-related accommodation

☐ Requested or used a religious accommodation

☐ Requested or used Family Care or Medical Leave (CFRA) (employers of 5 or more people). Includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

**AS A RESULT I WAS:**

☐ Asked impermissible non-job-related questions

☐ Demoted

☐ Denied accommodation for pregnancy

☐ Denied accommodation for religious beliefs

☐ Denied any employment benefit or privilege

☐ Denied employer paid health care while on pregnancy disability leave

☐ Denied equal pay (includes violations of the Equal Pay Act)

☐ Denied Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Denied hire or promotion

☐ Denied or forced to transfer

☐ Denied reasonable accommodation for a disability

☐ Denied the right to wear pants

☐ Denied work opportunities or assignments

☐ Forced to quit

☐ Laid off

☑ Reprimanded

☑ Suspended

☑ Terminated

☑ Other (specify)  Please see attached. Amended Complaint.

2. Do you have an attorney who agreed to represent you in this matter?  ● Yes  ○ No
   If yes, please provide the attorney's contact information.

**COMPLAINANT'S REPRESENTATIVE INFORMATION**

Attorney Name: Sohaila Sagheb, Esq.

Attorney Firm Name: Law Office of Sohaila Sagheb

Attorney Address: 21112 Ventura Blvd

Attorney City, State, and Zip: Woodland Hills, CA 91364

3.  Briefly describe what you believe to be the reason(s) for the discrimination, harassment, or retaliation. (Optional)

Please see attached.

**VERIFICATION PAGE – THIS PAGE MUST BE COMPLETED**

**Before submitting the form, you must verify who you are and whether you are submitting this information for yourself or someone else.**

Verifier Name:   Devin Carlson

Verifier's Relationship to Complainant:  Self

Verifier's City and State: San Diego, CA

**By submitting this document, you are declaring under penalty of perjury under the laws of the State of California that to the best of your knowledge all information stated is true and correct, except matters stated on information and belief, which you believe to be true.**

5/25/2021

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

DFEH No.

**In the Matter of the Complaint of**
Devin Carlson,

Complainant,

vs.

United Airlines, Inc.
San Francisco International Airport
Terminal 3
San Francisco, California 94128

United Airlines, Inc. Employees:
Caroline Viola, Cladia Fletcher, Christina Kemper, Dana Merritt, Debbie Saurez Akel, Drew Dias, Ed Sanford, Felissa Hay, Fernando Rodriguez, James Braun, Jennifer Buckles, Karen Roller Penn, Kat Lopez, Kathleen Craig Osaki, Keith Harris, Kerry Hennessy, Kim Pafaia, Laverne Jones, Liz Harlan, Michael Lopez, Michael Miles, Michelle Gibson, Mie Katsumata, Nancy Von Huben, R. Dean Sylva, Scott Ando, Scott Schutte, Sheila Ramirez, Steve Craton, Terry Sydorenko, Colleen Roth, Juliana Petani
c/o United Airlines, Inc.
San Francisco International Airport
Terminal 3
San Francisco, California 94128

Respondents.

1. In or about 2010 United Airlines, Inc. ("UA") merged with Continental Airlines ("Continental") and Complainant because a UA employee.

2. Complainant Devin Carlson ("Complainant") was hired as a Flight Attendant ("FA") by Continental in or about April, 2015.

3. In or about 2018 UA merged its existing FA crews with the FA crews it had inherited from Continental.

4. Respondent UA is an employer subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

-1-
Complaint – DFEH

5. Respondents Caroline Viola, Cladia Fletcher, Christina Kemper, Dana Merritt, Debbie Saurez Akel, Drew Dias, Ed Sanford, Felissa Hay, Fernando Rodriguez, James Braun, Jennifer Buckles, Karen Roller Penn, Kat Lopez, Kathleen Craig Osaki, Keith Harris, Kerry Hennessy, Kim Pafaia, Laverne Jones, Liz Harlan, Michael Lopez, Michael Miles, Michelle Gibson, Mie Katsumata, Nancy Von Huben, R. Dean Sylva, Scott Ando, Scott Schutte, Sheila Ramirez, Steve Craton, Terry Sydorenko, are UA employees / agents whom Complainant is informed and believes was part of the group of UA employees who harassed Complainant and/or committed the infractions identified herein as an employee/agent of UA, including harassment based on sexual orientation, and are subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

6. Respondent Colleen Roth is the Human Resources Manager for UA who disregarded Complainant's complaints of harassment and continued the harassment begun by others on behalf of UA and is thus subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

7. Respondent Juliana Petani is an individual employed by UA and working from UA's San Francisco base of operations as a Supervisor for In Flight Services. Petani stalked and harassed Complainant based on sexual orientation, and is subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

8. At all relevant times, Complainant was employed by UA at the San Francisco International Airport. UA operated and made all employment decisions affecting Complainant's employment in the County of San Francisco, State of California.

## A. Tricky Trader List.

9. The employment of Complainant with UA was subject to the 2016 – 2021 Flight Attendant Agreement pursuant to a collective bargaining agreement ("JCBA").

10. Pursuant to the JCBA no FA was subject to termination without just cause and discipline of FAs was progressive.

11. In the time period relevant herein, 2018-2019, UA's policies and practices liberally allowed FAs to trade flight assignments ("pairings" or "trips"). This practice was documented at JCBA 7.J.1 which provides "Flight Attendants will have unlimited trip trades with, and pick ups from, open time in their Base, and unlimited trip trades with other Flight Attendants in their Base subject to the provisions of Paragraph I. above." This Policy is referred to herein as the "Trip Trading Policy" or "Trading Policy".

12. Pre-merger UA's Trip Trading Policy was restrictive. It allowed a FA to trade with another FA and once the trade was complete each FA was then obligated to work the flight they had traded.

13. Pre-merger Continental's Trip Trading Policy was liberal permitting FAs to make as many trades as they wanted and which would suit their schedules. There was no express

rule that prohibited FAs from picking up and trading flight assignments for the purpose of obtaining more preferable, profitable or favored flight assignments. Complainant admits to engaging in the practice of selecting and trading flight assignments to obtain increasingly more desirable flight assignments that suited his schedule. Preferences included positions worked on the flight (FA02, FA02, etc.), the destinations, the accommodations at the destination, the pay rate and hours counted as working hours, and other factors personal to each FA. For example, some FAs have families and need to be home for blocks of time, others can travel without going home for weeks at a time. Many factors went into trading trips and the key to successful trading was doing it frequently and being fast – much the same as college kids vying for seats in classrooms. As for Complainant Thompson, he used the liberal Trip Trading Policy as a means of accommodating his disability, as further discussed herein.

14. Senior and existing UA employees were less apt in the art of electronic trading than the former Continental employees who had, for years, engaged with the software to achieve the trip trades they wanted or needed. This created a chasm between the senior and existing UA employees and the new UA employees / former Continental employees. As stated in one social media post by Richard Soares "I hate United for allowing the Junior flight attendants to get international flight while the 20 year veterans have to fly domestic flights! This is not fair and I will have to say to the juniors that are picking up the trips before the flight attendants that are senior to them. YOU WILL GET YOUR DAY!!!! I PROMISE!!!!!!!!"

15. As early as December 2018, social media posts reflected the growing division between senior UA FAs and their more junior counterparts from Continental. While there were many such posts, some of which were bullying and harassing, this particular exchange is important because, as will be shown, the language of these early posts was later adopted by UA as the basis for its investigation.

16. On December 18, 2018 Cladia Fletcher's social media post asks "plz ask them [the FAs] to not drop them in CCS or that cesspool of parking/reporting/trip brokering "SFO trip trades" … Instead, if they cannot find friends to pick up their trips, please ask them to put them in the 'original sfosw trip trades/drops page' Also, Kerry Hennessey is running a trip trade page. You might know her from all the work she did to stop the 'tricky trading' on our side about 10 years ago."

17. Julie Humphreys Magowan posted her Amsterdam trip on CCS. Linda King Murphy asked "Julie have you joined friends trading with friends group". After Linda said she did not know the group existed Julie directed her "Yes it is called SFO FRIENDS TRADING WITH FRIENDS". None of the members of the SFO FRIENDS TRADING WITH FRIENDS were terminated.

18. The paradox in these posts should be obvious. The people who were complaining that the juniors / adopted Continental FAs were withholding trips from CCS and therefore from them were advocating withholding trips from the juniors. UA elected to support its senior FAs against the junior FAs and thereby entered into a new agreement with the senior FAs to the disadvantage of the junior FAs. The employees UA terminated were the junior / former Continental FAs.  UA left untouched the senior FAs who was doing exactly the

-3-

same thing but complaining that the junior FAs could do it faster. This is an important factor because UA was in a positions to select the new employees it wanted to terminate. Trip Trading was never the reason for the terminations. If it had been, then UA would have had to terminate Cladia Fletcher and Linda King Murphy who were advocating trading only with friends, not dropping trips into the common hold and excluding the high time trips. But given the labor dispute UA was in a position to use the dispute as pretext for the termination of "undesirable" employees.

19. On December 23, 2018 Doreen Regan Lundberg wrote: "I'm still wanting to know how all the jrs [juniors] keep getting Ppt (Tahiti) and the 5 and 6 day ones too."

> Debbie Surez Akel responded: "right"

> Luis Zavala responded: "I've heard that there is an **investigation** going on"

> Oscar Colocho responded: "From your mouth to God's ears, Luis Zavala – that would be only **just and fair!**

> Ann Marie Blalock responded: "Grabbing & **Parking**?

20. Tahiti is obviously a destination location and a well paid trip for FAs. A Tahiti with a 4 or 5 day layover means that the crew who flew from SFO to Tahiti would have 4 – 5 days of recreation time, accommodations paid by the employer. The way a junior FA would get a Tahiti trip would be if a senior FA did not want to work it and traded or it was in UA's Crew Communications Systems ("CCS") and the junior FA picked it up.

21. While not always consistent UA said that "parking" included trading with friends instead of placing all trips FAs did not want to work into CCS. The senior FA who were in friends groups were not fired for trading with friends.

22. Again, while not always consistent UA said that "parking" included holding trips to facilitate other trading of trips. On December 18, 2018 FA Keawe Kai was looking for an international trip and Debbie Miyasato asked "Do you want PVG [Shanghai] on 1/19?" Kai responded "if someone picks up my 1 day on 20th I would jump". Miyasato responded "ok I can hold for a while for you". Kai, who could have placed her trip on the 20th into CCS and taken the Shanghai on 1/19 instead said that she would "work harder to get that trip outta there!" Neither Kai nor Miyasato were terminated for "parking".

23. CCS provides several way for FAs to trade trips. These include:

> (1) Open pairing in the Market Que (CCS)

> (2) A Direct trade between FAs

> (3) Advertised pick up trade – where the FA advertises a pairing to be picked up

> (4) Advertised mutually traded - where the FA advertises a pairing to be traded for another pairing

24. UA cited "parking" as a basis for Complainant's termination also defining parking as moving a trip back to the FA from whom the FA originally received the trip. It was common practice and common courtesy that if a FA took a high end trip from another FA and decided not to work that trip the trip would be offered back to the FA from whom it came. If the FA who had originally dropped the trip wanted it back it would be returned. It the FA who had originally dropped the trip did not want it back it the receiving FA would then trade it for another trip.

25. On a date unknown to Complainant a group of UA employees, including but not limited to the individual Respondents named herein, circulated a "Tricky Traders List" identifying approximately 56 employees, the majority of whom were FA absorbed in the Continental merger. The List identified and targeted certain FAs as engaging in buying, brokering, or selling high end trips such as to Tahiti, Amsterdam, Beijing and other desirable locations.

26. On March 22nd 2019 Douglas McKeen, Senior Vice President of Labor Relations, distributed an Inflight update to all FAs stating that over the past few months many FAs had voiced concerns about illicit trip brokering. McKeen stated that UA had **investigated** and was ready to join you [the senior pre-existing UA employees to take a stand against this unethical practice. McKeen confirmed a "growing problem of **selecting, trading or parking a pairing to broker, buy or sell** [high end trips] to another Flight Attendant" for which UA had zero tolerance. UA promised to "take appropriate action, up to and including discharge. This is about **fairness,** …if you believe that individuals are not following rules, please let the management team knows that we can address this unfairness."

27. This communication aided and abetted the uprising by the senior FAs at UA. It was a misleading and misinformative statement of the "problem" which aided and abetted the on-going defamation and harassment being suffered by Claimant and the other fifty five (55) employees identified by senior employees as "Tricky Traders". Further, by this communication UA changed the terms and conditions of the employment agreement for junior FA by revoking their right to unlimited trading.

28. In the months that followed UA wrongfully disclosed private employment information by ensuring that all FAs knew that UA was investigating, meeting with and disciplining the FAs on the Tricky Trader List. This is evident from Christian Wiede's social media post stating "Hi guys … I might be out of the loop on this one, but I was coming in from zrh (Zürich) and heard that letters were being sent out to all the "tricky traders", telling them they had to attend a "meeting" and to bring a union rep if they chose to do so …" This very specific post shows that UA made sure that its FAs knew the "Tricky Traders" as identified by the FAs were being subjected to a different set of rules than the senior traders who were trading among friends and holding trips for each other, the same conduct for which UA was terminating certain FAs it had acquired from Continental.

29. Senior UA employees were allowed to continue with unlimited trades and not required to use CCS to drop trips they did not want to work. For example, Stacy Larson Goss , after accusing the junior UA FAs of "using bots" states "Personally I'll NEVER again post a drop to CCS. It'll be friends first, then FP [Facebook] pages. If we stop posting on CCS,

they won't have much to grab." Liz Farfan stated "I agree". Luis Zavala responded "same here I always offer to my friends first".

30. Furthermore, Union leadership was only half-heartedly provided to the FAs accused of being "Tricky Traders". In one post Chris Black, the Vice President of the Union, responding to another post calling Claimant "Milli Mafia (Millennium)" and stating "Time to play hardball!!" called the purported "tricky traders" an "exclusive group" stating that he "cannot support" them. In another post, Paul Hay, who was married to Felissa Hay, an executive of the Union stated "Devin there are lots of rumors of you being connected/leading a trade group with questionable ethics …", none of which was true.

31. UA took the side of its former employees (compare the text to the McKeen memo) Here, the informal deal or concession made by UA with its senior and existing employees negatively affected the new employees led to the isolation, harassment, discrimination of the new UA employees.

**B. The "Rumors" about Complainant were Motivated by his Sexual Preference, not because he was exercising his right to trade trips; The Harassing Letters and UA's Failure to Investigate.**

32. Complainant was a premier FA who tended to the needs of every passenger. Customer surveys reflected Complainant Carlson's efforts as exemplary stating such things as "he was discreetly attentive to me in my special circumstances … His eye contact and quiet communication smile transformed a potentially unhappy experience into a very pleasant one. I am grateful." Complainant Carlson received accolades from In-Flight supervisors who recognized his team effort in dealing with emergencies on flight 728 on 11/15/2015 and In-Service on flight 8893 on 10/27/2016.

33. Complainant Carlson had no performance issues and no write ups.

34. But from late 2018 forward Complainant Carlson was accused of various forms of misconduct, not by his supervisors or customers but by other FAs who were harassing him based on his sexual preference which Carlson does not hide. For example, FAs on a Tahiti trip reported that Carlson had "emptied 2 entire mini bins [alcohol] for their Tahiti layover". This was false and slanderous. As a result of this rumor Carlson had to deal with the Union's call inquiring as to whether he was an alcoholic, which he is not. Complainant Carlson did not take anything out of the airplane for personal use.

35. Complainant Carlson was called a thief, the derogatory and defamatory nature of which need not be explained.

36. One FA wrote "Devin Carlson the cheating trading mafia leader". Again, the derogatory and defamatory nature of this need not be explained.

37. On March 19th 2019 Complainant Carlson found the first of four handwritten anonymous letters in his company mailbox. In part, this first letter stated "DEVIN - THE GAMES YOU PLAY WITH A TRIP TRADING ARE ABSOLUTELY DISGUSTING AND IN

VIOLATION OF SENIORITY … YOUR DAYS ARE NUMBERED … YOU AND YOUR FRIENDS ARE ON THE *MOST HATED LIST – THE COMPANY KNOWS* … WE'LL SEE WHO GETS THE LAST LAUGH! YOU ARE A *SCAM ARTIST* … YOU *DISGUST ALL OF US* …YOU ARE A *VERY HATED JUNIOR MAN – WATCH YOUR BACK*". (All capital letters in the original).

38. On 3-25-2019 Complainant Carlson met with Defendant Roth to discuss the first anonymous letter. Ms. Roth assured Complainant Carlson that an investigation would be started to determine the identity of the person who left the note. Complainant Carlson is informed and believes there are monitoring cameras in the area of the mailboxes but that Roth never checked the camara footage.

39. On 4-10-2019 Complainant Carlson received a second anonymous handwritten letter in his company mailbox. The handwriting on the second letter matched the first letter. In part the second letter the author demanded "LEAVE SFO BEFORE YOU GET FIRED OR THROWN OUT – I HEAR THE PRIVATE INVESTIGATIVE TEAM HAS YOU #1 ON THE LIST OF MAFIA SUSPECTS?? THE HAMMER'S COMING DOWN BE -BEWARE.

40. As with the first, Complainant Carlson delivered the second letter to Defendant Roth requesting that he be protected from the ongoing harassment of the letters. But it was not only the letters that Complainant Carlson was reporting to Roth. Complainant Carlson also made complaints regarding the harassing, inappropriate, bullying he was receiving from his colleagues on UA's social media posts. Specifically, on 4-18-2019, Complainant Carlson provided the names of FAs Debbie Suarez Akel and Sheila Connors Ramirez as potential authors of the first two letters. Complainant Carlson had reason to suspect both Akel and Ramirez who were posting angry messages on UA's social media posts.

41. On 4/19/2019, realizing that he hadn't heard back from Roth regarding any type of investigation or the results thereof, Complainant Carlson again reached out to Roth requested information regarding the investigation and stating "I'm having a difficult time coming to work, because of all the stress and anxiety. I don't know if the severity of the note is being examined here, correctly. I am dropping trips left and right because the impact the notes left on me is making it hard for me to want to work, … For me to be threatened at my place of work in a secured area of the airport should have never happened. At this point to no resolve, almost a month later I'm worried nothing will come of the investigation." Of course, what Complainant Carlson did not know at the time was that UA and his Union were investigating him, not the FAs leaving him threatening notes.

42. UA and Roth failed to respond to Complainant Carlson's inquiry.

43. On 4-24-2019 Complainant Carlson received a third threatening anonymous letter in his company mailbox, matching the handwriting to the previous two. This letter demanded to know "WHEN THE FUCK ARE YOU GONNA GO AWAY?" Complainant Carlson dropped off this note at Roth's office with a note asking "what is the company doing to protect me? Are they trying to figure out who did this?"

44. On 4-25-2019, Complainant Carlson received a text message firm Roth essentially stating that it was going to take more time and that they were still investigating. She did not state exactly what they were investigating.

45. On 5-13-2019 Complainant Carlson become aware of a document being sent around to UA's FA population nicknamed the 'Tricky Trader List' where his name appeared in bold 3 different times on this two page list. At some point later Complainant Carlson also learned that his name appear on a short "Asshole List".

46. On 5-14-2019 Complainant Carlson found a fourth anonymous letter in his company mailbox, handwriting matching the previous 3 letters. Again Complainant Carlson submitted this letter to Roth in HR with a text message stating that he did not feel safe at work. The content of the fourth letter was particularly egregious calling Complainant Carlson "A LITTLE BOY" and "HEARD YOU WENT SCREAMING LIKE A LITTLE GIRL TO A SUPERVISOR FOR 'PROTECTION' THE LAST LETTER YOU GOT. TIME TO MOVE ALONG LITTLE BOY!!" The letter also made it clear that Complainant Carlson should be very careful of where he parks his car.

47. Nor were they letters the only way that the FAs let Complainant Carlson know that he was a target. On a UA social media post Kathy Clements wrote "Devin Carlson you do know that most of us know your name by now?"

48. Defendant McGee told FAs to "spread the word" about Complainant Carlson being on the list of junior Mafia.

49. At the same time, other FAs were promoting trading groups and asking for particular destinations, none of whom were part of the alleged "Mafia". For example when Roger Fadrsaer posted that he was looking for a London trip on certain days in July, Julie Humphreys Magowan responded "have you joined the other united trading groups as well? Lots of options out there to put the word out!" to which Jona Magadan responded "can U add me to the other groups [many emojis]."

50. Complainant Carlson is friends with FA Morgan Guist to whom he had lent $50.00 at the Disney store. On 6-17-2019 Morgan went on to Complainant Carlson's Venmo account and paid him back $50.00. Sometime later at the end of July or beginning of August Complainant Carlson noticed that "Minori Tanaka, Juliana Petani" "liked [with the use of a heart emoji]" this Venmo payment. In fact, this payment was again "liked" by "Minori Tanaka, JP PJ [Juliana Petani's initials forward and backward]", then again by "JP PJ @Mademoiselle_pj".

51. Although at the time Complainant Carlson did not know who Juliana Petani was, this strange sequence of "likes" for a minor payment by one of his friends from somebody he did not know felt harassing. On 8-1-2019 Complainant Carlson sent an email to Roth explaining that Petani, whom Complainant Carlson discovered was a UA employee, was harassing him online. Still in the dark as to the real purpose of the investigation, Complainant Carlson's email to Roth states his fear that "I am being targeted by a supervisor [Petani] with whom I have never interacted".

52. Roth failed to respond to this email. However, and suspiciously, on 8-3-2019 Petani blocked Complainant Carlson from her Venmo account. In the meantime, Complainant Carlson had taken some screenshots of Petani's Venmo account showing that Petani was receiving payment from other FAs with emojis that UA's McKeen had identified as meaning transfer money. For example, on December 21, 2018, Roland Guti paid Petani with a speech balloon, a heart and a rabbit. Paula Leslie-Ann Brown paid Petani on December 20, 2018 with the words "Hong Kong", a world emoji, a heart and a speech balloon, and Daniel Rodriguez charged Petani for "Chinese prostitution" with the world emoji, two hearts and a speech balloon. All of this was transmitted to Roth as she had led Complainant Carlson to believe Roth / UA's human resources department had commenced an investigation to protect Complainant Carlson. In fact, the so-called investigation was geared towards terminating Complainant Carlson.

53. In an email on 8-2-2019 Complainant Carlson reiterated that he was "distress that nothing is being done to help protect me in the workplace." Complainant Carlson also made clear that the letters appeared to him as harassment and discrimination based on sexual preference, homosexuality. Complainant Carlson reported to Roth that when he picked up his vehicle the tires on his vehicle were all low on air.

54. The reference to Complainant Carlson's sexuality is not limited to the anonymous letters. For example, when Zach Ketchum posted that he was traveling to Singapore from SFO, Rhonda Short Brown responded "Devin is treating you good". Mr. Ketchum's sexuality is unknown but the post implies that Carlson and Ketchum know each other and that Ketchum's trip is tied directly to Complainant Carlson, which was not the case.

### C. UA's Pretextual And Discriminatory Termination of Carlson

55. UA cited "parking" as a basis for Claimant's termination. This was pretext.

56. On 9-12-2019 UA hand-delivered to Complainant Carlson a letter stating that a meeting would be conducted on the same day at 08:30 at the SFO Flight Operations Conference Room which required his attendance. It was indicated the purpose of the meeting was to "investigate your trip trade activity from April 2019 to present." No other warning was provided.

57. About 30 minutes before the start of the meeting, voluminous papers were handed to Complainant Carlson. UA's representatives stated that the documents reflected Complainant Carlson's trip trades. But the way the data was arranged made no sense and could not be correlated or understood in the half hour before the meeting. In fact, the documents did not reflect raw data and were not organized in any fashion. According to the heading of the document this information was "United Airlines – Corporate Security Analytics, 2019 Flight Attendant Trip Trading, All Pairing History, 4/1/19 – 6/30/19".

58. The word "analytics" means the systematic computation analysis of data or statistics or information resulting from systematic analysis of data or statistics. As such, Complainant Carlson was not given raw data – a document that merely showed all of his trades (and

-9-

no one else's) but an analysis of how UA had interpreted the raw data. To this day Complainant Carlson has not been provided a straight forward list of his trips.

59. Both the presentation at the 9-12-2019 meeting as well as the 10-14-2019 Termination Decision significantly omit or rearrange data to make Carlson's Trip Trades appear as if he were "parking" when in fact they are trades for which Complainant Carlson always had the consent of the other FA with whom he was trading and were trades made with an intent to work the trip. By way of example not limitation, UA presented the pairing F9XIA – position FA01 for flights 968 and 969 from SFO to AMS (Amsterdam) departing April 20th and retuning April 22nd. UA evaluated the trade of this trip as "parking" because Complainant Carlson took the trip from FA Pamela Goynes and 13 hours and 51 minutes later dropped the trip back onto Goynes' line. Carlson still ended up working the trip but because the trip went back and forth from Goynes to Carlson, from Carlson to Goynes and then back to Carlson UA concluded that Carlson must've been parking to facilitate other trades. Not at all true. What was not reflected in the "analytics" is the fact that Complainant Carlson was trying to figure out whether the accommodations during the trip would be downtown Amsterdam or in Hague, a City about an hour away. When Complainant Carlson realized the accommodations would be in Hague he decided he wanted to wait for another trip where he would be staying downtown. But then he spoke to Goynes who told him his information was incorrect and that the accommodations would be in City Central. Complainant Carlson then took the trip back and worked the trip. There was no "parking" whatsoever and Complainant tried to explain this to UA's interrogators who were unwilling to listen because UA's real agenda was to terminate Carlson based on his sexuality for which he was "hated" by the other FAs.

60. The irony as to the Amsterdam trip is that not only did Carlson work the trip, get fired even though he worked the trip but after having worked the trip Complainant had to suffer social media shaming about being "lucky" and "fast finger" in obtaining the trip. In this particular case, neither was true. Complainant had simply given the trip back to Goynes because he was concerned about the accommodation.

61. In response to harassing social media posts Complainant Carlson remained calm stating: "Oscar Colocho hi! Yes, the hotel I had on my AMS trip was lovely … One thing I am curious about, we are not friends on FB, nor are we in any capacity, friends. How did you know what hotel I stayed at on my layover, and why are you mentioning my name in any capacity on a Facebook thread. I find that quite disturbing."

62. In violation of the FEHA, UA never investigated Carlson's complaints regarding hate mail partly based on Carlson's sexuality or ever try to correct continued harassment of Carlson.

**Additional Complaint Details**: Complainant was harassed, discriminated against and retaliated against in violation of the FEHA, including without limitation, in terms and conditions of his employment and was terminated due to being a member of protected categories. Complainant was retaliated against for requesting an investigation of on-going harassment based on his sexuality. Respondent UA retaliated against Complainant for pursuing his right to demand an

investigation and for requesting protection against continued harassment based on sexual orientation and in Carlson demand that he enjoy a workplace free from FEHA violations. In addition, UA failed to prevent FEHA violations from occurring and failed to investigate and/or correct FEHA violations.

**Complainant:**
Devin Carlson
4020 Utah Street, Apt #6
San Diego, CA 92104
401-932-7035
DevinCarlson.J@hotmail.com

**Right to Sue:**
I, Devin Carlson, am represented by Sohaila Sagheb of the Law Office of Sohaila Sagheb and I hereby request a Notice of Case Closure and Right to Sue.

**VERIFICATION**

I, Devin Carlson, am the Complainant in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On May 20, 2021, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in the County of San Diego, State of California

_____
DEVIN CARLSON

# EXHIBIT B



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

December 15, 2020

**Via Email**
devincarlson.j@hotmail.com

Devin Carlson
42 Lake Meadow Drive
Daly City, California 94015

RE:    **Notice Case closure and Right to Sue**
       **Case Number**: 201909-07562815
       **Case Name**: Carlson / United Airlines

Dear Devin Carlson:

The Department of Fair Employment and Housing (DFEH) has closed your case for the following reason: **Insufficient Evidence**. Based upon its investigation, the DFEH is unable to conclude that the information obtained establishes a violation of the statute. This does not certify that the respondent is in compliance with the statute. No finding is made as to any other issues that might be construed as having been raised by this complaint.

**This is your Right to Sue notice.** According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act (FEHA) against the person, employer, labor organization or employment agency named in the above-referenced complaint. This is also applicable to DFEH complaints that are filed under, and allege a violation of, Government Code section 12948, which incorporates Civil Code sections 51, 51.7, and 54. The civil action must be filed within one year from the date of this letter. However, if your civil complaint alleges a violation of Civil Code section 51, 51.7, or 54, you should consult an attorney about the applicable statutes of limitation.

Your complaint is **not dual filed** with the United States Equal Employment Opportunity Commission (EEOC). To obtain a federal Right to Sue notice, you must visit the EEOC to file a complaint within 30 days of receipt of this letter or within 300 days of the alleged discriminatory act, whichever is earlier.

Within 10 days of receiving this letter, you may appeal this decision by emailing appeals@dfeh.ca.gov; by calling our Communication Center at 800-884-1684 (voice), 800-700-2320 (TTY) or California's Relay Service at 711; or by writing to:

Appeals Unit
Department of Fair Employment and Housing
2218 Kausen Drive, Suite 100
Elk Grove, CA 95758

Your appeal should include a 1) summary as to why you disagree with the reason; and/or, 2) any new detailed information (e.g., documents, records, witness information) that supports your claim. If you appeal, the information you provide will be carefully considered.

Although the DFEH has concluded that the evidence and information did not support a finding that a violation occurred, the allegations and conduct at issue may be in violation of other laws. You should consult an attorney as soon as possible regarding any other options and/or recourse

Notice of Case Closure and Right to Sue
December 15, 2020
Page **2** of **2**

you may have regarding the underlying acts or conduct.

Should you decide to bring a civil action on your own behalf in court in the state of California under the provisions of the FEHA against the person, employer, labor organization or employment agency named in your complaint, below are resources for this. Please note that if a settlement agreement has been signed resolving the complaint, you may have waived the right to file a private lawsuit.

<u>**Finding an Attorney**</u>
To proceed in Superior Court, you should contact an attorney. If you do not already have an attorney, the organizations listed below may be able to assist you:

- The State Bar of California has a Lawyer Referral Services Program which can be accessed through its Web site at www.calbar.ca.gov, or by calling (866) 442-2529 (within California) or (415) 538-2250 (outside California).

- Your county may have a lawyer referral service. Check the Yellow Pages of your telephone book under "Attorneys."

<u>**Filing in Small Claims Court**</u>
- The Department of Consumer Affairs (DCA) has a publication titled "The Small Claims Court: A Guide to Its Practical Use" online at http://www.dca.ca.gov/publications/small_claims. You may also order a free copy online, by calling the DCA Publication Hotline at (866) 320-8652, or by writing to them at: DCA, Office of Publications, Design and Editing, 1625 North Market Blvd., Suite N-112, Sacramento, CA 95834.

- The State Bar of California has information on "Using the Small Claims Court" under the "Public Services" section of its Web site located at www.calbar.ca.gov.

Sincerely,

*Clara Hernandez*

Clara Hernandez
Consultant III (Specialist)
661-395-2973
clara.hernandez@dfeh.ca.gov

Cc:
United Airlines
C/o Megan Detzner
233 South Wacker Drive, 11th Floor
Chicago, IL 60606
Via Email: megan.detzner@united.com

# EXHIBIT C



# CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
## RIGHT-TO-SUE

Your submission of this document acknowledges that you have read and agree to the DFEH's Privacy Policy. By submitting this document, you are declaring under penalty of perjury under the laws of the State of California that to the best of your knowledge all information stated is true and correct, except matters stated on information and belief, which you believe to be true.

**DFEH CASE NUMBER (IF APPLICABLE):**

**COMPLAINANT:**

NAME:
Marc Elliott Thompson

TELEPHONE NUMBER:
773-220-7094

ADDRESS:
6784 E Cedar Ave, Apt #404

EMAIL ADDRESS:
Ewr767@ aol.com

CITY/STATE/ZIP:
Denver, CO 80224

**RESPONDENT:**

NAME:
United Airlines, Inc.

TELEPHONE NUMBER:
1-800-864-8331

ADDRESS:
San Francisco International Airport, Terminal 3

CITY/STATE/ZIP:
San Francisco, California 94128

NUMBER OF EMPLOYEES: <5,000          TYPE OF EMPLOYER: Airline

**ADD CO-RESPONDENT:**

NAME: Ben Benson, United Airlines Security Investigator

TITLE: Security Investigator

ADDRESS: San Francisco International Airport, Terminal 3

San Francisco, California 94128

TELEPHONE NUMBER: 1-800-864-8331

**ADD CO-RESPONDENT:**

NAME:

TITLE:

ADDRESS:

TELEPHONE NUMBER:

**DATE OF HARM:**

LAST DATE OF HARM (Month/Day/Year): 08/29/2019

1.  I ALLEGE THAT I EXPERIENCED: ☑ Discrimination    ☑ Harassment

**BECAUSE OF MY ACTUAL OR PERCEIVED:**

☐ Age (40 and over)

☐ Ancestry

☐ Association with a member of a protected class

☐ Color

☐ Criminal History

☑ Disability (physical or mental)

☐ Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Gender Identity or Expression

☐ Genetic Information or Characteristic

☐ Marital Status

☑ Medical Condition (cancer or genetic characteristic)

☐ Military and Veteran Status

☐ National Origin (includes language restrictions)

☐ Race

☐ Religious creed (includes dress and grooming practices)

☐ Sex/Gender

☐ Sexual harassment – hostile environment

☐ Sexual harassment – quid pro quo

☐ Sexual orientation

☐ Other (specify) _____

**AS A RESULT, I WAS:**

☐ Asked impermissible non-job-related questions

☐ Demoted

☐ Denied accommodation for pregnancy

☐ Denied accommodation for religious beliefs

☐ Denied any employment benefit or privilege

☐ Denied employer paid health care while on pregnancy disability leave

☐ Denied equal pay (includes violations of the Equal Pay Act)

☐ Denied Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Denied hire or promotion

☐ Denied or forced to transfer

☑ Denied reasonable accommodation for a disability

☐ Denied the right to wear pants

☐ Denied work opportunities or assignments

☐ Forced to quit

☐ Laid off

☑ Reprimanded

☑ Suspended

☑ Terminated

☑ Other (specify) _Please see attached_____

I ALLEGE THAT I EXPERIENCED:     ☑ Retaliation

**BECAUSE I:**

☐ Participated as a witness in a discrimination or harassment complaint

☐ Reported or resisted any form of discrimination or harassment

☐ Reported patient abuse (hospital employees only)

☑ Requested or used a disability-related accommodation

☐ Requested or used a pregnancy-disability-related accommodation

☐ Requested or used a religious accommodation

☐ Requested or used Family Care or Medical Leave (CFRA) (employers of 5 or more people). Includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

**AS A RESULT I WAS:**

☐ Asked impermissible non-job-related questions

☐ Demoted

☐ Denied accommodation for pregnancy

☐ Denied accommodation for religious beliefs

☐ Denied any employment benefit or privilege

☐ Denied employer paid health care while on pregnancy disability leave

☐ Denied equal pay (includes violations of the Equal Pay Act)

☐ Denied Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Denied hire or promotion

☐ Denied or forced to transfer

☑ Denied reasonable accommodation for a disability

☐ Denied the right to wear pants

☐ Denied work opportunities or assignments

☐ Forced to quit

☐ Laid off

☑ Reprimanded

☑ Suspended

☑ Terminated

☑ Other (specify) Please see attached.

2. Do you have an attorney who agreed to represent you in this matter?  ◉ Yes   ○ No
   If yes, please provide the attorney's contact information.

**COMPLAINANT'S REPRESENTATIVE INFORMATION**

Attorney Name: Sohaila Sagheb, Esq.

Attorney Firm Name: Law Office of Sohaila Sagheb

Attorney Address: 21112 Ventura Blvd

Attorney City, State, and Zip: Woodland Hills, CA 91364

3.  Briefly describe what you believe to be the reason(s) for the discrimination, harassment, or retaliation. (Optional)

Please see attached.

## VERIFICATION PAGE – THIS PAGE MUST BE COMPLETED

**Before submitting the form, you must verify who you are and whether you are submitting this information for yourself or someone else.**

Verifier Name:   MARC ELLIOTT THOMPSON

Verifier's Relationship to Complainant:  Self

Verifier's City and State: Denver, State of Colorado

**By submitting this document, you are declaring under penalty of perjury under the laws of the State of California that to the best of your knowledge all information stated is true and correct, except matters stated on information and belief, which you believe to be true.**

## VERIFICATION

I, Marc Elliott Thompson, am the Complainant in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On May 20, 2021, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in the County of Denver, State of Colorado

_Marc Thompson_

MARC ELLIOTT THOMPSON

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

DFEH No.

**In the Matter of the Complaint of**
Marc Elliott Thompson,

Complainant,

vs.

United Airlines, Inc.
San Francisco International Airport
Terminal 3
San Francisco, California 94128

United Airlines, Inc. Employees:
Ben Benson, Security Investigator
c/o United Airlines, Inc.
San Francisco International Airport
Terminal 3
San Francisco, California 94128

Respondents.

1.  Complainant Marc Elliott Thompson ("Complainant") was hired as a Flight Attendant ("FA") by Continental Airlines ("Continental") in or about 2000.

2.  In or about 2010 United Airlines, Inc. ("UA") merged with Continental and Complainant because a UA employee.

3.  In or about 2018 UA merged its existing FA crews with the FA crews it had inherited from Continental.

4.  Respondent United Airlines, Inc. is an employer subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

5.  Respondent Ben Benson is a UA employee / agent whom Complainant is informed and believes was part of the group of UA employees who harassed Complainant and/or committed the infractions identified herein as an employee/agent of UA, including invasion of privacy.

-1-
Complaint – DFEH

6. At all relevant times, Complainant was employed by UA at the San Francisco International Airport. UA operated and made all employment decisions affecting Complainant's employment in the County of San Francisco, State of California.

**A. UA's Mandatory Approval of Complainant's Family Medical Leave Act Request**

7. On or about November and December 2018 Complainant submitted to Respondent UA the necessary documentation related to his request for periodic leave pursuant to the Family Medical Leave Act. This medical documentation stated that Plaintiff suffered from HIV, depression and anxiety which caused gastrointestinal issues, including recurrent explosive diarrhea lasting multiple days.

8. On or about 12-30-2018 UA approved intermittent FMLA leave by Complainant to address his medical and mental health issues as certified by his physician.

9. As will be seen, Complainant was then discriminated against, harassed and terminated because of Complainant's medical and mental health conditions and retaliated against for having exercised his right to obtain and for having obtained family medical leave approval.

**B. Tricky Traders List.**

10. Complainant's employment with UA was subject to the 2016 – 2021 Flight Attendant Agreement pursuant to a collective bargaining agreement ("JCBA"). The Union was recognized by UA as the collective bargaining representative of the UA FAs to represent the employees in matters pertaining to the JCBA such as rates of pay, rules and working conditions, all in accordance with the Railway Labor Act.

11. Pursuant to the JCBA no FA was subject to termination without just cause and discipline of FAs was progressive.

12. In the time period relevant herein, 2018-2019, UA's policies and practices liberally allowed FAs to trade flight assignments ("pairings" or "trips"). This practice was documented at JCBA 7.J.1 and provides "Flight Attendants will have unlimited trip trades with, and pick ups from, open time in their Base, and unlimited trip trades with other Flight Attendants in their Base subject to the provisions of Paragraph I. above." This Policy is referred to herein as the "Trip Trading Policy" or "Trading Policy".

13. Pre-merger UA's Trip Trading Policy was restrictive. It allowed a FA to trade with another FA and once the trade was complete each FA was then obligated to work the flight they had traded.

14. Pre-merger Continental's Trip Trading Policy was liberal permitting FAs to make as many trades as they wanted and which would suit their schedules. For example, Complainant and FA Hannah Michal Fadida both reside in Denver but work out of the SFO. The incentive for some of their trades was to decrease the number of times they had to fly back-and-forth between Denver and San Francisco. Continental's Trip Trading Policy allowed as many trades as the FA needed to create a schedule they preferred.

15. With the merger UA adopted the liberal Trading Policy of Continental.

16. There was no express rule that prohibited FAs from picking up and trading flight assignments for the purpose of obtaining more preferable, profitable or favored flight assignments. Complainant admitted to engaging in the practice of selecting and trading flight assignments to obtain increasingly more suitable schedule consistent with weather and his health condition. In addition, preferences could include positions worked on the flight (FA01, FA02, etc.), the destinations, the accommodations at the destination, the pay rate and hours counted as working hours, and other factors personal to each FA. For example, some FAs have families and need to be home for blocks of time, others can travel without going home for weeks at a time. Many factors went into trading trips and the key to successful trading was doing it frequently and being fast – much the same as college kids vying for seats in classrooms. As for Complainant, he used the liberal Trip Trading Policy as a means of accommodating his disability.

17. Senior and existing UA employees were less apt in the art of electronic trading than the former Continental employees who had, for years, engaged with the software to achieve the trip trades they wanted or needed. This created a chasm between existing UA employees and the new UA employees / former Continental employees. Social media postings started to reflect this chasm with the senior UA FAs calling the newly adopted FA's "Mafia traders", unethical, unfair and worse.

18. In March 2019 Douglas McKeen, Senior Vice President Labor Relations issued a statement of concern regarding "the growing problem of selecting, trading or parking at pairing to broker, buy or sell it to another flight attendant."

19. On or about 5-21-2019 FA Akel complained "It's been 5 months since the merger. ENOUGH" and "There's more intl flying and I'm more senior since the merger and there's nada intl trips" to which FA Dana Merritt responded "What's going on is totally wrong and **unethical** …we need to get the Mafia members names out there .. it's just a matter of time [thumbs down emoji]!! … *Start that list now*." Thus was born the "Tricky Trader List". Complainant, a former Continental employee who was frequently trading to accommodate his health condition was named a "Tricky Trader", along with 53 other FAs.

20. This dispute gave UA the pretext it needed to terminate Complainant's employment in violation of his rights under the FEHA.

C. **UA's Pretextual and Discriminatory Termination of Complainant**

21. On 8-14-2019, Complainant received a letter of investigation from UA stating that a mandatory meeting would be held on the same day. During the meeting Complainant was questioned about the exercise of his right to trade his trips.

22. Despite having obtained FMLA leave and having disclosed his disabilities to UA, UA had never engaged Complainant in any interactive process or offered any accommodation.

-3-
Complaint – DFEH

23. Complainant used his ability to freely Trade Trips to accommodate his disability. When he was not feeling well, and knowing the limited paid time provided by FMLA, Complainant accommodated his disability by Trading Trips or just dropping them into UA's Crew Communications Systems ("CCS") where they could be picked up by other FAs.

24. Thirty minutes before the 8-4-2019 meeting Complainant was handed a matrix of Trip Trades consisting of thousands of trip trades. Complainant could not read, comprehend, or understand this document which had been generated by corporate security within the 30 minutes allotted prior to the meeting. Complainant had never seen such a matrix in his 19 years and 4 months as a FA.

25. The matrix purported to represent Trip Trades beginning in April of 2019 through August of 2019. But the trips were in no particular order.

26. Although during the meeting Complainant learned that UA had pre-selected specific trips they wanted to discuss, that information was not shared with Complainant before the meeting. Complainant was only given a massive amount of seemingly unorganized data based on the pretense that would be sufficient to "prepare" for the meeting.

27. At the 8-4-2019 meeting Complainant was asked questions about specific Traded Trips that had occurred over the course of 5 months. Complainant did his best, given the limited time to process and decipher the confusing language presented at meeting, to provide answers to UA's questions about the specific purpose of each Trip Trade.

28. During the meeting, Complainant was told that he was not being honest about the information he provided, and that he must know more about either his or the Trip Trading activity of others. Complainant said he was trying to answer the questions based on his recollection. Complainant at all times denied trading or parking trips to broker, buy or sell trips.

29. Complainant was then asked to provide his phone to the investigator and told that if he failed to do so that would be looked upon as Complainant had something to hide from UA. Although feeling invaded, Complainant felt he had no option but to permit Ben Benson, UA's security investigator, to examine his phone. Benson admitted that he found no evidence of Complainant's alleged coordinating, parking, or bartering of trips on his device.

30. Again Complainant was accused of not being honest about his Trip Trade practices. But Complainant had given not only his recollections but attempted to explain his circumstances, to wit, that he used trading of trips to accommodate his disability and that because he commuted from Denver to SFO sometimes weather conditions did not permit him to work a trip he had intended to work.

31. UA intentionally withheld information that would have been useful in determining the reasons behind specific trades by Complainant. United did not provide meteorological information, non-revenue loads, or check-in times for the specific trips Complainant

-4-

was questioned about. This would have allowed Complainant to better recall the specific trips in question, and the reasons for trading those specific trips. By way of example rather than limitation, one of the Trade Trips being questioned was on 4-10-2019. Had Complainant remembered or been told there was a blizzard warning for Denver on that day, he would have known that he dropped the trip on that day because of resulting congestion and cancelled flights the morning he was departing to San Francisco.

32. By way of another example, Complainant's Termination Letter discusses paring F6014 PVG (Shanghai) on 4-4-2019.  Complainant learned after his meeting that this was a commuting issue due to load factors and check-in times which would not have allowed Complainant to report for duty on time for the trip departing 4-4-2019.

33. UA knew that Complainant would not recall the details of each specific trade and used this meeting as the basis for terminating Plaintiff based on the pretext that his trades were "tricky", which they were not. In fact, Complainant's Trip Trades were well within his rights and compliant with his contractual obligations to UA.

34. Despite the fact that the JCBA calls for progressive discipline, Complainant was subsequently fired by UA because he had requested and received approval of FMLA, because of his disability, in retaliation for having reported his disability and sought accommodation.

35. In the process Complainant's privacy was invaded by Ben Benson, on behalf of UA when Complainant was forced to surrender his phone for inspection by Benson on behalf of UA.

**Additional Complaint Details**: Complainant was harassed, discriminated against and retaliated against in violation of the FEHA, including without limitation, in terms and conditions of his employment and was terminated due to being a member of protected categories. Complainant was retaliated against for having obtained FMLA status and for using the permitted trip trading policies and practices to accommodate his disabilities. Respondent UA retaliated against Complainant for pursuing his FEHA rights including his right to be free from FEHA violations, to seek and obtain reasonable accommodation and to engage in an interactive process and due to being a member of protected categories. In addition, UA failed to prevent FEHA violations from occurring and failed to investigate and/or correct FEHA violations.

**Complainant:**
Marc Elliott Thompson
6784 E Cedar Ave, Apt #404
Denver, CO 80224
773-220-7094
Ewr767@aol.com

**Right to Sue:**
I, Marc Elliott Thompson, am represented by Sohaila Sagheb of the Law Office of Sohaila Sagheb and I hereby request a Notice of Case Closure and Right to Sue.

**VERIFICATION**

I, Marc Elliott Thompson, am the Complainant in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On May 20, 2021, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed in the County of Denver, State of Colorado

_____

MARC ELLIOTT THOMPSON

# EXHIBIT D



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency _____ GAVIN NEWSOM, GOVERNOR

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING
KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

June 8, 2021

RE:     **Notice of Filing of Discrimination Complaint**
        DFEH Matter Number: 202106-13808408
        Right to Sue: Thompson / United Airlines, Inc. et al.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Department of Fair Employment and Housing (DFEH) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for DFEH's Small Employer Family Leave Mediation pilot program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Government Code section 12945.2, has the right to participate in DFEH's free voluntary mediation service. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in DFEH's free voluntary mediation service. A request for mediation must be made within 30 days of receipt of the Notice of Case Closure and Right to Sue. If mediation is requested, the employee is prohibited from filing a civil action until mediation is complete. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from DFEH's receipt of a mediation request under section 12945.21 until mediation is complete.  To request DFEH Small Employer Family Leave Mediation, email DRDOnlinerequests@dfeh.ca.gov and include the DFEH matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to DFEH is requested or required.

Sincerely,


Department of Fair Employment and Housing

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                          KEVIN KISH, DIRECTOR
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

June 8, 2021

Marc Thompson
6784 East Cedar Ave., Apt. 404
Denver, CO 80224

RE:     **Notice of Case Closure and Right to Sue**
        DFEH Matter Number: 202106-13808408
        Right to Sue: Thompson / United Airlines, Inc. et al.

Dear Marc Thompson:

This letter informs you that the above-referenced complaint filed with the Department of Fair Employment and Housing (DFEH) has been closed effective June 8, 2021 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for DFEH's Small Employer Family Leave Mediation pilot program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Government Code section 12945.2, has the right to participate in DFEH's free voluntary mediation service. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in DFEH's free voluntary mediation service. A request for mediation must be submitted to the DFEH within 30 days of receipt of the Notice of Case Closure and Right to Sue. If mediation is requested, the employee is prohibited from filing a civil action until mediation is complete. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from DFEH's receipt of a mediation request under section 12945.21 until mediation is complete.  To request DFEH Small Employer Family Leave Mediation, email DRDOnlinerequests@dfeh.ca.gov and include the DFEH matter number indicated on the Right to Sue notice.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency    GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | Email: contact.center@dfeh.ca.gov

Department of Fair Employment and Housing

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Marc Thompson                                    DFEH No. 202106-13808408

Complainant,

vs.

United Airlines, Inc.
San Francisco International Airport, Terminal 3
San Francisco, CA 94128

Ben Benson, United Airlines Security Investigator
San Francisco International Airport, Terminal 3
San Francisco, CA 94128

Respondents

_____

1. Respondent **United Airlines, Inc.** is an **employer United Airlines, Inc.** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

2. Complainant is naming **Ben Benson, United Airlines Security Investigator** individual as Co-Respondent(s).

3. Complainant **Marc Elliott Thompson**, resides in the City of **Denver**, State of **CO.**

4. Complainant alleges that on or about **August 29, 2019**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's disability (physical or mental), medical condition (cancer or genetic characteristic).

**Complainant was discriminated against** because of complainant's disability (physical or mental), medical condition (cancer or genetic characteristic) and as a result of the discrimination was terminated, reprimanded, suspended, denied reasonable accommodation for a disability, other.

-1-
*Complaint – DFEH No. 202106-13808408*

Date Filed: June 8, 2021

**Complainant experienced retaliation** because complainant requested or used a disability-related accommodation and as a result was terminated, reprimanded, suspended, denied reasonable accommodation for a disability, other.

**Additional Complaint Details:** See Attached

-2-

*Complaint – DFEH No. 202106-13808408*

Date Filed: June 8, 2021

VERIFICATION

I, **Marc Elliott Thompson**, am the **Complainant** in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On June 8, 2021, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Denver, Colorado**

-3-
*Complaint – DFEH No. 202106-13808408*

Date Filed: June 8, 2021 .



# CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
## RIGHT-TO-SUE

Your submission of this document acknowledges that you have read and agree to the DFEH's Privacy Policy. By submitting this document, you are declaring under penalty of perjury under the laws of the State of California that to the best of your knowledge all information stated is true and correct, except matters stated on information and belief, which you believe to be true.

**DFEH CASE NUMBER (IF APPLICABLE):**
202106-13808408

**COMPLAINANT:**

NAME:
Marc Elliott Thompson

TELEPHONE NUMBER:
773-220-7094

ADDRESS:
6784 E Cedar Ave, Apt #404

EMAIL ADDRESS:
Ewr767@ aol.com

CITY/STATE/ZIP:
Denver, CO 80224


**RESPONDENT:**

NAME:

United Airlines, Inc.

TELEPHONE NUMBER:
1-800-864-8331

ADDRESS:

San Francisco International Airport, Terminal 3

CITY/STATE/ZIP:

San Francisco, California 94128

NUMBER OF EMPLOYEES: <5,000          TYPE OF EMPLOYER: Airline

JUN 0 8 2021

DFEH-IF903-7X-ENG                    2                    JANUARY 2021

**ADD CO-RESPONDENT:**

NAME: Ben Benson, United Airlines Security Investigator

TITLE: Security Investigator

ADDRESS: c/o San Francisco International Airport, Terminal 3

San Francisco, California 94128

TELEPHONE NUMBER: 1-800-864-8331

**ADD CO-RESPONDENT:**

NAME:

TITLE:

ADDRESS:


TELEPHONE NUMBER:


**DATE OF HARM:**

LAST DATE OF HARM (Month/Day/Year):   08/29/2019

1.  I ALLEGE THAT I EXPERIENCED: ☑ Discrimination    ☑ Harassment

**BECAUSE OF MY ACTUAL OR PERCEIVED:**

☐ Age (40 and over)

☐ Ancestry

☐ Association with a member of a protected class

☐ Color

☐ Criminal History

☑ Disability (physical or mental)

☐ Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Gender Identity or Expression

☐ Genetic Information or Characteristic

☐ Marital Status

☑ Medical Condition (cancer or genetic characteristic)

☐ Military and Veteran Status

☐ National Origin (includes language restrictions)

☐ Race

☐ Religious creed (includes dress and grooming practices)

☐ Sex/Gender

☐ Sexual harassment – hostile environment

☐ Sexual harassment – quid pro quo

☐ Sexual orientation

☐ Other (specify) _____

**AS A RESULT, I WAS:**

☐ Asked impermissible non-job-related questions

☐ Demoted

☐ Denied accommodation for pregnancy

☐ Denied accommodation for religious beliefs

☐ Denied any employment benefit or privilege

☐ Denied employer paid health care while on pregnancy disability leave

☐ Denied equal pay (includes violations of the Equal Pay Act)

☐ Denied Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Denied hire or promotion

☐ Denied or forced to transfer

☑ Denied reasonable accommodation for a disability

☐ Denied the right to wear pants

☐ Denied work opportunities or assignments

☐ Forced to quit

☐ Laid off

☑ Reprimanded

☑ Suspended

☑ Terminated

☑ Other (specify) Please see attached _____

**I ALLEGE THAT I EXPERIENCED:**    ☑ Retaliation

**BECAUSE I:**

☐ Participated as a witness in a discrimination or harassment complaint

☐ Reported or resisted any form of discrimination or harassment

☐ Reported patient abuse (hospital employees only)

☑ Requested or used a disability-related accommodation

☐ Requested or used a pregnancy-disability-related accommodation

☐ Requested or used a religious accommodation

☐ Requested or used Family Care or Medical Leave (CFRA) (employers of 5 or more people). Includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

**AS A RESULT I WAS:**

☐ Asked impermissible non-job-related questions

☐ Demoted

☐ Denied accommodation for pregnancy

☐ Denied accommodation for religious beliefs

☐ Denied any employment benefit or privilege

☐ Denied employer paid health care while on pregnancy disability leave

☐ Denied equal pay (includes violations of the Equal Pay Act)

☐ Denied Family Care or Medical Leave (CFRA) (employers of 5 or more people) includes Pregnancy, childbirth, breastfeeding, and/or related medical conditions; baby bonding; care for self or child, parent, grandparent, sibling, spouse, or domestic partner.

☐ Denied hire or promotion

☐ Denied or forced to transfer

☑ Denied reasonable accommodation for a disability

☐ Denied the right to wear pants

☐ Denied work opportunities or assignments

☐ Forced to quit

☐ Laid off

☑ Reprimanded

☑ Suspended

☑ Terminated

☑ Other (specify) <u>Please see attached.</u>

2. Do you have an attorney who agreed to represent you in this matter? ⦿ Yes ○ No
   If yes, please provide the attorney's contact information.

**COMPLAINANT'S REPRESENTATIVE INFORMATION**

Attorney Name: <u>Sohaila Sagheb, Esq.</u>

Attorney Firm Name: <u>Law Office of Sohaila Sagheb</u>

Attorney Address: <u>21112 Ventura Blvd</u>

Attorney City, State, and Zip: <u>Woodland Hills, CA 91364</u>

3. Briefly describe what you believe to be the reason(s) for the discrimination, harassment, or retaliation. (Optional)

Please see attached.

## VERIFICATION PAGE – THIS PAGE MUST BE COMPLETED

**Before submitting the form, you must verify who you are and whether you are submitting this information for yourself or someone else.**

Verifier Name:   MARC ELLIOTT THOMPSON

Verifier's Relationship to Complainant:  Self

Verifier's City and State: Denver, State of Colorado

**By submitting this document, you are declaring under penalty of perjury under the laws of the State of California that to the best of your knowledge all information stated is true and correct, except matters stated on information and belief, which you believe to be true.**

# EXHIBIT E



Sent via FedEx: 7761 0560 4412

August 28, 2019

Yonah Segal
22542 Catania
Laguna Hills CA 92653

Termination Decision

Dear Ms. Segal,

On August 16, 2019, you were issued a Letter of Investigation (LOI) and a meeting was held that day. You were present and represented by AFA Council 11 Representatives Wendell Soohoo. Corporate Security Senior Manager Ben Brenson led the investigatory meeting. Also, present at this meeting was AFA representative Christopher Burton, Human Resources Manager, Colleen Roth, and SFOSW Inflight Supervisor Juliana Petani. The purpose of the meeting, as stated in the LOI, was to investigate your trading activity from April 2019 to August 1, 2019.

On March 22, 2019, P. Douglas McKeen, Senior Vice President of Labor Relations, sent you, as a United Airlines Flight Attendant, a communication through your Company email account. The Inflight Update clearly states the zero-tolerance policy for "parking" trips in one's schedule or on another Flight Attendant's schedule. This Inflight Update was also published on Flying Together.

On July 26, 2019, SFO Inflight management received notification from Corporate Security that they wanted to meet with you. A meeting was scheduled on August 2, 2019 and subsequently rescheduled and held on August 16, 2019.

On August 16, 2019, you were presented with your trade history for the April 2019 bid month through August 1, 2019. Upon review of the trade history, some examples appear below:

During our meeting on August 16, 2019, you were presented with pairing F6023–position FA01 for flights 954 and 955 between San Francisco (SFO) and Tel Aviv, Israel (TLV) departing June 29th and returning July 2nd. You picked up the trip from a Flight Attendant on May 20th and twenty-eight days later you dropped the trip on Meng Ju Wu's line. Two days and nineteen hours later, Wu dropped the trip on your line and one day and twenty hours later, you dropped the trip on Britni Herbert's line. The trip changed hands one last time before it was flown by another Flight Attendant.

After being asked why the trip returned to your line if you did not want it or something happened precluding you from working the trip, you indicated somehow the trip got back to you and suddenly "my life changed or crew switch" and you were able to work the trip. You maintained there are a lot of factors that go into considering working a trip. After being asked if you were parking trips, you stated from the definition of parking, it was holding a trip to do "other stuff" and "(parking) is not what I do."



**UNITED**

During the fact-finding interview, after you read, word for word as stated in the contract, the definition of parking from a personal notebook you brought to the interview, you were asked, if someone had prepared you for the fact-finding interview, if you knew what you were going to be asked, and when you wrote the definition of parking in your notebook. You denied talking to anyone about the fact-finding interview or being advised of the questions being asked. You stated you wrote the definition of parking in your notebook after talking to the Union immediately prior to the start of the fact-finding interview. At that point, the Union requested a break and after you returned with the Union from the break, you stated you looked at "material," Mr. McKeen's email and the contract after the Company called you for a meeting. You were confronted with the fact that your initial response to when you wrote the definition of parking in your notebook was contrary to what you were stating after the break. You indicated you were told you weren't being honest and that was making you defensive. You then asked, "what was the question", and went on to state you did not receive any information from anyone prior to the meeting and you wrote the definition of parking in your notebook when you got the call from the Company to schedule the meeting. The meeting was scheduled on or about July 26th.

Another example of the trading transactions presented to you was pairing F6502–position FA01 for flights 863 and 870 round-trip between San Francisco (SFO) and Sydney, Australia (SYD) departing June 1st and returning June 4th. Flight Attendant Devin Carlson picked up the trip from a Flight Attendant on May 30th and eight minutes later you picked up the trip from Carlson's line. One hour and twelve minutes later you dropped the trip on Katie Gil's line and one hour and forty-four minutes later, Gil dropped the trip back on your line. One day and five hours later, you dropped the trip back to Carlson's line. The trip changed hands one more time and ultimately another Flight Attendant worked the flight.

After being presented with the SFO to SYD paring F6502–position FA01 departing June 1st, you were asked to explain why the trip was traded between you and two other Flight Attendants four times. You indicated, "I can give you the exact reason this happened" and went on to claim you were offered the trip when you were in Orange County and you always want to fly the trips you pick up. You stated although Orange County is only a fifty-minute commute you were unable to commute, implying the flights were full. You then went on to say that because of your inability to commute, you offered the trip to a fellow Flight Attendant and that Flight Attendant called you later to say she could not fly the trip. According to your statement, unbeknownst to you, the Flight Attendant was also commuting from Orange County; thus, you said to the Flight Attendant to put the trip back on your line because you were going to drive to SFO. You indicated it is "like Flight Attendant etiquette" to call and offer the trip back to the Flight Attendant that offered you a trip if you can't work the trip, before it is given to another Flight Attendant or posted on Open Time. You said you were about to drive six to seven hours to SFO when your roommate, referring to Devin Carlson, fund out you'd have to rent a car to drive to SFO, so Carlson offered to help you and took the trip. You went on to say, "I was going to fly it no matter what," but Carlson was concerned about your commute and cost of the car rental, so he took the trip. After a brief break requested by the Company, you and the Union were presented with and given ample opportunity to review the history of your non-revenue flights (April to July 2019) and the flight time details of two flights (UA404 Houston, TX (IAH) to SFO on May 29th and UA1670 SFO to Honolulu, HI (HNL) on May 30th). After the you and the Union reviewed the documents, you were confronted with the fact that the week before you traveled to Port of Spain, Trinidad and Tobago (POS) and you returned to SFO on the 29th. On the 30th you traveled from SFO to HNL; thus, your previous statement about being in Orange County, being unable to commute and drive to SFO were false as you were actually in HNL at the time. You claimed you "mixed up" the dates and was very confused. You went on to say you came back from vacation and was prepared to go to work, but you were jet lagged and tired, so you dropped the trip and later the Flight Attendant returned the trip to you. Then



you said your plan was to travel to HNL for one night and return to work the SFO–SYD, but once in HNL you changed your mind and decided you did not want to go to work anymore so you offered the trip. You claimed you were not moving trips around or facilitating trading.

As another example, you were presented with pairing F6024–position FA01 for Flights 001 and 028 round-trip between SFO and Singapore (SIN) departing June 22nd and returning June 25th. You picked up the trip from Open Time on June 18th and four days and a half later, you dropped the trip on Matthew Balangitao's line. One minute and forty-one seconds later Balangitao dropped the trip on Sean Tanabe's line and two hours and fifty-eight minutes later you picked up the trip from Tanabe's line. Thirty-eight minutes later you dropped the trip on Anna Borja's line. The trip changed hands one more time and it was ultimately flown by another Flight Attendant.

After being presented with the SFO to SIN paring F6024–position FA01 departing June 22nd, you were asked to explain why the trip was traded between you and three other Flight Attendants three times. You said, "I assume I picked it up and probably was unable to work it". After you were asked, if you couldn't work the trip why did you pick up the trip again, you said you needed to review the history of that trip. After the history of the SFO to SIN pairing F6024–position FA01 departing June 22nd was reviewed with you, you stated something happened in your personal life and you decided not to work. According to Company records, twenty-eight minutes after you dropped the trip on Balangitao's line, Flight Attendant Andre Johnson dropped a SFO–Haneda, Japan (HND) trip on your line, the trip was scheduled to depart on June 23rd. Two hours and thirty-one minutes later, you dropped the SFO–HND trip on Chelsey Madrona's line. Fifty-seven seconds later you picked-up the SFO–SIN trip from Sean Tanabe's line and thirty-nine minutes later you dropped the trip on Borja's line. Your trading transactions in this instance clearly shows you are "parking" trips to facilitate the trading of other trips.

You were, also, presented with a printed copy of your Venmo account transactions as shown on your profile between July 2019 and October 2017. At the time, the history of your account was printed, the information related to your account was publicly available based on your account settings. Amongst three of the posts presented to you, was a post/payment where Flight Attendant Matthew Balangitao made a payment to you (undisclosed amount) and the remarks read "Line Clear Club" posted on October 23, 2018. When asked about that transaction you looked at your phone and said, "I'm looking to jog my memory" and then said it was "for dinner or something." Then you stated, "I can't tell you specifically." After being asked what "Line Clear Club" means, you said, "don't know what that means" and said the comments are not specific and questioned what does your Venmo had to do with your job. You were asked and denied the comments are related to United Airlines pairings and denied ever selling or paying for a trip, you went on to state the comments have nothing to do with United Airlines pairings.

Despite the fact you denied engaging in parking, specifically allowing other Flight Attendants to park trips on your line or you parking trips on another Flight Attendant's line, the patterns presented to you during the meeting and other evidence demonstrate you are placing trips on other Flight Attendants' lines to facilitate trading ("parking").

After conducting a thorough investigation of this incident, the Company has determined you are in violation of the following Working Together Guidelines:



- Honesty: Be truthful in all communications, whether oral, written, or electronic. Maintain the confidentiality of company information and refrain from using such information for personal gain. Avoid conflicts of interest or the appearance of such conflict.
- Responsibility: Use good judgement and open communication in all decisions.
- Professionalism: Communicate and perform all duties in a safe, courteous, helpful, competent, dependable, and businesslike manner. Act in ways that reflect favorably upon the company, yourself and your peers. Fully cooperate in all company investigations.
- Information and Social Networking: In the use of Information Systems, employees must comply with all company policies, including but not limited to the Information Security Policy, Working Together Guidelines, the Ethics and Compliance Principles and the Media Relations and Communications Policy. The JCBA section 7.1 19 states that "the placement of trips on other Flight Attendant's lines to facilitate trading ("parking") is not permitted.

Additionally, it is fraudulent and unethical to withhold United Airlines property, specifically pairings, for your personal gain.

A review of your record indicates the following:

You were hired by United Airlines Inc. on April 27, 2015. Your record reflects no performance or attendance infractions.

I now turn to the appropriate penalty for your conduct. The parking of trips to initiate a trade is explicitly prohibited by JCBA Section 7.1.19 and is very serious. Your actions deprived the rest of the United Airlines Flight Attendants the opportunity and contractual right to fair, ethical, and transparent trading. No Flight Attendant should have an unfair advantage when it comes to schedule and accessing flying opportunities. Your trip trading patterns indicate that you misused Company property, property being trip pairings, by withholding such trips pairings for your specific group of chosen recipients.

Taking into consideration this egregious violation of Company policy, United Airlines is terminating your employment effective August 22, 2019.

You have already returned your Crew Badge, KCM, Cabin Key, LINK and sled.

Additionally, please be advised under the Working Together Guidelines-Pass Travel Privileges, former employees who were under disciplinary investigation at the time of their termination of employment or who were involuntarily terminated from employment are not eligible for any form of pass travel, including travel as the spouse, partner, travel companion, child, parent or buddy pass rider of an employee or retiree.

In the event that you are dissatisfied with this decision as rendered, a Step One appeal in accordance with Section 23.A.9 of the Agreement may be made within thirty (30) days to John Wolfe, Base Operational Manager – SFOSW.





If you have any questions. feel free to contact me at (650)874-6593. I wish you the best in your future endeavors.


Sincerely,

*Teressa Bellazain*

Teressa Bellazain
Supervisor. Inflight Services – SFOSW
United | San Francisco Intl. Airport - SFOSW | San Francisco, CA 94128
Tel 650-874-6593 | Fax 650-874-6511 | teressa.bellazain@united.com


CC:     PE File U 335517
        Email: yonahsegal@gmail.com
        WHQSW- Dean Whittaker
        WHQSW- Jennifer Thompson
        WHWLR- Elizabeth Cavanagh.
        SFOSW – John Wolfe
        SFOSW – Beau Brinker
        SFOSW – Scott Prickett
        AFA-MEC- Ken Diaz
        AFA-MEC- Maria Torre
        AFA-LECP- Kaitlin White
        AFA-LEC- Kelly Norton
        AFA-MEC- Legal
        FA.Processing@united.com

**CM-010**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address)*:<br>Sohaila Sagheb, SBN 144202<br>Law Office of Sohaila Sagheb<br>21112 Ventura Blvd., Woodland Hills, CA 91364<br><br>TELEPHONE NO.: 818-346-3724    FAX NO. *(Optional)*: 818-702-9916<br>ATTORNEY FOR *(Name)*: Plaintiffs Michael Ayson, et al | **FOR COURT USE ONLY**<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>**JUN 15 2021**<br><br>Sherri R. Carter, Executive Officer/Clerk of Court<br>By_____ **S. DREW** _____ Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME:

CASE NAME:
Ayson v. United Airlines, Inc., et al

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000) | [ ] **Limited** (Amount demanded is $25,000) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>*(Cal. Rules of Court, rule 3.402)* | **21STCV22789** |
| | | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[x] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [x] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify)*: 24
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 12, 2021

Sohaila Sagheb, Esq.
_____    ▶ _____
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

RECEIVED JUN 15 2021 — Filing Window